**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* Nortel Networks Inc., *et al*., Debtors.[1] | Chapter 11<br>Bankruptcy Case No. 09-10138 (KG)<br>Jointly Administered |
| Nortel Networks Inc., *et al*.,<br>        Appellants and<br>        Cross-Appellees,<br><br>    v.<br><br>Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors, *et al*.,<br>        Appellees and<br>        Contingent Cross-Appellants. | Appeals from the Bankruptcy Court<br>Civil Action No. 15-624 (LPS)<br>Civil Action No. 15-586 (LPS)<br>Civil Action No. 15-622 (LPS)<br>Civil Action No. 15-623 (LPS)<br>Civil Action No. 15-627 (LPS)<br>Civil Action No. 15-628 (LPS)<br>Civil Action No. 15-635 (LPS)<br>Civil Action No. 15-636 (LPS)<br>Civil Action No. 15-699 (LPS)<br>Misc. Action No. 15-196 (LPS)<br>Misc. Action No. 15-197 (LPS)<br>CONSOLIDATED APPEALS |

## OPENING BRIEF OF MONITOR AND THE CANADIAN DEBTORS

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
BUCHANAN INGERSOLL & ROONEY PC
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

Ken Coleman (admitted *pro hac vice*)
Jacob S. Pultman (admitted *pro hac vice*)
Laura R. Hall (admitted *pro hac vice*)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Counsel for the Canadian Debtors and Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors—Appellees and Contingent Cross-Appellants*

Dated:  January 12, 2016

---

[1]  The debtors in these chapter 11 cases and the last four digits of their respective tax identification numbers are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (US) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) (collectively, the "US Debtors").

## CORPORATE DISCLOSURE STATEMENT

On January 14, 2009, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") filed for and obtained protection under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, as amended (the "CCAA"), in the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court").  On the same day the Ontario Court appointed Ernst & Young Inc. as monitor of the Canadian Debtors in the CCAA proceedings (the "Monitor").  The Canadian Debtors and the Monitor hereby make the following disclosures pursuant to Federal Rule of Bankruptcy Procedure 8012 as appellees and contingent cross-appellants:

NNC is the direct or indirect parent of each of the other Canadian Debtors.  The Canadian Debtors and the Monitor are not aware of any publicly held company that holds 10% or more of NNC's common shares, as no filing disclosing any such holding has been made with the US Securities and Exchange Commission since at least the CCAA filing date, January 14, 2009.  Current information about holders of NNC common shares is not available due to the closure of the share transfer register on June 28, 2013.  The Ontario Securities Commission issued a permanent cease trade order on December 24, 2012, prohibiting substantially all trading in securities of both NNC and NNL, but it is not known whether shares have continued to be traded.  The Canadian Debtors and the Monitor submit that further inquiry is not practicable or reasonable in these circumstances.  The Monitor is a party in these appeals and contingent cross-appeals solely in its role as Monitor and not in its personal capacity.  The shares of Ernst & Young Inc. are owned by EY Advisory Services Inc.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS .......................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................... iv

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTIONAL STATEMENT ............................................................................ 3

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ........................... 4

STATEMENT OF THE CASE .................................................................................. 5

SUMMARY OF ARGUMENT ................................................................................ 21

ARGUMENT .......................................................................................................... 21

I.  THE BANKRUPTCY COURT HAD AUTHORITY TO MAKE AN
    EQUITABLE ALLOCATION OF THE SALES PROCEEDS ......................... 21

    A.  The Parties' Agreements Submitted Them to the Courts' Jurisdiction and
        Confirmed the Courts' Authority and Discretion to Resolve the Dispute ........... 22

    B.  The Bankruptcy Court Had the Power and Discretion Under the
        Bankruptcy Code to Make an Equitable Allocation ................................. 22

    C.  The US Debtors and Bondholders Invent a Conflict Between the  US
        Allocation Decision and Sections 1129 and 363 .................................... 24

    D.  The US Allocation Decision Is Consistent With Section 541 Because the
        Bankruptcy Court Found No Controlling Legal Basis to Identify or Value
        Each Debtor's Interest in the Shared Sales Proceeds ............................. 25

II.  THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN
     ADOPTING A MODIFIED PRO RATA ALLOCATION ............................... 28

    A.  The Bankruptcy Court's Finding That a Modified Pro Rata Allocation Is
        Fair and Equitable Was Not an Abuse of Discretion ............................... 28

        1.  Appellants Themselves Have Calculated Comparable Recoveries
            for Creditors ............................................................................... 28

        2.  The PBGC Claim and NGS and DiamondWare Sales Are
            Irrelevant .................................................................................... 29

    B.  The Bankruptcy Court Modified "Pure" Pro Rata to Accord with the Facts
        of the Case and to Respect the Way Nortel Operated ............................. 30

        1.  Exclusion of Bondholder Claims from US Debtors' Allocation
            Claims Pool Was Appropriate ...................................................... 31

        2.  Exclusion of Post-Petition Claims Was Appropriate ..................... 32

        3.  The Risk of Claims Manipulation Is Purely Speculative .............. 33

III.  MODIFIED PRO RATA ALLOCATION OF SALES PROCEEDS IS NOT
      SUBSTANTIVE CONSOLIDATION ........................................................... 33

IV.  MODIFIED PRO RATA ALLOCATION IS NOT A *SUB ROSA* PLAN ....... 34

V.      ADOPTION OF MODIFIED PRO RATA ALLOCATION DID NOT VIOLATE
        DUE PROCESS ................................................................................................35

        A.      The Bankruptcy Court Properly Conducted the Joint Trial ....................35

        B.      Modified Pro Rata Allocation Was Litigated During Trial ....................37

        C.      Appellants Cannot Complain of the Absence of Evidence Where They
                Sought its Exclusion ...............................................................................38

VI.     THE BANKRUPTCY COURT PROPERLY DISMISSED THE REVENUE
        AND CONTRIBUTION THEORIES .................................................................40

        A.      The Bankruptcy Court Properly Dismissed the Revenue Theory ..........40

        B.      The Bankruptcy Court Properly Dismissed the Contribution Theory .................42

VII.    IF THE BANKRUPTCY COURT ERRED IN ORDERING AN EQUITABLE
        ALLOCATION BASED ON THE FACTS OF NORTEL'S OPERATIONS,
        THIS COURT SHOULD ORDER ALLOCATION ON THE BASIS OF
        OWNERSHIP .....................................................................................................43

        A.      The Bankruptcy Court Erred in its Construction of the MRDA under
                Ontario Law ............................................................................................43

        B.      Principles of Comity Support Adopting the Ontario Court's Interpretation
                of the MRDA ...........................................................................................46

        C.      This Court Has Sufficient Evidence to Order Allocation Based on
                Ownership ...............................................................................................47

VIII.   IF THE COURT CONSIDERS THE CONTRIBUTION THEORY THE
        BANKRUPTCY COURT CORRECTLY REJECTED, IT SHOULD CORRECT
        CLEAR ERRORS RELATING TO THAT THEORY .......................................48

        A.      The Bankruptcy Court Erred in Characterizing Transfer Pricing Payments
                Required by the MRDA as a "Contribution" to R&D ...........................48

        B.      The Bankruptcy Court Erred in Substituting the Useful Life of Nortel's
                Patents for the Useful Life of R&D Expenditure ...................................49

CONCLUSION ...................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Compton* (*In re Bonham*),
  229 F.3d 750 (9th Cir. 2000) ................................................................................23

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
  131 S. Ct. 2188 (2011) .........................................................................................43

*Bodum USA, Inc. v. La Cafetière, Inc.*,
  621 F.3d 624 (7th Cir. 2010) ..........................................................................44, 47

*Butner v. United States*,
  440 U.S. 48 (1979).................................................................................................25

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*,
  367 U.S. 886 (1961)...............................................................................................35

*Carey v. Piphus*,
  435 U.S. 247 (1978)...............................................................................................35

*Chem. Bank N.Y. Trust Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966)..................................................................................33

*Diorinou v. Mezitis*,
  237 F.3d 133 (2d Cir. 2001)..................................................................................48

*Drysdale v. Woerth*,
  153 F. Supp. 2d 678 (E.D. Pa. 2001) ...................................................................40

*F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*,
  152 B.R. 61 (Bankr. E.D. Va. 1993).....................................................................24

*Ferrostaal, Inc. v. M/V Sea Phoenix*,
  447 F.3d 212 (3d Cir. 2006).....................................................................................4

*Films by Jove, Inc. v. Berov*,
  250 F. Supp. 2d 156 (E.D.N.Y. 2003) ..................................................................48

*Gen. Elec. Co. v. Deutz AG*,
  270 F.3d 144 (3d Cir. 2001)............................................................................46, 48

*Giuliano v. Shorenstein Co. LLC (In re Sunset Aviation, Inc.)*,
  468 B.R. 641 (Bankr. D. Del. 2011) .....................................................................22

*Grupo Protexa, S.A., v. All Am. Marine Slip*,
  20 F.3d 1224 (3d Cir. 1994)..................................................................................44

*Hilton v. Guyot*,
   159 U.S. 113 (1895)...............................................................................46

*Huntington Nat'l Bank v. Richardson (In re Cyberco Holdings, Inc.)*,
   734 F.3d 432 (6th Cir. 2013) ...............................................................23

*In re 26 Trumbull St.*,
   77 B.R. 374 (Bankr. D. Conn. 1987) ....................................................24

*In re Adam Aircraft Indus., Inc.*,
   Adv. No. 09-1481 MER, Bankr. No. 08-11751 MER,
   2012 WL 993477 (Bankr. D. Colo. Mar. 23, 2012)........................27, 38

*In re Adam Aircraft Indus., Inc.*,
   Civil Action No. 12-cv-01573-CMA,
   2013 WL 773044 (D. Colo. Feb. 28, 2013) ...........................................27

*In re Alliance Aerospace, LLC*,
   No. 01-52973-JDW, 2001 WL 1855337 (Bankr. M.D. Ga. Sept. 13, 2001)..........................24

*In re Alwan Bros. Co.*,
   105 B.R. 886 (Bankr. C.D. Ill. 1989)....................................................22

*In re Armstrong World Indus., Inc.*,
   432 F.3d 507 (3d Cir. 2005)..................................................................24

*In re Augie/Restivo Baking Co., Ltd.*,
   860 F.2d 515 (2d Cir. 1988)..................................................................33

*In re Awal Bank, BSC*,
   455 B.R. 73 (Bankr. S.D.N.Y. 2011)....................................................36

*In re Braniff Airways, Inc.*,
   700 F.2d 935 (5th Cir. 1983) ................................................................35

*In re Capmark Fin. Grp. Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) .....................................................35

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)..................................................................22

*In re Commodore Int'l, Ltd.*,
   242 B.R. 243 (Bankr. S.D.N.Y. 1999)..................................................36

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992)..................................................33

*In re Enron Corp.*,
    291 B.R. 39 (S.D.N.Y 2003) ..................................................................................24

*In re Escalera Res. Co.*,
    No. 15-22395-TBM, 2015 WL 7351396 (Bankr. D. Colo. Nov. 9, 2015) ..............................23

*In re Fed.-Mogul Global, Inc.*,
    No. 01-10578, 2002 WL 34946156 (Bankr. D. Del. Feb. 7, 2002) ........................................36

*In re Greenwich Sentry, L.P.*,
    534 F. App'x 77 (2d Cir. 2013) ..................................................................................23

*In re ID Liquidation One, LLC*,
    No. 11-11046, 2013 WL 6701911 (Bankr. D. Del. Dec. 19, 2013)........................................40

*In re Ins. Brokerage Antitrust Litig.*,
    241 B.R. 829 (Bankr. S.D.N.Y. 1999) ..................................................................25, 29, 39

*In re Ionica PLC*,
    579 F.3d 241 (3d Cir. 2009)..................................................................................36

*In re Jevic Holding Corp.*,
    787 F.3d 173 (3d Cir. 2015)..................................................................................4, 45

*In re Johns-Manville Corp.*,
    36 B.R. 743 (Bankr. S.D.N.Y. 1984) ..................................................................................23

*In re Kaiser Aluminum Corp*,
    456 F.3d 328 (3d. Cir. 2006)..................................................................................23

*In re LTV Steel Co., Inc.*,
    285 B.R. 259 (Bankr. N.D. Ohio 2002) ..................................................................27, 38

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)..................................................................................33, 34

*In re Parkway Calabasas*,
    89 B.R. 832 (Bankr. C.D. Cal. 1988) ..................................................................................33

*In re Perlman*,
    188 B.R. 704 (Bankr. S.D. Fla. 1995) ..................................................................................22

*In re SPhinX, Ltd.*,
    351 B.R. 103 (Bankr. S.D.N.Y. 2006) ..................................................................................36

*In re SPhinX, Ltd.*,
    371 B.R. 10 (S.D.N.Y. 2007) ................................................................................36

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3rd Cir. 2006) ..............................................................................23

*In re Trickett*,
    391 B.R. 657 (Bankr. D. Mass. 2008) ................................................................27

*In re Vecco Constr. Indus., Inc.*,
    4 B.R. 407 (Bankr. E.D. Va. 1980) ....................................................................33

*In re WorldCom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........................33

*Kerr v. Baranow*,
    2011 SCC 10 (Can.) ............................................................................................44

*Kingstate Oil v. M/V Green Star*,
    815 F.2d 918 (3d Cir. 1987) ................................................................................4

*Kuroda v. SPJS Holdings, LLC*,
    971 A.2d 872 (Del. Ch. 2009) ............................................................................44

*Law v. Siegel*,
    134 S. Ct. 1188 (2014) ........................................................................................22

*Marchant v. Penn. R.R.*,
    153 U.S. 380 (1894) ............................................................................................35

*Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*,
    93 F.3d 1036 (2d Cir. 1996) ................................................................................36

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991) ................................................................................4

*Minn. Mining & Mfg. Co. v. Berwick Indus., Inc.*,
    532 F.2d 330 (3d Cir. 1976) ................................................................................40

*Mullane v. Cent. Hanover Trust Co.*,
    339 U.S. 306 (1950) ............................................................................................35

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*,
    119 F.3d 349 (5th Cir. 1997) ..............................................................................35

*Pepper v. Litton,*
  308 U.S. 295 (1939)............................................................................23

*Primo Poloniato Grandchildren's Trust (Tr. of) v. Browne,*
  2012 ONCA 862 (Can.) .....................................................................46

*Remington Rand Corp.-Del. v. Bus. Sys. Inc.,*
  830 F.2d 1260 (3d Cir. 1987)......................................................47, 48

*Salah v. Timothy's Coffees of the World Inc.,*
  2010 ONCA 673 (Can.). ....................................................................44

*Sattva Capital Corp. v. Creston Moly Corp.,*
  2014 SCC 53 (Can.). ..........................................................................44

*Schroeder v. New Century Liquidating Trust,*
  407 B.R. 576 (D. Del. 2009)..............................................................34

*Shell Petroleum Inc. v. U.S.,*
  182 F.3d 212 (3d Cir. 1999)..............................................................25

*Stones v. McDonald,*
  7 F. Supp. 3d 422 (D. Del. 2014)......................................................39

*Stonington Partners Inc. v. Lernout & Hauspie Speech Prods. N.V.,*
  310 F.3d 118 (3d Cir. 2002)..............................................................36

*Tarazi v. Truehope Inc.,*
  958 F. Supp. 2d 428 (S.D.N.Y. 2013)...............................................47

*United Parcel Serv. v. Int'l Bhd. Local Union No. 430,*
  55 F.3d 138 (3d Cir.1995).................................................................37

*United States v. Pepperman,*
  976 F.2d 123 (3d Cir. 1992)..............................................................22

*Westmoreland Human Opportunities, Inc. v. Walsh,*
  246 F.3d 233 (3d Cir. 2001)..............................................................25

**Statutes and Rules**

11 U.S.C. § 105(a) ....................................................................... *passim*

11 U.S.C. § 363...........................................................................24, 25

11 U.S.C. § 506...........................................................................26, 27

11 U.S.C. § 541 ................................................................................................... *passim*

11 U.S.C. § 547 ...............................................................................................................22

11 U.S.C. § 1129(b)(2) ...........................................................................................24, 25

11 U.S.C. § 1525 .............................................................................................................36

11 U.S.C. § 1527 .............................................................................................................36

28 U.S.C. § 157 ................................................................................................................3

28 U.S.C. § 157(b)(2) .......................................................................................................3

28 U.S.C. § 158(a)(1) ........................................................................................................4

28 U.S.C. § 158(a)(3) ........................................................................................................4

28 U.S.C. § 1334 ...............................................................................................................3

Fed. R. Bankr. P. 8002 ......................................................................................................3

Fed. R. Bankr. P. 8004(d) ..................................................................................................3

**Other Authorities**

2 Collier on Bankruptcy ¶ 105.09[1][a] (16th ed.) .......................................................33

H.R. Rep. No. 109-31, pt. 1 (2005) .................................................................................36

## PRELIMINARY STATEMENT

Appellants'[2] submissions distort beyond recognition the Bankruptcy Court's decision directing a modified pro rata allocation of the proceeds of assets it found to be subject to the Debtors' shared interests. Attempting to manufacture a basis for appeal, Appellants misrepresent the Bankruptcy Court's opinion, reached after a six-week trial involving thousands of exhibits and testimony from multiple fact and expert witnesses. Their attempt should fail.

The Bankruptcy Court found, from an exhaustive review of the massive trial record, that the Debtors had operated as a single multinational enterprise engaged in the development of technology and products to be sold under a common name and logo. To that end, Nortel's worldwide operations were managed—and its assets were created—in accordance with business lines and administrative functions rather than geographical constraints, and no one entity or region operated, or could operate, on a standalone basis. On this basis, the Bankruptcy Court concluded that, while all of the Debtors have an equitable interest in the Sales Proceeds, the Debtors' pre-bankruptcy intercompany agreements do not govern their allocation in the context of Nortel's coordinated global liquidation. The Ontario Court reached a consistent outcome.

The Bankruptcy Court did not, as Appellants erroneously contend, identify specific assets of the Debtors and then fail to value them—rather, it found no controlling legal basis to do either of those things. The Bankruptcy Court therefore adopted the pro rata allocation advocated by certain creditor groups, modifying it to address specific concerns raised by Appellants at trial. Adoption of a theory that was fully litigated over the course of protracted proceedings did not violate due process, and communications between the Courts consistent with governing protocols were neither improper nor objected to.

---

[2] Capitalized terms used in the Preliminary Statement, Statement of the Issues and Standard of Review are defined elsewhere in this brief.

The Bankruptcy Court's findings of fact supporting its conclusion that no agreement or law governed allocation and its equitable allocation are entitled to substantial deference on appeal and, indeed, Appellants do not challenge them. Instead, Appellants claim that the Bankruptcy Court lacked the authority to choose an equitable allocation metric and that the modified pro rata allocation metric is not fair and equitable. They are wrong on both counts.

Having found that that no legal basis for allocation was proven, the Bankruptcy Court had authority under Section 105(a) of the Bankruptcy Code to fill the gap by adopting an equitable allocation methodology. Applying modified pro rata allocation determines each Debtor's property interests in the Sales Proceeds, including property of the US Debtors under Section 541 of the Bankruptcy Code. The allocation of those proceeds does not commingle the Debtors' assets, alter their continued, separate existence or displace the claims allowance and distribution processes with respect to their separate creditors under applicable local insolvency regimes. Thus, the modified pro rata allocation is neither improper substantive consolidation nor a *sub rosa* plan.

The modified pro rata allocation is based on the uncontroverted facts of Nortel's pre-insolvency operations and the escrow of proceeds from joint sales of assets subject to shared interests for later allocation. Appellants claim that the Bankruptcy Court erred in not considering certain facts, such as expected creditor recoveries, a lien granted to a creditor on NNI's allocation from one sale, the sale of shares in NNI's subsidiaries and the order of a French court permitting NNSA to participate in the joint sales, but Appellants presented no evidence at trial on these issues and therefore cannot complain that the Bankruptcy Court did not consider them. Further, Appellants themselves sought the exclusion of evidence of creditor outcomes and cannot now argue that such exclusion was in error. The evidence that was presented at trial and

on reconsideration in any event confirms that creditors of the various Nortel companies will receive broadly consistent recoveries.

If this Court concludes, however, that the Bankruptcy Court erred in ordering an equitable allocation, this Court should order allocation based on ownership of the Nortel assets, as confirmed by a proper reading of the Debtors' Master Research & Development Agreement ("MRDA") under governing Ontario law. The Bankruptcy Court correctly rejected the revenue and contribution allocation theories propounded by Appellants and the EMEA Debtors, and the expert evidence offered in support thereof, but erred by misconstruing the scope of the licenses granted under the MRDA. This Court can and should consider the authoritative decision of the Ontario Court interpreting the MRDA in the context of the identical facts and arguments presented to the Bankruptcy Court, and correct the Bankruptcy Court's errors of law or defer to the Ontario Court's interpretation on the basis of comity. This Court should thus order allocation consistent with the evidence of the Monitor's and the Canadian Debtors' valuation expert, Philip Green, which the Ontario Court held to be correct if the MRDA applies to allocation.

## JURISDICTIONAL STATEMENT

The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")[3] had jurisdiction to hear this matter. 28 U.S.C. §§ 157, 1334. This matter is a core proceeding. 28 U.S.C. § 157(b)(2). Notices of appeal, which may be construed as a motion for leave to appeal (Fed. R. Bankr. P. 8004(d)), were timely filed by Appellants on July 20, 2015 (B.D.I. 15890),[4] in accordance with Federal Rule of Bankruptcy Procedure 8002 from the Bankruptcy Court's May 12, 2015, Opinion (B.D.I. 15544)[5] and Order (B.D.I. 15545) and July 6, 2015, Order on motions for reconsideration and clarification (B.D.I. 15830) (collectively, the

---

[3] Together, the Bankruptcy Court and the Ontario Court are referred to as the "Courts."
[4] Citations in the form "B.D.I." are to the docket of Bankruptcy Court Case No. 09-10138.
[5] Cited herein as "US Op." The Ontario Court's May 12, 2015, opinion is cited as "Ont. Op."

"US Allocation Decision") pursuant to 28 U.S.C. § 158(a)(3).  This Court has jurisdiction over the appeals and contingent cross-appeals if it grants the pending Motion for Determination that Allocation Order is Interlocutory and for Leave to Appeal[6] or determines that the US Allocation Decision was a final judgment.  28 U.S.C. § 158(a)(1).

<u>**STATEMENT OF THE ISSUES AND STANDARD OF REVIEW**</u>

An appellate court reviews questions of law (including foreign law) *de novo*, findings of fact for clear error and exercises of discretion for abuse thereof.  *In re Jevic Holding Corp.*, 787 F.3d 173, 179 (3d Cir. 2015), *petition for cert. filed*, No. 15-649, 2015 WL 7252903 (U.S. Nov. 16, 2015); *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3d Cir. 2006).  Exercise of equitable powers is an exercise of discretion.  *Kingstate Oil v. M/V Green Star,* 815 F.2d 918, 922 (3d Cir. 1987).  Mixed questions of law and fact are reviewed under a mixed standard.  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991).

<u>Issues on Appeal</u>

1.     Whether the Bankruptcy Court correctly found that no law or agreement governed allocation of the Sales Proceeds and that, based on Nortel's integrated operations, "no one estate is entitled to any specific asset."  US Op. at 99.  **This is a mixed question of law and fact reviewed under a mixed standard**.

2.     Whether the Bankruptcy Court had the authority under Section 105(a) of the Bankruptcy Code to adopt the modified pro rata allocation methodology in the absence of controlling law or agreement.  **This is a question of law subject to *de novo* review**.

3.     Whether the Bankruptcy Court correctly exercised its authority under Section 105(a) of the Bankruptcy Code in concluding that modified pro rata allocation is "a fair and equitable mechanism to allocate the billions of dollars of Sales Proceeds to numerous international entities

---

[6] *In re Nortel Networks Inc. et al.*, Misc. Action No. 15-196 (LPS) D.I. 1.

for the benefit of their creditors who have now waited years for their recoveries."  US Op. at 91.  **This is a question of discretion reviewed for abuse of discretion**.

4.      Whether the Bankruptcy Court's adoption of the modified pro rata allocation methodology to allocate the Sales Proceeds effected improper substantive consolidation or an impermissible *sub rosa* plan.  **This is a question of law subject to *de novo* review**.

5.      Whether the Bankruptcy Court properly conducted a joint trial on allocation in accordance with duly entered protocols for cross-border coordination of the Debtors' insolvency proceedings.  **This is a question of law subject to *de novo* review**.

6.      Whether the Bankruptcy Court's adoption of an allocation methodology advocated in pleadings, pre- and post-trial briefs and trial evidence and argument was consistent with due process.  **This is a question of law subject to *de novo* review**.

Issues on Contingent Cross-Appeal

1.      Whether, if the Bankruptcy Court's adoption of the modified pro rata allocation methodology is not affirmed, the Bankruptcy Court erred in reaching a different interpretation of the MRDA, an agreement governed by Ontario law, than did the Ontario Court presented with the same evidence and argument.  **This is a question of law subject to *de novo* review**.

2.      Whether, if this Court considers the contribution theory the Bankruptcy Court correctly rejected, it should reverse certain findings relating to calculation of "contribution" on the basis of R&D expense.  **This is a mixed question of law and fact reviewed under a mixed standard.**

## STATEMENT OF THE CASE

Commencement of Bankruptcy Cases:  Since January 14, 2009 (the "Petition Date"), Bankruptcy Court Judge Kevin Gross has overseen not only the US Debtors' cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), but also ancillary cases under chapter 15 of the Bankruptcy Code in respect of the Canadian Debtors' proceedings in the

Ontario Court under the CCAA[7] and the EMEA Debtors'[8] English-law administration proceedings in the High Court of Justice of England and Wales under the *Insolvency Act 1986*.[9]

> History of Joint Hearings:  The Cross-Border Court-to-Court Protocol (the "Cross-Border Protocol") entered by the Courts on January 14 and 15, 2009, provides, *inter alia*, that the Courts "may coordinate activities," "may conduct joint hearings" and

> > shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms . . . of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.[10]

Over the past seven years, the Bankruptcy Court has presided over every aspect of the Debtors' US cases, including at least fifteen joint hearings with the Ontario Court.[11]

> IFSA and Asset Sales:  Following a joint hearing, the Courts approved the Interim Funding and Settlement Agreement ("IFSA")[12] to address:  (i) Debtors' decision to sell Nortel's business lines in joint sales; (ii) Debtors' inability to agree on the allocation of the proceeds from such sales (collectively, "Sales Proceeds"); and (iii) funding to maintain Canadian operations.[13]

> The Nortel companies that carried out research and development ("R&D") were party to

---

[7] US Op. at 3-4; *In re Nortel Networks Corp. et al.*, Case No. 09-10164 (Bankr. D. Del.) (the "Can. Chapter 15").

[8] Nortel Networks UK Ltd. ("NNUK"), NNSA, Nortel Networks Ireland ("NN Ireland"), Nortel GmbH, Nortel Networks France S.A.S. ("NNSA"), Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V. (with the Canadian and US Debtors, the "Debtors").

[9] US Op. at 5; *Nortel Networks UK Ltd., et al.*, Case No. 09-11972 (Bankr. D. Del.).

[10] B.D.I. 18 (Cross Border Protocol Motion); B.D.I. 990 (Amended Cross Border Protocol Order) Ex. A, Ex. 1 ¶¶ 11-12.

[11] *See*, *e.g.*, B.D.I.s 1042, 1286, 2351, 2842, 1314, 1594, 1735, 2122, 3872, 4057, 5368, 5939, 10552, 10792, 12747.

[12] TR12032 (IFSA); B.D.I. 993 (IFSA Order); Can. Chapter 15, D.I. 107 (IFSA Recog. Order).

[13] US Op. at 6; B.D.I. 874 (IFSA Motion) ¶¶ 14, 17; TR00009A (Hamilton Aff.) ¶¶ 27-30; TR00014 (Binning Aff.) ¶¶ 49-50; TR50886 (June 7, 2011, Hr'g Tr.) 36:5-24, 43:12-44:1.

the Ontario law-governed MRDA (the "MRDA Participants"). Under the MRDA, NNL was vested with title to all "NN Technology"[14] (including approximately 8,800 worldwide patents and patent applications as of the Petition Date) and each of NNI, NNUK, NNSA and NN Ireland (the "Licensed Participants") was granted a license to exploit NN Technology in connection with making and selling Nortel "Products" in its territory.[15] The MRDA Participants shared in the residual profits (or losses) from the exploitation of NN Technology in accordance with their share of the group's R&D spending (the "Residual Profit Split Methodology" or "RPSM").[16] NNL performed nearly 50% of Nortel R&D from 2000 through 2009[17] and therefore received payments under the MRDA but, because Nortel was loss-making from 2001, NNL also bore the largest share of the losses.[18] After January 2009, RPSM payments ceased, threatening the continued operation of Canadian R&D facilities and the business lines they supported.[19]

The IFSA provided for the US Debtors to pay $157 million to NNL for costs incurred for the benefit of the US Debtors from the Petition Date to September 30, 2009; the Sales Proceeds

[14] Defined as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." TR210003 (MRDA) Art. 1(f).

[15] *Id.* Art. 4 and 5. The MRDA defines "Products" as "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing." *Id.* Art. 1(g).

[16] *See* US Op. at 16; MRDA Art. 3. Each MRDA Participant first received a routine return on non-R&D expenses, MRDA Sched. A, then, to allocate the residual profits or loses, the relevant metric at the Petition Date was each MRDA Participant's R&D expenditure over five years, with a one year lag, TR22078 (NNL and NNI APA Request: 2007-2011) at 50.

[17] US Op. at 10. For 2005 to 2009, NNL accounted for 49.8% of Nortel's R&D spend, NNI for 38.5%, and EMEA RPEs for 11.7%. *Id.*

[18] TR00050 (Reichert Rebuttal Report) at 151.

[19] Hamilton Aff. ¶ 28; IFSA Motion ¶¶ 14-17, 31 (seeking entry of IFSA because US Debtors required "use of intellectual property owned by NNL that is crucial to the U.S. Debtors' business" and the liquidity pressure facing NNL put entire Nortel group at risk).

to be allocated either by agreement of the selling Debtors or the determination of a dispute resolver(s); and the Licensed Participants to terminate their licenses to facilitate asset sales.[20] Section 11(a) of the IFSA states that the Licensed Participants agreed to enter into license termination agreements "in consideration of a right to an allocation," but there was no guarantee of a specific allocation or that an allocation would not be zero.[21]

To mitigate the risk of a particular Debtor spending more on the sales process than it would receive in allocation, the Debtors entered into subsequent agreements to have certain costs deducted from or shared in proportion to the ultimate allocation of the Sales Proceeds.[22]   One such agreement was the Final Canadian Funding and Settlement Agreement ("FCFSA"), which provided for the reimbursement of certain costs from the Sales Proceeds.[23]   The FCFSA also granted NNI an allowed $2.06 billion claim against NNL in connection with their entry into an Advance Pricing Agreement ("APA") with Canadian and US tax authorities.[24]

Between March 2009 and March 2011, all of Nortel's principal lines of business were sold in nine cross-border sales and the proceeds were escrowed in accordance with the IFSA.[25] Each business line sale included the tangible assets relating to the business line, the transfer of employees working in that business line and certain intellectual property rights.[26]   Patents predominantly used in one business line were assigned by NNL to the purchaser, and the Patents used in multiple business lines were retained by NNL and licensed to the purchasers on a non-

---

[20] IFSA ¶¶ 10(a), 11-12, 16(a).

[21] IFSA Part C; US Op. at 106; Ont. Op. ¶ 210; McDonald Depo. 143:7-144:5.

[22]  Hamilton Depo. 101:15-102:8; TR40039 (IP Transaction Side Agreement) ¶ 2; TR44243 (Supplemental IP Transaction Side Agreement) ¶ 8; TR48581 (Second Amended and Restated IP Transaction Side Agreement) ¶ 2(h).

[23] TR46910 (FCSFA) ¶¶ 6-8.

[24] US Op. at 18, 23; FCFSA ¶ 10.

[25] US Op. App'x B (identifying line of business sales).

[26] US Op. at 24-25; Hamilton Aff. ¶ 52.

exclusive basis.[27]  Licensed Participants entered into license termination agreements with respect to the patents that were sold or licensed.[28]  The business line sales were approved following joint hearings of the Courts and generated net proceeds of approximately $2.85 billion.[29]

The approximately 7,000 patents and patent applications NNL held after the completion of the business line sales formed the "Residual IP Portfolio."[30]  The Debtors formed a committee to evaluate options for the Residual IP Portfolio, including the potential formation of a new company—an "IPCo"—to license the patents by threatening infringement suits.  However, the committee did not discuss how any proceeds from an IPCo would be shared.[31]  Models prepared by Lazard to evaluate IPCo's potential value used discount rates of up to 45%, reflecting significant uncertainty around a business Nortel had never operated pre-bankruptcy.[32]  The IPCo idea was abandoned after the Canadian Debtors indicated they would not provide funding.[33]

In June 2011, the Residual IP Portfolio was sold at auction to Rockstar, a consortium of major technology companies, for $4.5 billion (the "Rockstar Sale").[34]  The Rockstar Sale was approved by both Courts following a joint hearing.[35]  Contrary to the US Debtors' contention that NNI's license under the MRDA was transferred to Rockstar,[36] the Licensed Participants executed a license termination agreement in connection with the Rockstar Sale.[37]  As with the

---

[27] US Op. at 24-26 ("NNL retained ownership of the patents licensed . . . .").

[28] *See*, *e.g.*, TR43642.03 (GSM Retained Contracts Sale License Termination Agreement) Arts. 2.01, 2.06, 2.08; TR44186 (MEN Sale License Termination Agreement) Arts. 2.01, 2.06, 2.08; *see also* Hamilton Aff. ¶ 54; May 21, 2014, Trial Tr. 1431:25-1433:9 (Ray).

[29] US Op. at 24, App'x B.

[30] US Op. at 34.  Intellectual property is referred to herein as "IP."

[31] *See* US Op. at 28-33; May 15, 2014, Trial Tr. 917:17-924:20 (Hamilton).

[32] June 5, 2014, Trial Tr. 3162:6-12 (Green).

[33] May 15, 2014, Trial Tr. 923:22-24 (Hamilton) ("[W]e were both unwilling and unable to provide funding, and we asked and nobody was willing to provide funding at the time.").

[34] Hamilton Aff. ¶ 95; TR44220 (Rockstar Transaction ASA).

[35] B.D.I. 5935 (Rockstar Sale Order).

[36] *See* US Debtors Br. at 13, 15.

[37] TR21508 (Rockstar Transaction IP License Termination Agreement) Art. 2.

business line sales, proceeds from the Rockstar Sale were escrowed pursuant to the IFSA.[38]

Allocation Protocol:  During the years-long sales process, the Debtors were unable to reach agreement on the allocation protocol contemplated by the IFSA.[39]  The US Debtors therefore sought entry of an allocation protocol from both Courts on June 7, 2011.  Following a joint hearing, the Courts ordered the parties to engage in mediation.[40]  Over the next two years, the Debtors and their key creditor constituencies participated in two rounds of formal mediation, but these, as well as informal discussions throughout the case and during trial at the Courts' direction, ultimately proved unsuccessful.[41]  In early 2013, after a joint hearing, an allocation protocol was entered by the Courts (the "Allocation Protocol").[42]  The Allocation Protocol provides that "[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."[43]  On May 17, 2013, following a joint hearing, the Bankruptcy Court approved a Litigation Timeline and a Discovery Plan pursuant to the Allocation Protocol.[44]  On May 16, 2013, the Core Parties filed allocation position pleadings advancing four principal allocation methodologies—ownership, revenue, contribution and pro rata.

Ownership Theory:  Allocation on the basis of ownership was advanced by the Canadian

---

[38] US Op. at 6-7.

[39] *Id.*

[40] B.D.I. 5752 (Order Directing Mediation).

[41] US Op. at 6-7; B.D.I.s 4210, 6079.

[42] B.D.I. 5307 (Allocation Protocol Motion); B.D.I. 10565 (US Allocation Protocol Order); TR50027 (Can. Allocation Protocol Order).

[43] Can. Allocation Protocol Order, Sched. A ¶ 4(a); US Allocation Protocol Order, Ex. 1 ¶ 4(a). The Core Parties under the Allocation Protocol are the Debtors, the US Committee of Unsecured Creditors ("UCC"), the Ad Hoc Group of Bondholders (the "Bondholders"), the Monitor, the Joint Administrators of the EMEA Debtors, the Canadian Creditors Committee ("CCC"), certain indenture trustees for Nortel bonds, the UK Pension Claimants ("UKPC"), and certain former directors and officers of NNC and/or NNL.  US Allocation Protocol Order, Ex. 1 ¶ 2.

[44] B.D.I. 10566 (Order Entering Litigation Timetable and Discovery Plan).

Debtors, the Monitor, the CCC and Wilmington Trust.[45]  Under the MRDA, NNL owned all NN Technology and granted licenses to the Licensed Participants, which were limited to the right to use NN Technology to make and sell Products, defined in the MRDA as products, software and services developed by or for Nortel entities.[46]  As a matter of Ontario law, a license is a contractual right, limited to its terms, not a property interest in the licensed IP.[47]

Under the ownership theory, each Debtor should be allocated the value of the tangible and intangible assets it owned.[48]  In the business line sales, the Licensed Participants should be compensated for their license terminations in accordance with the value they could have received had they carried on Nortel's business.[49]  Any value realized for the IP in excess of what they could have expected to earn must be attributed to rights not licensed to them and therefore retained by NNL as owner.  Business line purchasers obtained the right to use Nortel IP in their own products; thus, the IP had greater value in their hands than in Nortel's.  The licenses to use NN Technology in Products were valueless in the Rockstar Sale.[50]  Other than a few NNI employees who were transferred to Rockstar, all of the assets sold in the Rockstar Sale were owned by NNL.  Philip Green, the Canadian Debtors' and the Monitor's valuation expert, calculated that an ownership-based allocation of the Sales Proceeds would be 82.2% to the Canadian Debtors,

---

[45] US Op. at 48-56. "Wilmington Trust" refers to Wilmington Trust, National Association, as Indenture Trustee for the NNL 6.875% Notes due 2023.

[46] US Op. at 48-56 (summarizing ownership theory); MRDA Arts. 1(g), 5.  The potential "IPCo" licensing business was not a "service" within the definition of Products.  Ont. Op. ¶ 170.

[47] Ont. Op. ¶ 82.

[48] TR00042 (Green Report) at 16.

[49] US Op. at 49-52; Green Report at 16.

[50] Green Report at 63-65.  The Residual IP Portfolio consisted of both patents used in multiple business lines and those not used in any business line.  With respect to the former, the ownership allocation would compensate Licensed Participants in connection with the business line sales in which they had already terminated their licenses.  With respect to the latter, their licenses had no value because the patents were not used in connection with Nortel Products.  *Id.*

13.7% to the US Debtors and 4.1% to the EMEA Debtors.[51]

Revenue Theory:  The revenue theory of allocation, advanced by the US Interests[52] and by the EMEA Debtors as an alternative theory, purports to be based on the MRDA but ignores its plain terms.[53]  Proponents of the revenue theory contend that the MRDA licenses convey all rights to NN Technology in each of the Licensed Participants' geographic territories, reading out the restriction of those licenses to use in connection with Nortel Products,[54] and they seek allocation of the entire value of each business line sale in accordance with each entity's proportional gross revenue in its territory.[55]

As the Bankruptcy Court recognized and the US Debtors' expert, Jeffrey Kinrich, conceded, this is not a discounted cash flow analysis and does not value particular assets.[56]  The gross revenue metric ignores all costs, including the RPSM obligation.  Thus, the revenue theory gives no effect to half of the bargain struck between NNL and the Licensed Participants.  Further, as Mr. Kinrich conceded and his reference (for valuing small businesses) states, this methodology is only appropriate if all participants have a standard cost structure; in fact each of the Licensed Participants bore a different share of R&D expenditure in comparison to revenues.[57]  The revenue theory thus ignores the value of that R&D in generating the revenues realized.[58]

---

[51] TR00043 (Green Rebuttal Report) at 2.
[52] The US Interests are the US Debtors, the UCC and the Bondholders.
[53] B.D.I. 10537 (US Debtors and UCC Allocation Position); B.D.I. 10540 (Bondholders Allocation Position); B.D.I. 14260 (EMEA Debtors Post-Trial Br.).
[54] US Debtors Br. at 10-11.
[55] TR00051 (Kinrich Report) at 13-15.  The US Debtors erroneously state that "[w]ith respect to the tangible property sold in the Business Line Sales . . . the parties had little disagreement," US Debtors Br. at 24, but Mr. Kinrich did not allocate proceeds on the basis of tangible assets; he applied the revenue metric to the total sales price, Kinrich Report at 13-15. Mr. Kinrich also did not separately value NNI's non-debtor subsidiaries.  *Id.* at 9 n.34, 13-15.
[56] US Op. at 89; June 18, 2014, Trial Tr. 4329:14 (Kinrich) ("But I did not perform a DCF.")
[57] June 18, 2014, Trial Tr. 4326:20-4327:20 (Kinrich).
[58] US Op. at 62.

For the Rockstar Sale, the revenue allocation is based on a mix of projections created for a potential IPCo and the relative telecommunications infrastructure expenditures of Canada and the US.[59]   The theory assumes that the Licensed Participants could license others to use NN Technology other than in connection with Nortel Products and simply ignore the licenses' profit-sharing obligations under the MRDA.   Mr. Kinrich calculated a revenue-based allocation of 10.6% to the Canadian Debtors, 72.6% to the US Debtors and 16.8% to the EMEA Debtors.[60] The EMEA Debtors' experts, James Malackowski and Paul Huffard, presented an alternate calculation of the revenue theory (termed the "License Approach") that yielded an allocation of 11.5% to the Canadian Debtors, 57.7% to the US Debtors and 30.9% to the EMEA Debtors.[61]

Contribution Theory:   The EMEA Debtors acknowledge that the contribution methodology is not based on the rights granted by the MRDA.[62]   Instead, they contend that Nortel companies that employed R&D employees retained an ownership interest in their inventions, notwithstanding the employees' express assignment to NNL of their rights.[63]   This argument is based on the laws of the United Kingdom and Canada, ignoring that under US law there is no statutory right of a company to ownership of its employees' inventions, and the vast majority of the IP sold was US patents and patent applications.[64]   Moreover, by agreeing in the MRDA to execute all documents necessary for NNL to hold title to NN Technology, the Licensed Participants disclaimed any such ownership interest.[65]

The EMEA Debtors contend that allocation should be commensurate with proportional R&D "contribution," measured by R&D expenditure over a much longer period than that used in

---

[59] Kinrich Report at 55-57.
[60] *Id.* at 4.
[61] TR00030 (Huffard Report) at 5.
[62] US Op. at 45-46, 88; June 2, 2014, Trial Tr. 2829: 4-10 (Malackowski).
[63] Ont. Op. ¶¶ 186-92.
[64] *Id.* ¶ 188.
[65] *Id.* ¶ 190; MRDA Art 4(b).

the MRDA.[66]  The EMEA Debtors' expert, Mr. Huffard, conceded that this does not value any rights in the NN Technology conveyed in the asset sales, but rather is an equitable allocation.[67]

The US Debtors' proposed "correction" to the contribution methodology departs even further from Nortel's pre-bankruptcy practice by treating transfer pricing payments made by NNI as R&D expenditure, on the theory that some portion was used by the recipients to fund R&D.[68] This theory ignores that Nortel's transfer pricing payments were owed to the recipients on account of their R&D funding, and treating such payments as R&D funding would leave no metric to determine the amounts of future transfer pricing payments.  The US Debtors' own expert contended that transfer pricing payments should not be used for valuation purposes in bankruptcy.[69]  Allocation under the EMEA Debtors' version of the contribution theory would be 31.9% to the Canadian Debtors, 49.9% to the US Debtors and 18.2% to the EMEA Debtors.[70] Under the US Debtors' modified version of the contribution theory, allocation would be 8.3% to the Canadian Debtors, 71.4% to the US Debtors and 20.3% to the EMEA Debtors.[71]

Pro Rata Theory:  The UKPC advanced pro rata allocation as its primary theory, and the CCC and Wilmington Trust advanced pro rata allocation as an alternative methodology.[72]  They contend that the value realized on the sale of Nortel's assets was created by the unified operations of the Nortel group across corporate entities and should be shared with the pre-

---

[66] Ont. Op. App'x. B ¶ 71; TR00033 (Malackowski Report) at 45, 48.
[67] US Op. at 88.
[68] Ont. Op. ¶¶ 72, 87-89; TR11393 (Memorandum of Understanding) ("MOU") ¶ 11. As the MRDA Participants agreed in the MOU, transfer pricing payments "represent the [RPSM] allocation rather than a commercial transaction, as 'true up' payments whereby a Participant that holds profits from its own sales and distribution activity in excess of its attributable share under the RPSM formula, pays amounts to parties that hold profit in an amount less than their attributable share."  MOU ¶ 11.
[69] TR00062 (Eden Report) at 72-73; *see also* June 17, 2014, Trial Tr. 3834:12-3837:8 (Reichert).
[70] Huffard Report at 4.
[71] TR00052 (Kinrich Rebuttal Report) at 66.
[72] US Op. at 53-58.

bankruptcy creditors of the corporate entities on a *pari passu* basis.[73]  Several different pro rata models were presented in the opening pleadings and throughout the course of the litigation and trial.  The UKPC's expert, Coleman Bazelon, showed how "pure pro rata" could be modified to give effect to guarantees and intercompany claims.[74]  The CCC's expert, Thomas Britven, calculated allocation percentages necessary to yield a common dividend to creditors of different Debtors after giving effect to cash on hand, intercompany claims (including NNI's $2 billion claim against NNL) and guarantee claims.[75]  Mr. Britven estimated that a pro rata allocation methodology that eliminated all guarantee and intercompany claims and included the Debtors' cash on hand would give all creditors a 71.2% recovery based on an allocation of approximately 69.4% to the Canadian Debtors, 2.5% to the US Debtors and 28.1% to the EMEA Debtors.[76]

Allocation Trial Record:  Following the presentation of each of these allocation theories in May 2013, the parties engaged in wide-ranging discovery including over 100 fact witness depositions in six countries, dozens of expert reports and depositions of numerous expert witnesses.  In the spring of 2014, the parties filed pre-trial briefs.  The US Interests' pre-trial motion to strike the experts presented to support the pro rata allocation methodology, on the basis, *inter alia*, that creditor recoveries were irrelevant was dismissed.[77]

---

[73] *Id.*  The US Debtors' contention that they had no notice that post-bankruptcy claims would be "excluded" from pro rata allocation, US Debtors Br. at 58-59, misrepresents the record; none of the pro rata proponents advocated *including* post-bankruptcy claims in their allocation methodology.  TR00045 (Britven Report) at 18-19; B.D.I. 13457 (CCC Pre-Trial Br.) App'x A (definition of "Claim"); *see also* Britven Depo. 59:23-25 ("So any priority claims will not be subject to pro rata allocation, is that right?  I think that's correct, yes.").

[74] *See* May 30, 2014 Trial Tr. 2413:23-2415:11 (Bazelon); Bazelon Tr. Dem. at 2-4; June 02, 2014, Trial Tr. 2955:9-2959:4 (Bazelon).

[75] Britven Report at 18; Britven Tr. Dem. at 27.  The Monitor and the Canadian Debtors respectfully refer the Court to the CCC's explanation of how Mr. Britven's testimony has been distorted by the US Interests.  CCC Br. at 21-22.

[76] Britven Report at 7-8.

[77] B.D.I. 13370 (US Debtors and UCC Motion to Strike Pro Rata Expert Reports); B.D.I 13555 (May 8, 2014 Hr'g Tr.) 8:11-11:4.

In May and June 2014, the Courts jointly presided over a 21-day trial (the "Allocation Trial").[78]  The Courts heard from 21 fact witnesses and 15 expert witnesses and admitted over 2,000 exhibits and designations from depositions into evidence, following which the parties filed more than 1,000 pages of briefs and made closing arguments over three days.[79]  Numerous witnesses, including those put forth by Appellants,[80] testified that the MRDA was not intended to and did not in fact govern the allocation of proceeds from the sale of the Nortel group's assets in a worldwide insolvency.[81]  At the conclusion of closing arguments, the Bankruptcy Court asked the parties "to what extent do you expect that Justice Newbould and I can/should discuss our allocation opinions," and referred to the provisions of the Cross Border Protocol permitting the Courts to confer "for the sake of consistency."[82]  No party objected, then or subsequently, to such communications occurring.

Allocation Decisions:    Over seven months later, on May 12, 2015, the Courts simultaneously released their allocation decisions.  While certain of the Courts' findings of fact and conclusions of law differed, they agreed on modified pro rata allocation.[83]  The Courts reserved jurisdiction to deal with claims allowance and distributions independently and at an

---

[78] US Op at 1-2.

[79] *Id.* at 2.

[80] "Appellants" are the US Debtors, the UCC, the Bondholders, Stephen Taylor as Conflicts Administrator for NNSA, the Nortel Trade Claims Consortium ("NTCC"), the Pension Benefit Guarantee Corporation ("PBGC"), and the Bank of New York Mellon as Indenture Trustee.

[81] US Op. at 61; Ont. Op. ¶¶ 172-77.

[82] Sept. 24, 2014, Trial Tr. 5893:7-16 (Gross, J.).

[83] US Op. at 60 ("The parties recognized the problems that could result were rulings by the Courts to diverge. . . .  The Courts have had discussions following the trial of the Allocation Dispute in an effort to avoid the travesty of reaching contrary results which would lead to further and potentially greater uncertainty and delay."); Ont. Op. ¶ 10 ("We have come to the conclusion that a consistent ruling can and should be made by both Courts. . . .  Consistent decisions that we both agree with will facilitate [] a resolution.").  Even the US Debtors acknowledge "the important interest of consistent rulings between th[e Bankruptcy] Court and the Canadian Court . . . ."  B.D.I. 15611 (US Debtors Recon. Motion) at 1 n.2.

appropriate time in the future.[84]

The Bankruptcy Court made extensive findings of fact, drawing on the enormous trial record, which the US Debtors expressly state that they do not challenge.[85]  It found that Nortel operated a "uniquely integrated . . . global enterprise,"[86] "organized along Lines of Business operating for the same purpose under the same logo and trade name, and all of the entities engaged in the development, manufacture, and sale of various products of a single company."[87] The development of IP was the heart of Nortel's business, but it "is impossible to trace which R&D expenses produced which IP."[88]  As a result of Nortel's business structure, no single company or region was able to provide the full line of Nortel products and services, including R&D capabilities, on a standalone basis.[89]  The combined efforts of the Nortel group produced "extensive[ly] integrat[ed] . . . IP assets" that were exploited by "a truly global enterprise" for "the benefit of all of Nortel."[90]  The Bankruptcy Court therefore concluded, on the basis of these facts, that all of the selling Debtors had an interest in the Sales Proceeds and rejected each of the ownership, revenue and contribution theories as "flawed" in the circumstances.[91]

Specifically with respect to the MRDA, the Bankruptcy Court concluded that nothing in the MRDA (including the IP licenses granted thereunder, the revenue sharing mechanisms that

---

[84] US Op. at 62, 112; Ont. Op. ¶¶ 253, 258(6); B.D.I. 15842 (Ontario Recon. Op.) ¶¶ 50-51.

[85] US Debtors Br. at 5.

[86] US Op. at 106; *see also id.* at 95 ("Nortel's globally distributed R&D distinguished it from other high technology companies which centralized their R&D in a single site.").

[87] *Id.* at 105.

[88] *Id.* at 11; *see also id.* at 96-97 ("Nortel's laboratories often worked collaboratively and as a unified whole to develop technology.").

[89] US Op. at 97-98.

[90] *Id.* at 93-94, 106

[91] US Op. at 62, 86.  The Bankruptcy Court also found that the purported expert "valuations" offered for the license and revenue theories were nothing of the sort.  US Op. at 88-90.  The Bankruptcy Court had no such criticism for the evidence of the Canadian Debtors and the Monitor's valuation expert, Philip Green, who indisputably valued each separate asset transferred in each of the sales giving rise to the Sales Proceeds.  Green Report at 16.

encumbered those licenses and the grant of ownership to NNL), or any other pre-petition agreement or applicable law, governed the allocation of the Nortel group's assets after they ceased operations or provided a basis for establishing any given Debtor's "entitlement to assets" in a global insolvency.[92]   The US Debtors' mantra that the Bankruptcy Court determined ownership of the assets flagrantly misrepresents the Bankruptcy Court's central holding.[93]

In the absence of any agreement or other legal right or entitlement, the Bankruptcy Court turned to equitable principles to allocate the Sales Proceeds in accordance with its factual findings about Nortel's operations.[94]   Based on its finding that Nortel respected corporate form, the Bankruptcy Court concluded that an equitable allocation should leave cash on hand in place and that intercompany claims should be given effect.[95]   Likewise, the exclusion of Bondholders' claims against NNI, solely for allocation purposes, was driven by the Bankruptcy Court's finding that the Bondholders did not have an expectation of recovery from separate asset pools.[96]

The Ontario Court also concluded that the modified pro rata allocation was appropriate.[97] Its agreement with the Bankruptcy Court is significant because the Sales Proceeds can be released from escrow only upon agreement of the parties or consistent decisions of both Courts.[98] The Ontario Court's analysis differed, however, in certain ways.   First, the Ontario Court interpreted the MRDA under Ontario law and concluded, consistent with the ownership theory, that NNL owned the NN Technology and the Licensed Participants held licenses limited in scope

---

[92] *Id.* at 60, 90, 99 (finding "nothing in the law or facts giving any of those entities certain and calculable claims to the proceeds from the liquidation of those assets" and that "no one estate is entitled to any specific asset").

[93] *See*, *e.g.*, US Debtors Br. at 2-3, 6-7, 17, 19, 22-23, 24, 26, 27, 30, 37, 38-39, 40, 45-46; *see also* Bondholders Br. at 7; UCC Br. at 1; NNSA Br. at 1.  This mischaracterization also infects the first four of the US Debtors' questions presented on appeal.  US Debtors Br. at 6.

[94] US Op. at 60, 103.

[95] *Id.* at 63, 93.

[96] US Op. at 102, 108-09.

[97] Ont. Op. ¶¶ 193-211.

[98] IFSA ¶ 12(b).

to Nortel "Products" that did not give rise to an ownership interest.[99]  Second, in analyzing all of the expert valuation evidence, the Ontario Court specifically found that Mr. Green's calculation of allocation under the ownership theory was correct if the MRDA governed allocation.[100]

The Ontario Court nonetheless concluded, consistent with the Bankruptcy Court and on the basis of consistent findings of fact, that "[t]he MRDA was an operating agreement and was not intended to, nor did it, deal with the disposal of all of Nortel's assets in a situation in which no revenue was being earned and no profit or losses were occurring,"[101] and, therefore, "there has been no recognized measurable right in any one of the selling Debtor Estates to all or a fixed portion of the proceeds of sale."[102]  Like the Bankruptcy Court, the Ontario Court determined that an equitable allocation was required, and concluded that a modified pro rata allocation was "what is just in the unique circumstances of this case."[103]

Motions for Reconsideration and Clarification:  Most of the Appellants filed motions for reconsideration and/or clarification.  For the first time, NNSA advanced a position separate from and in conflict with the EMEA Debtors, and the Nortel Trade Claims Consortium (an *ad hoc* and newly formed group that is not a Core Party under the Allocation Protocol) appeared.[104]

The US Debtors, in support of their motion for reconsideration, presented an "illustrative" analysis of creditor recoveries by the three geographic groups of estates.  This was based on the trial testimony of the CCC's expert, Thomas Britven, that the US Debtors insisted

---

[99] Ont. Op. ¶¶ 169-70.
[100] *Id.* App'x A ¶ 47, App'x B ¶ 99.
[101] *Id.* ¶ 172; *see also id.* ¶ 214 ("[L]ockbox funds are largely due to the sale of IP and no one Debtor Estate has any right to these funds. It cannot be said that these funds in whole or in part belonged to any one Estate or that they constituted separate assets of two or more Estates that would be combined. Put another way, there would be no 'wealth transfer' . . . .").
[102] *Id.* ¶ 224.
[103] *Id.* ¶ 204.  Despite accepting the ownership proponents' interpretation of the MRDA, the Ontario Court held that allocation on the basis of ownership of assets would constitute unjust enrichment because it concluded the MRDA did not apply to allocation.  *Id.* ¶¶ 193-201.
[104] NNSA Br. at 6-7; NTCC Br. at 16.

was unreliable,[105] consistent with their position throughout the Allocation Trial.[106]  Even with adjustments that artificially depress anticipated recoveries for creditors of the US Debtors,[107] the US Debtors' analysis showed anticipated recoveries for their unsecured creditors of 40%, for unsecured creditors of the Canadian Debtors of 49%, for unsecured creditors of the EMEA Debtors of 65%, and for the Bondholders entitled to recover from both Canadian and US Debtors of 89%.[108]  The US Debtors contended that these recoveries were so manifestly unfair as to require reconsideration, even though under their revenue theory unsecured creditors of the Canadian Debtors could expect only an 11% recovery while creditors of the US Debtors would receive 100% of their claims plus post-petition interest.[109]

The Courts rejected all grounds for reconsideration presented by Appellants, but made certain clarifications.[110]  Specifically, the Bankruptcy Court revised its opinion to correctly identify Nortel Networks Capital Corporation as guarantor of certain bonds and to omit language that might suggest that the US Allocation Decision affected the allowance of the Bondholders' claims against NNI.  The Courts also clarified that settled claims and intercompany claims within groups of Debtors would be included in the claims pools used to calculate allocation percentages, and that allocation would be made to individual Debtors and not Debtor groups.

Appeals:  Following the issuance of the decisions on reconsideration and clarification, Appellants filed notices of appeal.[111]  The Monitor, the Canadian Debtors and the CCC filed

---

[105] US Debtors Recon. Motion at 9-10 n.13, Ex. A-2, A-3.

[106] *See e.g.*, US Debtors and UCC Pre-Trial Br. at 131; B.D.I. 14178 (US Debtors and UCC Post-Trial Br.) at 137; B.D.I. 14179 (US Debtors and UCC Proposed Findings of Fact and Conclusions of Law) at 214.

[107] *See* B.D.I 15739 (Canadian Debtors Opp. to Recon.) at 14-15.

[108] US Recon. Motion, Ex. A-2.

[109] *See* TR00046 (Britven Rebuttal Report) at 5.

[110] B.D.I. 15830 (US Recon. Op.); Ontario Recon. Op.

[111] B.D.I.s 15846, 15888, 15890, 15893, 15894, 15916.  NTCC filed a notice of cross-appeal, B.D.I. 15878.

notices of contingent cross-appeal and sought leave to appeal the US Allocation Decision as an interlocutory order.[112]  They also sought certification of the appeal directly to the Third Circuit, which was opposed by the US Interests and denied by the Bankruptcy Court.[113]

## SUMMARY OF ARGUMENT

The summary of argument in the Preliminary Statement is incorporated by reference.

## ARGUMENT

**I.    THE BANKRUPTCY COURT HAD AUTHORITY TO MAKE AN EQUITABLE ALLOCATION OF THE SALES PROCEEDS**

All parties to the IFSA submitted to the Courts' jurisdiction for allocation, and based on the substantial evidentiary record at trial, the Bankruptcy Court determined that proponents of the revenue, ownership and contribution theories failed to adduce "a preponderance of evidence showing entitlement to assets and the value of those assets . . . ."  US Op. at 90-91.

If this Court determines that the Bankruptcy Court correctly concluded that neither the MRDA nor any law provides a definitive legal resolution to the allocation question in the circumstances of Nortel's global insolvency,[114] Appellants' contention that the Bankruptcy Court had no authority to adopt the modified pro rata allocation methodology must be rejected.  In these circumstances, the Bankruptcy Court appropriately used its broad powers under the Bankruptcy Code, confirmed by the parties in the IFSA, to adapt the pro rata theory advanced by certain Core Parties to resolve a novel and complex dispute based on the evidence and arguments at trial, and consistent with applicable provisions of the Bankruptcy Code.

---

[112] B.D.I.s. 15921, 15926; Misc. Action No. 15-196 (LPS) D.I. 1.
[113] B.D.I.s 15929, 15940, 15963, 15964, 15965, 15981.
[114] If this Court concludes that the Bankruptcy Court erred, the Monitor and Canadian Debtors cross-appeal the Bankruptcy Court's rejection of their ownership theory of allocation.  As discussed in Section VII *infra*, the MRDA establishes NNL's ownership of, and the Licensed Participants' limited licenses to, the IP from which the bulk of the Sales Proceeds are derived.

**A.      The Parties' Agreements Submitted Them to the Courts' Jurisdiction and Confirmed the Courts' Authority and Discretion to Resolve the Dispute**

Each of the Debtors submitted to the jurisdiction of the Courts with respect to allocation matters pursuant to, *inter alia*, the IFSA.  US Op. at 106.  Indeed, the US Debtors argued that "[t]he US and Canadian Courts *have both the power and the duty*, both under the IFSA and applicable law, to . . . *determine how the Sale Proceeds should be allocated* . . . ."  Allocation Protocol Motion ¶ 2 (emphasis added).  Neither the IFSA nor the Allocation Protocol mandates a particular allocation methodology or limits the Courts' discretion.  US Op. at 106, Ont. Op. ¶ 210.  In fact, the range of possible allocation methods was deliberately and expressly left open.[115]

**B.      The Bankruptcy Court Had the Power and Discretion Under the Bankruptcy Code to Make an Equitable Allocation**

In the absence of a statutory or contractual basis for the allocation of the Sales Proceeds, the Bankruptcy Court properly relied on Section 105(a) of the Bankruptcy Code to adopt an equitable allocation methodology.

The cases cited by Appellants merely stand for the uncontroversial proposition that Section 105(a) cannot be used in contravention of specific statutory provisions.[116]  None suggest

---

[115] US Allocation Protocol Order, Ex. 1 ¶ 4(a);  Can. Allocation Protocol Order, Sched. A ¶ 4(a) ("[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.").

[116] *See*, *e.g.*, *Law v. Siegel*, 134 S. Ct. 1188, 1194-95 (2014) (surcharge of value protected by homestead exemption contravened Section 522); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233-34,  (3d Cir. 2004) (Section 105(a) cannot be used to extend a channeling injunction to non-debtors without satisfying Section 524(g)); *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (use of Section 105(a) contravened policy behind section of the Internal Revenue Code and longstanding procedure of the IRS); *In re Perlman*, 188 B.R. 704, 709 (Bankr. S.D. Fla. 1995) (Section 105(a) cannot override specific provisions of the Internal Revenue Code); *In re Alwan Bros. Co.*, 105 B.R. 886, 895 n.10 (Bankr. C.D. Ill. 1989) (Section 105(a) cannot convert assets into property of the estate when they would otherwise fall outside of Section 541); *Giuliano v. Shorenstein Co. LLC (In re Sunset Aviation, Inc.)*, 468 B.R. 641, 648 (Bankr. D. Del. 2011) (Section 105(a) cannot be used to expand indirectly the preference period in Section 547).

that the Bankruptcy Court is prohibited from exercising its broad equitable authority to take necessary action where legal or contractual principles are inapplicable.  Indeed, the US Debtors have repeatedly invoked Section 105(a) as authority for a wide range of relief in this unique case, including as authority for entry of the Allocation Protocol and conduct of the joint trial.[117]

It has long been recognized that "bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates."  *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d. Cir. 2006).  Section 105(a) of the Bankruptcy Code embodies this broad equitable authority and "confer[s] authority [on bankruptcy courts] to fill the gaps left by the statutory language" and to "exercise equity in carrying out the *provisions* of the Bankruptcy Code."  *In re Greenwich Sentry, L.P.*, 534 F. App'x 77, 80 (2d Cir. 2013) (internal quotations and citations omitted).[118]  Thus, where a "proposed action is not expressly circumscribed and instead is in harmony with other provisions of the Bankruptcy Code as well as its overriding purpose, Section 105(a) provides a bankruptcy court power to act."  *In re Escalera Res. Co.*, No. 15-22395-TBM, 2015 WL 7351396 at *4 (Bankr. D. Colo. Nov. 9, 2015).

For example, consistent with that broad authority to act, Section 105(a) has been cited as the basis for a bankruptcy court's authority to recharacterize parties' pre-petition agreements based on economic substance rather than mere labels and to substantively consolidate estates in appropriate circumstances, despite the fact that there is no express statutory authority for either remedy.[119]  Similarly, courts have used Section 105(a) to extend the automatic stay to non-debtor

---

[117] *See e.g.* IFSA Motion; Allocation Protocol Motion.

[118] *See also In re Johns-Manville Corp.*, 36 B.R. 743, 757 (Bankr. S.D.N.Y. 1984) (holding Section 105(a) enables courts to "respond to extraordinary problems in estate administration" consistent "with the statutory goals of [the Bankruptcy Code].")

[119] *See, e.g., In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006) (recharacterization is "grounded in the bankruptcy courts' equitable authority") (citing *Pepper v. Litton*, 308 U.S. 295 (1939)); *Huntington Nat'l Bank v. Richardson (In re Cyberco Holdings, Inc.)*, 734 F.3d 432,

parties in the absence of express authorization in Section 362.[120]  Further, the broad discretion available to a bankruptcy court has been employed specifically in the allocation context.[121]

Accordingly, the Bankruptcy Court had power and discretion to order allocation on the basis of a modified pro rata methodology where it concluded that there is no other controlling statutory or contractual basis for making such an allocation.

### C.   The US Debtors and Bondholders Invent a Conflict Between the US Allocation Decision and Sections 1129 and 363

Appellants attempt to cast doubt on the US Allocation Decision by suggesting that it violates the "absolute priority rule" of Section 1129(b)(2) and the provisions of Section 363 of the Bankruptcy Code.  There is no such conflict, even if those sections applied, which they do not.  Here, the US Allocation Decision allocates Sales Proceeds to NNL on the basis of its interest in the shared assets, *not* "on account of" equity interest in NNI, as would be required to implicate the absolute priority rule in the context of a plan.  Appellants cite no case holding that the absolute priority rule applies to or restricts the allocation of proceeds from the sale of assets in which different parties have a shared interest.[122]  The US Allocation Decision provides a basis

---

438-39 (6th Cir. 2013) (reasoning courts find Section 105(a) provides equitable authority for substantive consolidation); *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 764 (9th Cir. 2000) (holding "the power of substantive consolidation derives from . . . [Section] 105 of the Bankruptcy Code.").

[120] *See F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 63 (Bankr. E.D. Va. 1993).

[121] *See In re 26 Trumbull St., Inc.*, 77 B.R. 374, 375-76 (Bankr. D. Conn. 1987) (employing an "equitable method" to allocate sale proceeds where "neither the parties nor the court" were able to "locate any decisional authority" to allocate certain sale proceeds); *In re Alliance Aerospace, LLC*, No. 01-52973-JDW, 2001 WL 1855337, *3-4 (Bankr. M.D. Ga. Sept. 13, 2001); *cf. In re Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y 2003) (holding lower court had "an ample basis on which to make an independent determination on whether the allocation was fair and reasonable.").

[122] The "absolute priority rule" applies in the context of plan confirmation and provides that a plan is not fair and equitable—and therefore cannot be confirmed under the cramdown provisions of Section 1129(b) of the Bankruptcy Code—if it provides for a distribution of estate property to a junior class of claims or interests while failing to pay dissenting senior classes in full.  *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005).

for determining the value of each Debtor's interest in property—it does not address distributions to the stakeholders of individual Debtors.  Accordingly, Appellants' contention that the US Allocation Decision violates Section 1129(b)(2) must be rejected.

The US Allocation Decision also does not violate Section 363, which governs the use, sale or lease of property of the estate.  The Bankruptcy Court authorized sales of the Nortel assets pursuant to Section 363, but never held that a specific estate was entitled to a specific portion of the Sales Proceeds on account of any specific asset sold.  *See* IFSA Order ¶¶ 2, 8. Indeed, the purpose of the IFSA was to defer the issue of how the Sales Proceeds would be allocated.  IFSA ¶ 12(a)-(c), (f).  Appellants fully supported the sales process pursuant to the IFSA in which each selling Debtor's allocation was uncertain and cannot argue now that the subsequent allocation violates Section 363.

### D. The US Allocation Decision Is Consistent With Section 541 Because the Bankruptcy Court Found No Controlling Legal Basis to Identify or Value Each Debtor's Interest in the Shared Sales Proceeds

The Bankruptcy Court's decision, based on the evidence, to adopt the modified pro rata allocation is fully consistent with Section 541 of the Bankruptcy Code.[123]  Section 541 provides that all legal and *equitable* interests of a debtor constitute property of a debtor's estate in bankruptcy, but such property interests are determined under applicable non-bankruptcy law as Section 541 does not establish property rights or provide a means to value them.[124]  The

---

[123] As a threshold matter, Appellants never objected to pro rata allocation on the basis of Section 541 notwithstanding having ample opportunity to do so in response to the UKPC, CCC and Wilmington Trust allocation positions.  As such, Appellants failed to preserve the issue for appeal.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) ("For an issue to be preserved for appeal, a party 'must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits.'") (quoting *Shell Petroleum Inc. v. U.S.*, 182 F.3d 212 (3d Cir. 1999)).

[124] *See Butner v. United States*, 440 U.S. 48, 54-55 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"); *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 242 (3d Cir. 2001).

Bankruptcy Court determined that none of the Debtors' competing allocation methodologies were sufficient to determine the scope of the Debtors' ownership of, or property interests in, the specific assets of the Nortel group.[125]  Specifically, the Bankruptcy Court found that neither the MRDA (whose primary purpose, the Bankruptcy Court found, was to enable compliance with international tax regulations as a going concern) nor any other pre-petition agreement among the Debtors provided a basis to define or quantify the parties' shared interests in the context of a global insolvency and liquidation of the Nortel group.[126]  Rather, the Bankruptcy Court found that the evidence at trial regarding how the Nortel group developed and deployed its assets established that the Debtors have shared equitable interests in the Sales Proceeds.

Based on those conclusions, and consistent with its broad powers under Section 105(a) and the IFSA, the Bankruptcy Court adopted a methodology to value each Debtor's interest in the Sale Proceeds based on the uncontroverted evidence regarding the interconnected pre-petition operations of the Nortel group and the "unified endeavour" of the constituent companies to develop and deploy Nortel products without regard to geographic boundaries.[127]  Doing so was fully consistent with Section 541 of the Bankruptcy Code, which requires the Bankruptcy Court to determine the nature and scope of a debtor's interest in property, including any *equitable* interest.  That is precisely what the US Allocation Decision has finally accomplished.

Thus, Appellants' assertions that the Bankruptcy Court erred in finding that NNI had property rights under the MRDA but did not value those rights mischaracterizes the Bankruptcy Court's analysis.  Appellants attempt to cast doubt on the reasoning of the Bankruptcy Court by citing cases from Ohio and Colorado that address the rights of *secured* creditors under Section

---

[125] US Op. at 86-91.

[126] *Id.* at 19, 60-63.

[127] *Id.* at 93-99.

506 of the Bankruptcy Code.[128]   Notwithstanding Appellants' selective citations and summaries,

neither case offers guidance in resolving the specific allocation issue that confronted the

Bankruptcy Court.   The *LTV Steel* and *Adam Aircraft* cases stand for the narrow principle that a

creditor with a proven and defined security interest in a debtor's property should recover the

value of its security interest from proceeds generated by the sale of such property when it is sold

together with other assets.[129]   The critical distinction here is that the Bankruptcy Court concluded

that "no one estate is entitled to any specific asset."[130]   There were no shared interests at issue in

the *LTV Steel* or *Adam Aircraft* cases—those courts were confronted only with the task of

ascribing value to specific, readily identifiable assets that were the subject of separate secured

creditors' liens.[131]

No relevant authority supports Appellants' contention that the Bankruptcy Court was

precluded from adopting a modified pro rata allocation methodology where it found no

controlling basis in law or contract to determine allocation.[132]   The Bankruptcy Court's adoption

---

[128] US Debtors Br. at 29; Bondholder Br. at 10-11; NNSA Br.at 10.

[129] *In re LTV Steel Co., Inc.*, 285 B.R. 259, 261-62, 267 (Bankr. N.D. Ohio 2002); *In re Adam Aircraft Indus.*, Adv. No. 09-1481 MER, 2012 WL 993477 at *1-*3 (Bankr. D. Colo. Mar. 23, 2012), *aff'd in relevant part*, No. 12-cv-01573, 2013 WL 773044 at *5, *10 (D. Colo. Feb. 28, 2013).

[130] US Op. at 99.

[131] *Compare* US Op. at 95-97, 99 (concluding that modified pro rata allocation was appropriate where Debtors' interests in Sales Proceeds are shared and not otherwise defined by agreement or law) *with LTV Steel Co., Inc.*, 285 B.R. at 261-62, 267 (preserving secured creditors' proven interest in collateral by allocating debtor's joint sale proceeds to particular assets pursuant to Section 506); *Adam Aircraft*, 2012 WL 993477 at *1-3 (finding Section 506 required determining portion of sales proceeds attributable to equipment after sale of "substantially all the estate's assets"), *aff'd in relevant part*, 2013 WL 773044 at *5, 10.

[132] Although there is a dearth of case law on allocations to debtors with shared interests in assets, *In re Trickett*, 391 B.R. 657 (Bankr. D. Mass. 2008), cited by the Bondholders, addressed spouses' shared interests in a tax refund.   After concluding that there was no rule of relevant state law that mandated a particular allocation, the *Trickett* court looked to the broader principle of marriage as a "shared partnership" to support a 50/50 allocation.   *Id.* at 661-63.   Thus, the only

of a modified pro rata allocation methodology was fully consistent with the broad powers conferred on the court by the Bankruptcy Code (and confirmed in the IFSA) to determine the Debtors' shared interests in the assets of the Nortel group and their equitable interest in the liquidation proceeds of such assets in a global bankruptcy liquidation.

## II.     THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN ADOPTING A MODIFIED PRO RATA ALLOCATION

### A.     The Bankruptcy Court's Finding That a Modified Pro Rata Allocation Is Fair and Equitable Was Not an Abuse of Discretion

#### 1.     Appellants Themselves Have Calculated Comparable Recoveries for Creditors

The "illustrative analysis" submitted by the US Debtors in support of their motion for reconsideration of the US Allocation Decision predicts a return of 40% to general unsecured creditors of the US Debtors, 49% to unsecured creditors of the Canadian Debtors, 65% to unsecured creditors for the EMEA Debtors and, to Bondholders with direct claims in Canada and guarantee claims in the United States, an 89% return.[133]  Even with the US Debtors' "limited adjustments" that artificially understate returns to their creditors, this shows that the modified pro rata allocation yields a fair and equitable result—significant and relatively consistent creditor recoveries.[134]  Such returns are not inequitable (let alone manifestly unjust as certain of the Appellants argued in support of reconsideration).  Notably, the range of recoveries is far narrower than that projected to result from the revenue, contribution and ownership theories. The US Debtors' allocation theory would have resulted in only a 10.6% recovery to creditors of the Canadian Debtors, with more than a 100% recovery to US creditors.[135]

one of Appellants' cases with analogous facts supports the Bankruptcy Court's reliance on equitable principles to determine allocation, consistent with Section 541.

[133] US Debtors Recon. Motion at 9-10.

[134] *Id.* at 10 n.13.

[135] Britven Rebuttal Report at 35 (calculating returns under the revenue theory ranging from 10.6% to Canadian creditors to 100% to US creditors, under the contribution theory from 25.4%

2.   The PBGC Claim and NGS and DiamondWare Sales Are Irrelevant

At trial, the US Debtors and the UCC (which represented the interests of the PBGC in the Allocation Trial) did not seek allocation of the book value of the NGS and DiamondWare shares to the US Debtors and did not mention the PBGC's lien over a portion of the proceeds of one business line sale.[136]   These arguments have been waived and this Court should not consider them now.[137]

The arguments also fail on their merits.  The Bankruptcy Court's findings of fact about the nature of Nortel's operations are consistent with treating the value of NGS and DiamondWare as part of the integrated line of business.  US Op. at 97.  Indeed, the recitals to the relevant Asset Sale Agreement state that NGS and DiamondWare "beneficially own[ed] and operate[d] the [Enterprise] Business"[138] together with the selling Debtors.[139]   No separate

---

[136] While the ownership theory would allocate the book value of NGS and DiamondWare to NNI, that theory is not advocated by the US Interests now.

return to Canadian creditors to 100% to US creditors, and under the ownership theory from 19.3% to EMEA creditors to 100% to US creditors).

[137] See Ins. Brokerage Antitrust Litig., 579 F.3d at 262. Similarly, NNSA contends for the first time on appeal that the modified pro rata allocation violates the conditions the Versailles Commercial Court placed on its accession to the IFSA (that "with regard to NNSA's assets the offer presented to the Court must indicate a price to be paid to NNSA"). NNSA Br. at 8. However, NNSA never contended in the Bankruptcy Court that the Versailles Commercial Court's order was relevant to allocation, waiving any such argument here on appeal.  Moreover, neither of the theories advanced by the NNSA at trial and on appeal (contribution and revenue/"license") identify specific assets of NNSA or allocate specific value to them and thus are also inconsistent with the Versailles Commercial Court's order.

[138] By contrast, the definition of "Business" specifically excludes two other non-debtor subsidiaries: LG-Nortel and NN Turkey (NETAS).  TR44163 (Enterprise ASA) at 9-10. The US Debtors, like the Canadian and EMEA Debtors, have separately sold assets, including equity interests, and retained the proceeds for the sole benefit of their creditors.  See, e.g., B.D.I.s 4025 & 4162 (sale of US Debtors' 15.6% equity interest in Blade Technologies, Inc.); B.D.I.s 5143 & 5315 (sale of US Debtors' IP addresses); B.D.I.s 5256 & 5403 (sale of NNI's Texas campus).

[139] Enterprise ASA at 1; see also B.D.I. 1248 (Reidel Aff. in Support of Approval of Enterprise Sale) ¶ 15 ("NGS performs the role of a systems integrator and channel for Nortel's Enterprise products in the US Federal government markets.").

purchase price was paid for the NGS and DiamondWare shares as part of the Enterprise sale; the purchase price was payable "in consideration of the sale of the Assets and the Shares."[140]

Arguments based on the lien granted to the PBGC over NNI's allocation from the proceeds attributable to NGS and DiamondWare are inconsistent with the position the US Debtors took at trial and take here on appeal.  They seek application of the revenue theory, which allocates all assets on the basis of proportional revenues and does not specifically value and allocate to NNI the proceeds attributable to its ownership of NGS and DiamondWare.[141]  Thus, granting their appeal still would not establish the proceeds subject to the PBGC lien.

Further, the PBGC stipulation provides for a separate allocation, to be conducted by the Bankruptcy Court alone, to determine the amount of Sales Proceeds attributable to the US Debtors' sale of NGS and DiamondWare and to which the PBGC lien should be deemed to attach.[142]  Nothing in the US Allocation Decision supersedes these provisions; nor does it prevent the PBGC claim issue from being addressed by the Bankruptcy Court once the US Debtors' allocation is finally determined.  The Bankruptcy Court therefore correctly rejected these arguments for reconsideration.  US Recon. Op. at 4.

### B.     The Bankruptcy Court Modified "Pure" Pro Rata to Accord with the Facts of the Case and to Respect the Way Nortel Operated

Based on the evidence presented at trial, the Bankruptcy Court determined that modified pro rata allocation best accords with the Nortel group's integrated operations when it created the

---

[140] Enterprise ASA § 2.2.1(a).  Thus, the US Debtors' statement that "these were Asset Sales – rather than sales of stock," US Debtors Br. at 24, is incorrect.

[141] *See* Kinrich Report at 14 n.48; Ont. Recon. Op. ¶ 28 ("[T]he U.S. Debtors' approach to allocation did not purport to allocate the value of NGS and Diamondware to the U.S. Debtors.").

[142] B.D.I. 1639 (PBGC Stipulation Motion) Ex. B ¶ 5 ("[T]he Enterprise Proceeds allocated to the US Debtors . . . will continue to be held in escrow until such time as: (i) the Share Sale Proceeds are determined pursuant to an order of the Bankruptcy Court or other allocation procedures as may be approved by the Bankruptcy Court; and (ii) the PBGC Lien is determined.").

assets that were sold.[143]   In aligning the allocation methodology with Nortel's specific circumstances and in direct response to Appellants' criticisms of the pro rata methodology, the Bankruptcy Court gave specific attention to the treatment of intercompany claims, Bondholders' guarantee claims and cash on hand.[144]   It held that US Debtors' revenue generation would be recognized by respecting NNI's $2 billion claim against NNL and leaving the Debtors with their cash on hand—hundreds of millions of dollars in the case of the US Debtors.[145]

1.   <u>Exclusion of Bondholder Claims from US Debtors' Allocation Claims Pool<br>Was Appropriate</u>

The exclusion of Bondholders' guarantee claims from the claims pools for allocation purposes is consistent with pro rata allocation.   While there is no doubt that the Bondholders contributed value, that value was contributed only once, to the Canadian issuers.[146]   The US Interests' contention that these claims should be included twice (against NNC as issuer and NNI as guarantor) for purposes of allocation is illogical and ignores that *three* Debtors (NNL, NNC and NNI) are liable on the bonds.[147]   If Bondholders' guarantees against NNI should be included for allocation, their claims against NNL also should be included.

The US Interests complain of alleged inconsistency with the treatment of the UKPC's allowed contractual claim,[148] but that different treatment is justified by different facts.   The UKPC's contractual claim arises out of negotiations among NNL, NNUK's pension committee and the UK Pensions Regulator.   Unlike the bond guarantees, with respect to which the

---

[143] US Op. at 91.

[144] *Id*. at 92-93.

[145] *Id.* at 63 (concluding that the US Debtors' allocation theory "based on revenue" was "already baked into the case by virtue of the [$2 billion] IFSA inter-company claim"); B.D.I. 13431 (Monthly Operating Report No. 60) at 2 ($749.2 million in cash on hand as of January 2014).

[146] Nothing in the US Allocation Decision affects the rights of the bondholders, and any other guarantee claimants, to receive distributions on account of the guarantees.  US Recon. Op. at 3-4.

[147] US Debtors Br. at 55-56.

[148] *Id.* at 57.

Bankruptcy Court found "insufficient trial evidence establishing pre-filing reliance by Bondholders on the corporate separateness of the various entities that comprise Nortel,"[149] the NNUK pension committee and the UK Pensions Regulator specifically and vigorously negotiated a partial, capped guarantee by NNL of a deficiency in NNUK's pension fund under certain circumstances.[150]  Giving effect to that guarantee, which was the subject of a several-week-long trial before the Ontario Court, is not inconsistent with disregarding, solely for allocation purposes, the guarantee claims of the Bondholders where the facts at trial did not establish reliance on access to a separate pool of assets.[151]

Finally, the NTCC's arguments about whether and to what extent the bond guarantee claims are allowed against the US Debtors are simply irrelevant.[152]  The Bankruptcy Court made clear that the US Allocation Decision does not affect allowance of or distribution on claims.[153]  All such issues are expressly reserved for the claims processes to be separately administered in the relevant proceedings.[154]

2.   Exclusion of Post-Petition Claims Was Appropriate

In fashioning an allocation method that reflected the Nortel group's pre-petition operations, the Bankruptcy Court properly excluded post-petition claims from the claims pools used to calculate allocations.  No pro rata proponent presented a methodology that included post-petition claims, and post-petition expenses did not contribute to the collective creation of the assets and business lines that generated the Sales Proceeds.

---

[149] US Op. at 108.

[150] As the US Debtors and UCC argued to the Courts, "the UK Pension Claimants specifically negotiated to obtain written guarantees from NNL of  the UK pension debt." B.D.I. 10690 (US Debtors and UCC Response to Core Parties' Allocation Positions) at 33.

[151] Furthermore, the UKPC's claim is more akin to the intercompany claims between the Debtor estates that are being included in the claims pool for allocation purposes.  Ont. Op. ¶ 249.

[152] *See* NTCC Br. at 10.

[153] US Op. at 106-07, 112; US Recon. Op. at 3-5.

[154] US Op. at 112.

3.   The Risk of Claims Manipulation Is Purely Speculative

The US Debtors' concern over hypothetical inflation of intercompany claims for the purpose of rigging the allocation process[155] is wholly unfounded and offensive to the fiduciaries and professionals of Debtor estates.  The Monitor and the Canadian Debtors trust, as do the Courts,[156] that any unmeritorious claims will be recognized as such and appropriately resolved by the relevant court and estate professionals in the conduct of the Debtors' claims proceedings.

## III.   MODIFIED PRO RATA ALLOCATION OF SALES PROCEEDS IS NOT SUBSTANTIVE CONSOLIDATION

Appellants contend that the modified pro rata methodology is the equivalent of an improper substantive consolidation of the Debtor estates, but that premise is not supported by a fair reading of the US Allocation Decision or Third Circuit law.  As described by the Third Circuit, substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased)."  *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005).  Courts have consistently held that substantive consolidation consists of the aggregation of assets owned by separate and distinct entities to be shared with an aggregated group of creditors.[157]

Modified pro rata allocation bears none of the hallmarks of substantive consolidation.  First, and most essentially, the Canadian, US and EMEA Debtors' separate identities and insolvency proceedings remain intact.  Second, the modified pro rata methodology only affects allocation of the Sales Proceeds from the sale of jointly-created assets escrowed pursuant to the

---

[155] US Debtors' Br. at 57.

[156] US Op. at 112; Ont. Op. ¶ 211.

[157] *See In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988); *Chem Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928 at *35 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Drexel Burnham Lambert Grp.*, Inc., 138 B.R. 723, 764  (Bankr. S.D.N.Y. 1992); *In re Parkway Calabasas*, 89 B.R. 832, 836-37 (Bankr. C.D. Cal. 1988); *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 412 (Bankr. E.D. Va. 1980); *see also* 2 COLLIER ON BANKRUPTCY ¶ 105.09[1][a] (16th ed.).

IFSA.  Other assets held separately by each of the Debtors, including significant amounts of cash on hand, proceeds of independent asset sales and assets remaining to be sold, are not affected by the US Allocation Decision.  The modified pro rata methodology cannot be an impermissible consolidation of the Debtors' Sales Proceeds if the Bankruptcy Court is correct that those assets are not in fact separate in the first place.  US Op. at 74.  In this case, and in contrast to the facts in *Owens Corning* and *New Century*,[158] modified pro rata allocation does not raise concerns that certain creditors now share assets with other creditors where previously they could expect to look to a single Debtor because, here, the Bankruptcy Court held that "no one estate is entitled to any specific asset."  US Op. at 99.  Third, the allocation methodology does not consolidate the Debtors' liabilities and preserves intercompany claims. Fourth, claims allowance proceedings in each jurisdiction will determine the claims entitled to receive distributions from each Debtor, and those distributions will include, in addition to the allocated Sales Proceeds, cash on hand, proceeds from intercompany claims and proceeds of separate sales.  The absence of any of the traditional elements of substantive consolidation underscores that modified pro rata allocation is not substantive consolidation.

## IV.   MODIFIED PRO RATA ALLOCATION IS NOT A *SUB ROSA* PLAN

Modified pro rata allocation also does not override plan confirmation requirements in contravention of the Bankruptcy Code as certain Appellants contend.  Rather, the US Allocation Decision makes clear that, after allocation of the Sales Proceeds, the "US Estate will then propose a distribution *plan* for the Court's consideration."  US Op. at 112 (emphasis added). Moreover, only a transaction that (i) disposes of substantially all the Debtors' assets, (ii) takes away a party's right to vote on or object to a plan, (iii) eliminates third parties' claims or (iv)

---

[158] *Owens Corning*, 419 F.3d at 206; *Schroeder v. New Century Liquidating Trust*, 407 B.R. 576, 582-83 (Bankr. D. Del. 2009).

calls for a change in control of the Debtors constitutes an impermissible *sub rosa* plan.[159]

Modified pro rata allocation does not dispose of all or even a portion of the Debtors' assets;

rather, it identifies the Debtors' interests in Sales Proceeds that the Bankruptcy Court found to be

subject to their shared assets.  Nor does modified pro rata allocation take away any party's plan

voting rights, improperly dispose of any third party's claims or call for a change in control of the

Debtors.  The limited and specific circumstances that constitute a s*ub rosa* plan are not present

here where, subsequent to allocation, courts and fiduciaries in each jurisdiction will

independently administer the estates, including formulating a plan for the US Debtors.

## V.      ADOPTION OF MODIFIED PRO RATA ALLOCATION DID NOT VIOLATE DUE PROCESS

Due process requires prior notice and a full and fair trial before a litigant may be deprived

of property.  *Marchant v. Penn. R.R.*, 153 U.S. 380, 386-87 (1894).  The denial of a claim to

property as a result of an adverse, but justifiable, decision is not a due process violation.  *See*

*Carey v. Piphus*, 435 U.S. 247, 259 (1978).  The requirements for due process vary based on

what is "appropriate to the nature of the case."  *Mullane v. Cent. Hanover Trust Co.*, 339 U.S.

306, 313 (1950); *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S.

886, 895 (1961).  Here, the extensive record shows that all parties had far more than sufficient

notice and opportunity to be heard with respect to both the conduct of the Allocation Trial and

the allocation methodology ultimately adopted by the Bankruptcy Court.

### A.      The Bankruptcy Court Properly Conducted the Joint Trial

In cross-border insolvency proceedings, communication between courts is common, often

---

[159] *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513-14 (Bankr. D. Del. 2010).

crucial, and therefore encouraged.[160]   The need for court-to-court communication and joint hearings has been evident since the Petition Date, when the Canadian and US Debtors filed motions to approve the Cross-Border Protocol. B.D.I. 18.   The Allocation Trial was held in accordance with the provisions of the Cross-Border Protocol and the subsequent Allocation Protocol.   The parties consented to a joint trial to determine their rights in the Sales Proceeds, IFSA ¶ 16(b), and the Allocation Protocol, Litigation Timeline and Discovery Plan were approved on notice after joint hearings, B.D.I. 9947, 10527.   Accordingly, all parties had notice and ample opportunity to be heard regarding the conduct of the Allocation Trial.[161]

The Allocation Trial was held jointly with respect to testimony of witnesses and submission of evidence, but no "joint adjudication occurred" as NNSA contends.   NNSA Br. at 24.   Both Courts made clear that they "conducted the cases independently, while cooperatively."

---

[160]   *See*, *e.g.*, *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1053 (2d Cir. 1996) ("[B]ankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a case-by-case basis."); *Stonington Partners Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 133 (3d Cir. 2002) ("We strongly recommend, in a situation such as this, that an actual dialog occur or be attempted between the courts of the different jurisdictions in an effort to reach an agreement as to how to proceed . . . . "); *In re Fed.-Mogul Global, Inc.*, No. 01-10578, 2002 WL 34946156, at *1 (Bankr. D. Del. Feb. 7, 2002) (approving cross-border protocol); *In re Commodore Int'l, Ltd.*, 242 B.R. 243, 256 (Bankr. S.D.N.Y. 1999) (deferring to Bahamian insolvency proceedings under cross-border protocol); *In re Ionica PLC*, 241 B.R. 829, 835 (Bankr. S.D.N.Y. 1999) (noting "the Court's insistence" that a cross-border protocol be adopted); *see also* 11 U.S.C. §§ 1525 & 1527 (2006) (US court "shall cooperate to the maximum extent possible with a foreign court" through "any appropriate means."); H.R. Rep. No. 109-31, pt. 1 at 157 (2005) ("United States bankruptcy courts already engage in most of the forms of cooperation described here, but they now have explicit statutory authorization for acts like the approval of protocols of the sort used in cases.").

[161]   Contrary to NNSA's arguments, Sections 1525 and 1527 apply to plenary bankruptcy proceedings.   *See In re Awal Bank, BSC*, 455 B.R. 73, 81-82 (Bankr. S.D.N.Y. 2011); *In re SPhinX, Ltd.*, 351 B.R. 103, 113 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007). NNSA also forgets that the Bankruptcy Court is presiding over chapter 15 cases for the Canadian and EMEA Debtors.   Further, the Bankruptcy Court complied with Bankruptcy Rule 2002(q) providing notice of its intent to communicate by approving of the Cross-Border Protocol which made clear that the Courts could "*communicate with each other during or after any joint hearing, with or without counsel present* . . . ." Amended Cross Border Protocol Order Ex. A. ¶ 12(d)(vi) (emphasis added).

US Op. at 59; Ont. Op. ¶ 10.  In fact, on the last day of trial, the Bankruptcy Court solicited the parties' views on communication between the Courts.[162]  No party objected to communication, and all parties, including NNSA, therefore waived any right to challenge the result of the Allocation Trial on that basis.  *United Parcel Serv. v. Int'l Bhd. Local Union No. 430*, 55 F.3d 138, 140 n.5 (3d Cir. 1995).

### B.    Modified Pro Rata Allocation Was Litigated During Trial

The US Debtors suggest that the Bankruptcy Court concocted the modified pro rata allocation *sua sponte* by repeatedly emphasizing that the Bankruptcy Court rejected all of the allocation methodologies proffered by the "Debtor Group[s]," [163]  but the Debtors were not the only parties to the Allocation Trial.  The Core Parties defined by the Allocation Protocol include the UKPC, the CCC and Wilmington Trust, each of which advocated pro rata allocation and modifications to pro rata were explored during the testimony of their experts.[164]  Any claim that the US Debtors had no opportunity to challenge modified pro rata at trial is without basis.

> From the outset, the pro rata proponents made clear that
>
> [t]he Pro Rata Distribution Model, being based in equity, is a flexible concept that can permit numerous variations to achieve, so far as possible, an equitable outcome among all unsecured creditors [and] is sufficiently flexible to accommodate any findings that the Courts might make regarding the guarantees held by any creditor, any inter-company claims that might exist or any other factors that the Courts consider appropriate in resolving the Allocation Litigation.[165]

The US Debtors acknowledged that the proposed pro rata allocation could be adapted to resolve certain concerns and specifically argued against it, contending that "the prejudice to creditors

---

[162] *See* n.82, *supra*, and associated text.

[163] US Debtors Br. at 16, 19, 23, 30-31, 52.

[164] June 5, 2014, Trial Tr. 3056:15-3058:7, 3060:17-3061:5, 3069:19-3070:5 (Bazelon); Britven Depo. 293:21-295:7 (questioning by counsel for US Debtors); *see also* US Op. at 112 ("The Court has answers to the concerns expressed.").

[165] B.D.I. 13451 (UKPC Pre-Trial Br.) at 27; *see also* CCC Pre-Trial Br. at 93-94.

around the globe resulting from the imposition of a legally and factually unsupportable theory, even in a 'modified' form, should not be permitted."[166]

Coleman Bazelon, the UKPC expert, specifically addressed different ways NNI's $2 billion allowed intercompany claim against NNL could be treated in the context of a pro rata allocation.   June 02, 2014, Trial Tr. 2955:9-2959:4 (Bazelon).   And on cross-examination, counsel for the UCC questioned Mr. Bazelon on how pro rata allocation could be modified with respect to other issues, such as cash settlements, the EMEA Debtors' claims process, allowance of claims by the UKPC against multiple Debtors, guarantees and intercompany claims.   *See* June 05, 2014, Trial Tr. 3039:03-3073:20 (Bazelon).   Likewise, the CCC reiterated in its post-trial brief that

> Pro Rata Allocation is a flexible approach capable of efficient implementation in a manner sufficiently adaptable to overcome concerns raised by the U.S. Interests and EMEA Debtors, including with respect to the treatment of (i) solvent and near solvent Debtor Estates, (ii) Intercompany Claims and (iii) guaranteed debt.[167]

Thus, the parties considered the flexibility offered by a pro rata approach, explored permutations at trial and had ample opportunity to challenge them.   The Bankruptcy Court's adoption of the modified pro rata methodology is not the application of an allocation "paradigm not argued by the parties" or a "model that has not been considered."[168]

### C.    Appellants Cannot Complain of the Absence of Evidence Where They Sought its Exclusion

Appellants argue that the record below was not sufficiently developed with regard to the modified pro rata methodology, but that is because they chose for tactical reasons to respond to the allocation positions of the UKPC, CCC and Wilmington Trust in a limited manner and provided no alternative calculations or illustrative recoveries.   Instead, they argued that creditor

---

[166] B.D.I. 13454 (US Debtors and UCC Pre-Trial Br.) at 139.
[167] CCC Post-Trial Br. at 72; *see also* UKPC Post-Trial Br. at 38.
[168] *Adam Aircraft*, 2012 WL 993477 at *3; *LTV Steel*, 285 B.R. at 267.

distributions and relative recoveries were irrelevant to the allocation determination and sought to limit disclosure and consideration of such evidence.[169]

Likewise, the PBGC's argument that the Bankruptcy Court failed to consider the value of its lien on the proceeds of the sale of NGS and DiamondWare (PBGC Br. at 8) cannot be entertained on appeal where neither the US Debtors nor the UCC (which represented the interests of the PBGC in the Allocation Trial) introduced such evidence at trial.[170] The Bankruptcy Court also correctly rejected this argument on reconsideration as irrelevant in the context of the modified pro rata allocation.[171] If, however, this Court gives any credence to the claim that the value of NGS and DiamondWare should have been allocated to the US Debtors, it must rely on the only evidence presented—that put forth by the Canadian Debtors' expert valuing their shares at approximately $111 million[172]—and disregard the PBGC's belated and unsupported claim of greater value. *See* PBGC Br. at 8.

The US Debtors contend that the Bankruptcy Court should have requested additional expert analysis to determine the "legally correct" allocation. US Debtors Br. at 35-36. However, a "trial judge does not abuse his [or her] discretion in declining to appoint an independent expert if it determines that the expert is solely to benefit a party who has otherwise failed to gather such evidence as would suffice to prove his claims." *Stones v. McDonald*, 7 F. Supp. 3d 422, 431-32 (D. Del. 2014) (internal quotations omitted). Here, Appellants had ample opportunity to, and

---

[169] *See*, *e.g.*, US Debtors Motion to Strike Pro Rata Experts at 28 ("Choosing an allocation methodology based on the supposed 'fairness' of perceived recoveries is inappropriate. . . . The size of the claims against [an estate] is irrelevant."); US Debtors and UCC Pre-Trial Br. at 139 n.473; B.D.I. 13906 (June 27, 2014, Hr'g Tr.) 21:23-22:13 (US Debtors successfully oppose UKPC request for exchange of information regarding each estate's assets and liabilities); B.D.I. 14435 (Bondholders Post-Trial Br.) at 3, 9; *see also* May 13, 2014, Trial Tr. 353:22-3541 (UCC Opening) ("[W]hat a particular allocation methodology yields in terms of creditor recoveries, that is just not relevant to the question of the allocation that the estates are entitled to.").

[170] *See Ins. Brokerage Antitrust Litig.*, 579 F.3d at 262.

[171] US Recon. Op. at 4.

[172] Green Report, Ex. D.

did, present expert testimony to support their allocation theories and also to attack or present alternate calculations under other allocation theories, but that testimony fell short.  US Op. at 89-90.  "It is 'axiomatic that the trier of fact is not bound to accept expert opinion.'"  *In re ID Liquidation One, LLC*, No. 11-11046, 2013 WL 6701911, at *2 (Bankr. D. Del. Dec. 19, 2013) (quoting *Minn. Mining & Mfg. Co. v. Berwick Indus., Inc.*, 532 F.2d 330, 333 (3d Cir. 1976)) Moreover, "such testimony is ordinarily not conclusive."  *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 689 (E.D. Pa. 2001), *aff'd*, 53 F. App'x 226 (3d Cir. 2002).  The Bankruptcy Court had no duty to order additional testimony on areas Appellants strategically chose not to address and acted well within its authority as trier of fact in rejecting testimony that it found to be flawed.

Finally, the Bankruptcy Court did not err by ordering an equitable remedy that was not identical to any of the experts' theories.[173]  When acting as fact-finder making a complicated valuation determination, a court may rely "on the evidence presented in the case . . . the exhibits submitted with the experts' opinions and [the Court's] own common sense."[174]  Accordingly, the Bankruptcy Court did not err by reaching its own factual conclusions based on evidence and argument that the parties had ample opportunities to present and test.

## VI.   THE BANKRUPTCY COURT PROPERLY DISMISSED THE REVENUE AND CONTRIBUTION THEORIES

### A.   The Bankruptcy Court Properly Dismissed the Revenue Theory

The US Interests' revenue theory proposes allocation in proportion to revenue in each party's jurisdiction in 2009.  This allocation flies in the face of both the Bankruptcy Court's unchallenged findings of fact and their own interpretation of the MRDA.  The revenue theory

---

[173] *See Drysdale*, 153 F. Supp 2d at 689-91 (rejecting "proposition that the Court was required to adopt either one of the two expert opinions in its entirety" because doing so "would improperly invade on the role of the fact finder and would elevate the testimony of the expert above that of other witnesses.").
[174] *Id.* at 691.

ignores all costs, including the profit-sharing obligations that encumbered the MRDA licenses. With respect to the RPSM, this is supposedly because it does not apply to proceeds from the sale of a business, but the revenues used as an allocation metric were in fact subject to that obligation.[175]   As the Bankruptcy Court correctly held, the revenue theory is flawed because it "equate[s] revenue to value without any regard to where the value-generating assets were developed . . . ."  US Op. at 62.  The US Debtors' theory would not provide the creator of IP with any compensation in its sale, but would reward the distributor alone.  The US Debtors' myopic focus on revenues in 2009 also ignores that they were generated by a failing, loss-making business.[176]

The Bankruptcy Court correctly rejected the evidence of the US Debtors' expert with respect to allocation under the revenue theory.  Mr. Kinrich conceded that with respect to the business line sales he made no attempt to value the particular rights contended by the US Interests to have been granted to the Licensed Participants under the MRDA.[177]   Thus, the revenue theory is just as much an attempt at equitable allocation of the Sales Proceeds as the modified pro rata methodology adopted by the Bankruptcy Court, only with manifestly unjust results.  Mr. Kinrich failed to perform a discounted cash flow analysis, which he conceded would have been most appropriate, to value such licenses. US Op. at 89.[178]   A discounted cash flow

---

[175] *See* IFSA ¶¶ 1, 3; FCFSA ¶¶ 1, 3 (resolving NNL's claims against NNI for transfer pricing payments owed post-petition on 2009 revenues).

[176] Green Rebuttal Report at 12-13.

[177] US Op. at 89-90.

[178] June 18, 2014, Trial Tr. 4328:13-4329:14 (Kinrich).  The Bondholders are correct that Mr. Kinrich claimed to perform discounted cash flow analysis with respect to the Rockstar Sale; however, this suffered from critical, fundamental flaws and the Ontario Court therefore held that "Mr. Kinrich did not carry out a valid DCF valuation."  Ont. Op. App'x B ¶ 23.  Mr. Kinrich adopted revenue projections from one of several models (and not the last) prepared for the proposed IPCo, but this did not identify the revenues to be earned by NNI or NNL, instead making projections for "North America."  Kinrich Report at 46; Green Rebuttal Report at 16, 19.  To divide the revenue stream, Mr. Kinrich used the relative telecommunications infrastructure

analysis would consider not only projected revenues, steeply declining in light of Nortel's economic distress, but also would account for the costs associated with achieving those revenues, including obligations of the MRDA Participants.[179]   The Bondholders' argument[180] that a proportional split by revenues is the "economic equivalent" of a discounted cash flow analysis ignores Mr. Kinrich's critical concession that the Nortel companies did not have a standard cost structure, but rather had widely divergent ratios of costs (particularly R&D costs) to revenues.[181] In the absence of *any* consideration of costs, the Bankruptcy Court had no way of "simply adjust[ing] the results of his analysis to correct for such deficiency," as the Bondholders suggest.[182]

### B.      The Bankruptcy Court Properly Dismissed the Contribution Theory

The contribution theory contends that all MRDA Participants were joint owners of all NN Technology as a matter of law because, under certain countries' laws, the employers of inventors own any resulting IP.  The EMEA Debtors go further and argue they beneficially own *all* Nortel employees' inventions because R&D at Nortel was performed on a global and integrated basis.

---

spending of Canada versus the United States, but there was no evidence that either Rockstar or IPCo's licensing business would have any relationship to those figures.  Green Rebuttal Report at 5-7.  In addition, to relate the amount paid by Rockstar to the IPCo projections, Mr. Kinrich used an unrealistically low discount rate—15% instead of the 25%-45% used in the IPCo— failing to recognize that the greater value paid by Rockstar was due to attributes it had that Nortel lacked, such as the defensive value to the numerous technology companies in the Rockstar consortium and their vastly greater resources to bring infringement litigation.  Green Rebuttal Report at 10, 17-18.  This, then, is not value NNI could have realized under its license and should instead be allocated to the owner of the patents, NNL, who held all rights not licensed.  Green Rebuttal Report at 19-20.

[179] Green Rebuttal Report at 11-12, 15.

[180] Bondholders Br. at 23.

[181] June 18, 2014, Trial Tr. 4326:20-4327:20 (Kinrich) (responding to quote from his reference, "Valuing Small Businesses and Professional Practices," TR50451 at 341-42, which states that a gross revenue approach is appropriate where "an industry or profession has a fairly standard cost structure," Mr. Kinrich agreed that "no one could conclude that the cost structure of Nortel Canada was similar to the cost structure of Nortel US").

[182] Bondholders Br. at 23.

Under US law, however, it is the inventor and not the employer who is the owner of his or her invention until he or she assigns it.[183]  All Nortel employees worldwide were required to assign any IP generated during the course of their employment to NNL.[184]  Thus, the contribution theory is impossible to sustain in the face of US law, Nortel's employment contracts and Licensed Participants' obligations under the MRDA to execute any documents necessary to vest legal title to all NN Technology in NNL.[185]

## CONTINGENT CROSS-APPEAL

**VII.    IF THE BANKRUPTCY COURT ERRED IN ORDERING AN EQUITABLE ALLOCATION BASED ON THE FACTS OF NORTEL'S OPERATIONS, THIS COURT SHOULD ORDER ALLOCATION ON THE BASIS OF OWNERSHIP**

### A.    The Bankruptcy Court Erred in its Construction of the MRDA under Ontario Law

The Bankruptcy Court correctly found that Ontario law governs the interpretation of the MRDA and recognized that the plain language of the MRDA supports the interpretation advanced by the Monitor, the Canadian Debtors and other proponents of ownership-based allocation.  US Op. at 64, 74 ("The Canadian Debtors[] rel[y] on a strict interpretation of the MRDA . . . .").  Yet the Bankruptcy Court, contrary to the Ontario Court and contrary to Ontario law holding that licenses do not convey property interests in the licensed IP, rejected a plain reading of the MRDA and held that, in view of the "economic reality" of Nortel's operations, the "MRDA establishes the Participants' shared ownership of the Nortel assets which are now the Sales Proceeds."  US Op. at 74.  In so doing, the Bankruptcy Court committed an error of Ontario law that must be reversed, if this Court concludes that the rights granted under and confirmed in the MRDA are determinative of the allocation issue.

---

[183] *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196-97 (2011).

[184] TR00006 (de Wilton Aff.) ¶¶ 8-12; T. Collins Depo. 40:10-41: 20.

[185] MRDA Art. 4(b).

This Court should be guided in its review of the Bankruptcy Court's decision by the authoritative interpretation by the Ontario Court of the Ontario-law governed MRDA,[186] particularly because the use of "factual matrix" evidence in contract interpretation is foreign to US courts.[187] The Bankruptcy Court's error was based on a misunderstanding of the Ontario law of contract interpretation, which requires a court to consider the "factual matrix" surrounding the contract, even where the contract is unambiguous. *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 (Can.). The concept of "factual matrix" is not equivalent to the Delaware law concept of "parol evidence"—for example, the parties' subjective intentions and understandings are not admissible as factual matrix evidence.[188] Thus, the Bankruptcy Court erred as a matter of law in considering (i) the views expressed by former Nortel employees and professionals with respect to whether the MRDA was intended to have effect in a global insolvency of the Nortel group, US Op. at 61,[189] (ii) statements to tax authorities about the MRDA and Nortel's transfer pricing, *id.* at 77-78, and (iii) the supposed intention of the Nortel tax department to avoid creation of a "permanent establishment" by NNL for US tax purposes, *id.* at 20, to be factual

---

[186] If the MRDA applies, allocation by ownership would not be unjust enrichment. *Kerr v. Baranow*, 2011 SCC 10 ¶¶ 32, 40-41 (Can.) (holding unjust enrichment claim fails where a contract governs the relationship between the parties); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. Ch. 2009) (same).

[187] *See Bodum USA, Inc. v. La Cafetière, Inc.*, 621 F.3d 624, 630-31 (7th Cir. 2010) (Easterbrook, C.J.) (deferring to a Danish court's previous interpretation of the French contract central to the dispute because the Danish court was more familiar with the civil law tradition of French law); *see also Grupo Protexa, S.A., v. All Am. Marine Slip*, 20 F.3d 1224, 1239 (3d Cir. 1994) (in determining foreign law, the court may consider any relevant material whether or not submitted by a party and is not limited to the materials available to the court below).

[188] *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 ¶ 16 (Can. Ont. C.A.) (holding that factual matrix excludes "subjective evidence of the intention of the parties") (quoted in Ont. Op. ¶ 52 and US Op. at 65).

[189] The Ontario Court rejected this evidence as inadmissible hearsay as well as not part of the factual matrix. Ont. Op. ¶ 119.

matrix evidence relevant to its interpretation of the MRDA.[190]

The Bankruptcy Court then compounded its error in misidentifying relevant "factual matrix" evidence by concluding that such evidence could negate the plain language of the MRDA, incorrectly relying on *Sattva*, 2014 SCC 53 ¶ 48.  US Op. at 74.  The Ontario Court, presented with the same evidence, correctly applied Ontario law, including *Sattva*, and held that the "surrounding circumstance or factual matrix evidence [does not] provide much clear assistance in construing the meaning of the terms in the MRDA." Ont. Op. ¶ 157.  The Ontario Court further cautioned that even if it were required to consider the factual matrix evidence, it "would be required to be guided by the dictates of *Sattva* that while the surrounding circumstances will be considered in interpreting a contract . . . they must never be allowed to overwhelm the words of the contract and the interpretation of a contract must always be grounded in the text." *Id.*

Thus, in light of both the law of contract interpretation and the principle that "[a] licensee does not enjoy property rights,"[191] the Ontario Court concluded that

> NNL had all ownership interests of the NN Technology subject to grants, being (i) the grant to each Licensed Participant of a non-exclusive right to assert actions and recover damages in their territory under article 4(e) and (ii) the grant of exclusive and non-exclusive licenses to the Licensed Participants under article 5(a).
>
> The licenses under article 5(a) were not licenses of all rights to the NN Technology but were subject to field of use restrictions that gave the Licensed Participants the right to use the NN Technology to make, use or sell Products as defined in the MRDA, which meant products, software or services that were made or sold by, or for, any of the Licensed Participants.  The Products must have been created or marketed by or for the Nortel Group.  No product that was part of a third party's business rather than the business of Nortel fell within the definition

---

[190]  The Bankruptcy Court also committed clear error in relying on supposed "custom and practice" evidence from a Canadian lawyer who testified that no common custom or practice applied to agreements like the MRDA. *See* US Op. 79-80; Bereskin Depo. 23:8-25:13; *Jevic Holding*, 787 F.3d at 179 (findings of fact are reviewed for clear error).

[191]  Ont. Op. ¶ 82.

of Products.  The business considered by IPCo was not covered by the licenses.  The Licensed Participants' rights to sublicense were subject to these restrictions.[192]

The Bankruptcy Court therefore committed an error of Ontario law in allowing unspecified "facts [that] make it clear to the [Bankruptcy] Court that the U.S. Debtors and the EMEA Debtors held an economic and beneficial ownership interest in Nortel's assets," US Op. at 74, to supplant the plain language of the MRDA granting the Licensed Participants only contractual licenses to use Nortel IP in connection with Nortel products.[193]  If this Court determines that the MRDA is relevant to allocation, it should reverse the Bankruptcy Court's legal errors to conclude that the MRDA only grants the US and EMEA Debtors licenses subject to field of use restrictions, and vests full ownership of the NN Technology with the Canadian Debtors and concomitant rights to allocation of the Sales Proceeds.

## B.     Principles of Comity Support Adopting the Ontario Court's Interpretation of the MRDA

Comity is "the recognition which one nation allows within its territory to the . . . judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  The Third Circuit has repeatedly emphasized the importance of comity in cross-border proceedings.  *See, e.g.*, *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 159-60 (3d Cir. 2001) ("In parallel litigation, the issue of comity is an important and omnipresent factor" and "assumes even more significance in international proceedings.").  In this unique case, the Canadian and US proceedings were not simply parallel—the role of comity must be

---

[192] *Id.* ¶¶ 169-70.  The Ontario Court also correctly concluded that the former R&D Cost Sharing Agreements, governed by Ontario law, confirmed ownership in NNL and granted licenses to the other parties that did not convey ownership rights in the technology.  *Id.* ¶¶ 70-79.

[193] *See Primo Poloniato Grandchildren's Trust (Tr. of) v. Browne*, 2012 ONCA 862 ¶ 71 (Can.) (holding that evidence of the factual matrix cannot be used to effectively make a new agreement between the parties); *Sattva*, 2014 SCC 53 ¶ 57 (same).

heightened where the Ontario Court and the Bankruptcy Court were simultaneously presented with the exact same evidence and argument with respect to the interpretation of the MRDA under Ontario law.

In the global bankruptcy context, the Third Circuit recognizes the importance of comity. For example, it has held that a US court's order imposing a constructive trust upon assets regardless of their location impaired the Dutch bankruptcy proceeding from executing its obligations under Dutch bankruptcy law, which offended the principles of comity. *Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1272-74 (3d Cir. 1987). Likewise, where a contract is governed by foreign law, courts have deferred to the interpretation of a foreign court in a parallel proceeding.[194] Thus, as a matter of policy with respect to both foreign insolvency proceedings and the interpretation of contracts governed by foreign, law, comity strongly supports this Court adopting the Ontario Court's interpretation of the MRDA.

## C.  This Court Has Sufficient Evidence to Order Allocation Based on Ownership

If this Court adopts the Ontario Court's interpretation of the MRDA, whether by correcting the Bankruptcy Court's misapplication of Ontario law and erroneous findings of facts or by deferring to the Ontario Court under principles of comity, it has sufficient evidence in the record to order an allocation of the Sales Proceeds in accordance with ownership. The Ontario Court performed a detailed analysis of the expert valuation evidence and concluded with respect to both the business line sales and the Rockstar Sale that "[o]ne cannot quarrel with the logic" of Mr. Green's valuation if the Monitor and the Canadian Debtors' "interpretation [of the MRDA] were to govern allocation." Ont. Op. App'x A ¶ 47, App'x B ¶ 99. As with the Ontario Court's

---

[194] *See*, *e.g.*, *Tarazi v. Truehope Inc*., 958 F. Supp. 2d 428, 435-36 (S.D.N.Y. 2013) ("Because the document that lies at the foundation of these actions has a close connection with the foreign forum and is to be interpreted according to the laws of the foreign forum, it is appropriate to defer to that forum."); *see also Bodum*, 621 F.3d at 630 ("It would not be sensible to create an international conflict about the interpretation of this contract.").

legal analysis of the MRDA, this Court may adopt its legal and factual analysis of the valuation evidence under principles of comity.[195]

## VIII.   IF THE COURT CONSIDERS THE CONTRIBUTION THEORY THE BANKRUPTCY COURT CORRECTLY REJECTED, IT SHOULD CORRECT CLEAR ERRORS RELATING TO THAT THEORY

NNSA asks this Court to adopt the contribution theory of allocation.   While the Bankruptcy Court correctly rejected the contribution theory for several reasons,[196] certain errors relating to that theory's premises must be corrected if the modified pro rata allocation is not affirmed and allocation on the basis of contribution is considered.

### A.     The Bankruptcy Court Erred in Characterizing Transfer Pricing Payments Required by the MRDA as a "Contribution" to R&D

The Bankruptcy Court's characterization of transfer pricing payments as "contributions" to R&D is clearly erroneous both as a matter of fact and as a matter of the law of transfer pricing. The expert evidence offered in support of including a portion of transfer pricing payments in R&D expenditure was also deeply flawed, not least because it ignored the $2 billion reversal of transfer pricing payments required by the Canadian and US tax authorities in its calculations.[197]

The purpose of transfer pricing payments is to approximate an arm's-length price for the R&D shared with other MRDA Participants.[198]   They were income to which the recipient was entitled as a matter of contract and as a matter of tax law.  An MRDA Participant in possession

---

[195] *See Gen. Elec.*, 270 F.3d at 159-60; *Remington Rand*, 830 F.2d at 1272-74; *Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156, 191 (E.D.N.Y. 2003) ("'American courts will normally accord considerable deference to foreign adjudications as a matter of comity.'  In some cases, this deference leads a domestic court to adopt a foreign tribunal's previous resolution of a particular legal or factual issue . . . .") (quoting *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001)).

[196] US Op. at 88-89.

[197] May 28, 2014, Trial Tr. 2086:2-16 (Huffard); Eden Report at 72.  US Debtors' expert Laureen Ryan also had no principled basis to attribute any portion of transfer pricing payments to R&D in particular, and somehow calculates a negative total contribution to R&D through transfer pricing. *See* US Op. at 18 (copying TR00055 (Ryan Report) at 16).  Her evidence must be rejected.

[198] *See, e.g.,* MRDA Art. 3(a).

of funds greater than the profits to which it was entitled under the MRDA (typically because its share of revenues exceeded its share of R&D expenditures) was obligated to make a transfer pricing payment to an undercompensated party.  The Ontario Court therefore found no basis to account for transfer pricing payments as if they constituted R&D expenditures.[199]  Indeed, a Memorandum of Understanding executed shortly before bankruptcy confirms that no MRDA Participant had an ownership interest in the funds in its possession that exceeded its entitlement under the RPSM;[200] thus, the transfer of such funds to another MRDA Participant as required by the MRDA could not carry with it any proprietary interest.  The Bankruptcy Court's mischaracterization of tracing pricing payments as R&D contributions should be reversed.

### B.     The Bankruptcy Court Erred in Substituting the Useful Life of Nortel's Patents for the Useful Life of R&D Expenditure

The Bankruptcy Court's factual findings related to the long useful life of Nortel's *patents* were not themselves in error, but the Bankruptcy Court committed clear error by ignoring unsuccessful R&D and focusing only on patents in assessing the useful life of R&D expenditure used as the allocation metric under the contribution theory.[201]  As the Bankruptcy Court correctly noted, some R&D expenditure does not result in IP, or gives rise to IP that is never incorporated into Nortel products.[202]  Such R&D expenditure has a very short useful life or none at all and should lower the *average* economic life of a dollar of R&D expense.[203]

In connection with developing the MRDA, Nortel's tax and transfer pricing professionals analyzed this very issue, to ensure that MRDA Participants were appropriately compensated under the RPSM for their R&D expenditures.  They found that telecommunications R&D has a

---

[199] Ont. Op. App'x B ¶¶ 87-89.

[200] MOU ¶ 12.

[201] US Op. at 26-27.

[202] *Id.* at 97 (citing TR31355 (2000-2004 Functional Analysis) at 24).

[203] June 17, 2014, Trial Tr. 3890:6-3891:16 (Reichert).  The average is relevant because there is no way to determine which expenditures resulted in IP.  US Op. at 11.

short useful life; only 70% of the Nortel group's approved R&D projects resulted in commercially viable products; and significant R&D expense consisted of setting strategy and considering emerging technology, rather than building specific technology or products.[204]   The move to a five year "look-back" was prompted by accelerating obsolescence in telecommunications technology due to the rapid pace of development and entry of new competitors.[205]   The Bankruptcy Court should not have accepted *post hoc* changes to the pre-petition calculation of R&D expenditure to support a theory itself divorced from the law and the facts, and which it correctly rejected.

## **CONCLUSION**

For the foregoing reasons, the Monitor and Canadian Debtors respectfully request that this Court affirm the US Allocation Decision.   Alternatively, if this Court finds that the Bankruptcy Court erred in ordering an equitable allocation, the Monitor and Canadian Debtors respectfully request that this Court order allocation of the Sales Proceeds in accordance with the ownership of the assets sold as set forth in the report of Philip Green.

Dated:  January 12, 2016             ALLEN & OVERY LLP
        Wilmington, Delaware

                                    Ken Coleman (admitted *pro hac vice*)
                                    Jacob S. Pultman (admitted *pro hac vice*)
                                    Laura R. Hall (admitted *pro hac vice*)
                                    1221 Avenue of the Americas
                                    New York, New York 10020
                                    Telephone: (212) 610-6300
                                    Facsimile: (212) 610-6399

                                    – and –

---

[204] TR11055B (Horst Frisch Analysis) at 39-40; TR21080 (Nortel Networks APA Responses) at 10.
[205] TR22078 (NNL and NNI APA Request: 2007-2011) at 11, 49-50 (finding, *e.g.*, that Nortel's overall technology lifecycle is 4.4 years based on 2006 revenue by business segment).

BUCHANAN INGERSOLL & ROONEY PC
*/s/ Mary F. Caloway*
Mary F. Caloway (No. 3059)
Kathleen Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

*Counsel for the Canadian Debtors and Ernst &
Young Inc., as Monitor and Foreign Representative
of the Canadian Debtors—Appellees and
Contingent Cross-Appellants*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Bankr. P. 8015(a)(7)(C), I hereby certify that this brief contains 50 or fewer pages, exclusive of the portions exempted under Fed. R. Bankr. P. 8015(a)(7)(B)(iii), and therefore complies with the length requirements established by this Court's November 2, 2015, Order.


<u>*/s/ Mary F. Caloway*</u>
Mary F. Caloway