# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* Nortel Networks Inc., *et al*.,<br><br>Debtors.[1] | Chapter 11<br>Bankruptcy Case No. 09-10138 (KG)<br>Jointly Administered |
| Nortel Networks Inc., *et al*.,<br><br>Appellants and<br>Cross-Appellees,<br><br>v.<br><br>Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors, *et al*.,<br><br>Appellees and<br>Contingent Cross-Appellants. | Appeals from the Bankruptcy Court<br>Civil Action No. 15-624 (LPS)<br>Civil Action No. 15-586 (LPS)<br>Civil Action No. 15-622 (LPS)<br>Civil Action No. 15-623 (LPS)<br>Civil Action No. 15-627 (LPS)<br>Civil Action No. 15-628 (LPS)<br>Civil Action No. 15-635 (LPS)<br>Civil Action No. 15-636 (LPS)<br>Civil Action No. 15-699 (LPS)<br>Misc. Action No. 15-196 (LPS)<br>Misc. Action No. 15-197 (LPS)<br>CONSOLIDATED APPEALS |

## CROSS-APPEAL REPLY BRIEF OF MONITOR AND THE CANADIAN DEBTORS

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
BUCHANAN INGERSOLL & ROONEY PC
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

Ken Coleman (admitted *pro hac vice*)
Jacob S. Pultman (admitted *pro hac vice*)
Laura R. Hall (admitted *pro hac vice*)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

*Counsel for the Canadian Debtors and Ernst & Young Inc., as Monitor*

Dated:  March 11, 2016

---

[1]  The debtors in these chapter 11 cases and the last four digits of their respective tax identification numbers are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (US) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) (collectively, the "US Debtors").

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT...........................................................................................................................4

I.      THE US DEBTORS AND THE UKPC MISCONSTRUE THE PURPOSE OF
        CONTINGENT CROSS-APPEAL................................................................................4

II.     OWNERSHIP IS A QUESTION OF ONTARIO LAW SUBJECT TO *DE NOVO*
        REVIEW ...................................................................................................................5

III.    THE BANKRUPTCY COURT'S ERRONEOUS INTERPRETATION OF THE
        MRDA UNDER ONTARIO LAW MUST BE REJECTED.................................................6

        A.      The Bankruptcy Court Erred in Giving Effect to MRDA Recitals and
                Schedule A ...................................................................................................6

        B.      The Bankruptcy Court and the US Debtors Ignore Contractual Limitations
                on the MRDA Licenses...................................................................................8

        C.      The Bankruptcy Court Committed Legal Error in Identifying the Factual
                Matrix ........................................................................................................10

IV.     THE MRDA LICENSES DID NOT CONVEY "OWNERSHIP" UNDER US
        LAW .......................................................................................................................15

V.      THE MRDA HAS NOT BEEN TERMINATED ............................................................17

VI.     THE US DEBTORS' CLAIMS OF WAIVER REGARDING THE
        INTERPRETATION OF THE MRDA ARE BASELESS .................................................18

VII.    DEFERENCE ON THE BASIS OF COMITY WAS SOUGHT BY THE
        CANADIAN DEBTORS BEFORE TRIAL AND IS CONSISTENT WITH
        INDEPENDENT ADJUDICATION OF THE ALLOCATION DISPUTE .....................20

VIII.   THE EMEA DEBTORS' CONTINGENT CROSS-APPEAL SHOULD BE
        DENIED...................................................................................................................22

        A.      The EMEA Debtors' Theory Is Inconsistent with the MRDA .............................22

        B.      The EMEA Debtors' Argument About Supposed "Creditor Expectations"
                Has No Basis...............................................................................................23

IX.     "LIMITED REMAND" WOULD BE INAPPROPRIATE .............................................24

CONCLUSION ......................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Akazawa v. Link New Tech Int'l, Inc.*,
    520 F.3d 1354 (2008)......................................................................................................15

*Alberta v. Elder Advocates of Alberta*,
    2011 SCC 24  (Can. Alta. Q.B.) ...................................................................................23

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010)......................................................................................17

*Baker Acceptance Corp. Ltd. v. Tryburski*
    [1967] O.J. No. 1123 (Can. Ont. C.A.) .........................................................................11

*Brenner v. Local 514, United Bhd. of Carpenters & Joiners*,
    927 F.2d 1283 (3d Cir. 1991)...........................................................................................7

*Butner v. United States*,
    440 U.S. 48 (1979).............................................................................................................6

*Clouding IP, LLC v. Google Inc.*,
    61 F. Supp. 3d 421 (D. Del. 2014)............................................................... *passim*

*Grupo Protexa, S.A., v. All Am. Marine Slip*,
    20 F.3d 1224 (3d Cir. 1994)...........................................................................................22

*Hole v. Hole*,
    2016 ABCA 34 (Can. Alta. C.A.)...................................................................................11

*In re Brierley*,
    145 B.R. 151 (Bankr. S.D.N.Y. 1992)...........................................................................21

*In re Maxwell Commc'n Corp. plc*,
    93 F.3d 1036 (2d Cir. 1996)...........................................................................................21

*In re Montgomery Ward Holding Corp.*,
    269 B.R. 1 (D. Del. 2001)...............................................................................................19

*In re Nortel Networks, Inc.*,
    669 F.3d 128 (3d Cir. 2011)...........................................................................................25

*In re Penn-Dixie Indus., Inc.*,
    22 B.R. 794 (Bankr. S.D.N.Y. 1982)..............................................................................11

*In re Transcon Lines*,
    58 F.3d 1432 (9th Cir. 1995) ...........................................................................................6

*Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997)..........................................................................6

*Int'l Nutrition Co. v. Horphag Research Ltd.*,
    257 F.3d 1324 (Fed. Cir. 2001)....................................................................6

*Kerr v. Baranow*,
    2011 SCC 10 (Can. Ont. B.C.)....................................................................5

*Kuroda v. SPJS Holdings, LLC*,
    971 A.2d 872 (Del. Ch. 2009)......................................................................5

*Laborers' Int'l Union v. Foster Wheeler Corp.*,
    26 F.3d 375 (3d Cir. 1994).........................................................................19

*Lac Minerals Ltd. v. Int'l Corona Res. Ltd.*,
    [1989] S.C.J. No. 83 (Can. Ont.) ...............................................................23

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007)............................................................15, 16

*Olde Discount Corp. v. Tupman*,
    1 F.3d 202 (3d Cir. 1993) .....................................................................11, 19

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008).......................................................................11

*Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*,
    2012 ONCA 862 (Can.) ....................................................................11, 13, 14

*Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*,
    830 F.2d 1260 (3d Cir. 1987).....................................................................22

*Rite-Hite Corp. v. Kelly Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) *(en banc)* .................................................15

*Salah v. Timothy's Coffees of the World Inc.*,
    [2010] O.J. No. 4336 (Can. Ont. C.A.)......................................................11

*Sattva Capital Corp. v. Creston Moly Corp.*,
    2014 SCC 53 (Can. B.C.) ..........................................................................10

*TV Guide Online, Inc. v. Tribune Media Servs.*,
    Civ. No. 05-725-SLR/LPS, 2008 WL 979538 (D. Del. Mar. 26, 2008)...................................15

*York Bremner Dev. Ltd. v. FHR Props. Inc.*,
    [2007] O.J. No. 3484 (Can. Ont. S.C.J.)....................................................11

*Zaccardelli v. Kraus*
    [2003] A.J. No. 442 (Master) (Can. Alta.)...............................................................................12

**Other Authorities**

Geoff R. Hall, Canadian Contractual Interpretation Law (2d ed., LexisNexis
Canada Inc. 2012) ..........................................................................................................................11

Mitchell McInnes, The Canadian Law of Unjust Enrichment and Restitution
(LexisNexis Canada Inc. 2014)......................................................................................................23

Donovan W.M.Waters, Mark R. Gillen and Lionel D. Smith, eds., Waters' Law of
Trusts in Canada (4th ed., Thomson Reuters Canada 2012)..........................................................23

The Monitor and the Canadian Debtors[2] respectfully submit this reply memorandum of law in further support of their contingent cross-appeal and in response to the opposition briefs ("Opp.") filed by the US Debtors (joined by the UCC, Law Debenture[3] and NTCC), NNSA and UKPC ("Cross-Appellees").  The Bondholders and the PBGC have not filed or joined in an opposition brief to this contingent cross-appeal.[4]

## PRELIMINARY STATEMENT

The Ontario law-governed MRDA is the sole source of the MRDA Participants' rights to Nortel IP and must be given effect if the Court determines that the Bankruptcy Court erred in adopting the modified pro rata allocation methodology.  In ascertaining and applying Ontario law to interpret the MRDA, this Court has the benefit of a decision issued by the Ontario Court after hearing the exact same witnesses and argument and considering the exact same evidence that was presented to the Bankruptcy Court.  The Ontario Court exhaustively analyzed the MRDA under Ontario law and concluded that the MRDA grants NNL "all ownership interests of the NN Technology subject to grants" to the Licensed Participants of licenses "subject to field of use restrictions that gave the Licensed Participants the right to use the NN Technology to make, use or sell Products . . . . created or marketed by or for the Nortel Group."[5]  Under well-established principles of comity in cross-border insolvency cases, and as the Canadian Debtors advocated prior to the Allocation Trial, the Bankruptcy Court should have deferred to the Ontario Court on

---

[2] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Opening Brief of Monitor and the Canadian Debtors ("Opening Br.").  References to the Canadian Debtors herein include the Monitor.

[3] For the avoidance of doubt, in confining this brief to responding to opposition to their contingent cross-appeal, as provided by this Court's November 2, 2015 order, the Canadian Debtors do not concede any of the contentions made by Law Debenture, including with respect to its support agreement claim, and reserve all rights to address them at the appropriate time.

[4] As any opposition by the EMEA Debtors will be filed simultaneously herewith, the Canadian Debtors reserve all rights to respond to such opposition at oral argument.

[5] Ont. Op. ¶¶ 169-70.

1

this issue of Ontario law.  In any event, this Court is entitled to rely on the Ontario Court's authoritative opinion on a matter of foreign law, even if principles of comity did not apply here and even if the Ontario Court's analysis was not available to the Bankruptcy Court.

Cross-Appellees do not attempt to show that the Ontario Court committed any error of Ontario law.  While all Cross-Appellees except the UKPC contend that allocation should be based on the rights granted by the Ontario law-governed MRDA, they would have this Court ignore the authoritative interpretation by the Ontario Court in favor of various arguments that are strained, convoluted and wrong.  For example, the US Debtors argue that ownership of Nortel IP, derived from a contract governed by Ontario law, is somehow a question of fact governed by US law; that the Canadian Debtors waived any argument that the Bankruptcy Court erred in applying Ontario law, despite their consistent position on the proper interpretation of the MRDA throughout this litigation; and that the Ontario Court's decision does not support the Canadian Debtors' interpretation of the MRDA, despite having adopted that very interpretation.  Cross-Appellees also contend that every piece of evidence in the record forms part of the "factual matrix" to be considered in interpreting the MRDA, when that is not the law in Ontario.

Ownership of Nortel IP is a question of Ontario law because the Ontario law-governed MRDA is the sole source of the MRDA Participants' rights in Nortel IP.  This Court's decision in *Clouding IP LLC v. Google, Inc.*, the very case relied upon by the US Debtors, confirms that contract law, not US patent law, controls ownership of US patents.  Further, the Licensed Participants' rights under the MRDA do not qualify as "all rights" or "all substantial rights" in Nortel IP, as those concepts are defined in *Clouding IP*.  The Licensed Participants had licenses of certain exclusive rights subject to material limitations, including in respect of the field of use. The remaining rights, including the right to carry on a licensing business, were retained by NNL

2

as owner of Nortel IP.

Far from waiving these arguments, the Canadian Debtors have consistently asserted their interpretation of the MRDA, beginning with the allocation pleadings filed in May 2013, throughout trial and post-trial proceedings, and in this contingent cross-appeal.  The Canadian Debtors' Opening Brief specifically incorporated the Ontario Court's analysis that the Canadian Debtors' interpretation of the MRDA is correct as a matter of Ontario law.  There is simply no basis here to support the arguments for waiver.

The Ontario Court's conclusion that the MRDA does not apply to the allocation of the Sales Proceeds in the context of a global insolvency led it, like the Bankruptcy Court, to rely instead on equitable principles for allocation.  Thus, its holding that allocation in accordance with the rights granted under the MRDA would result in potential unjust enrichment was based on its conclusion that the contract was not controlling under the circumstances,[6] and does not detract from its interpretation of the contract itself and the rights established under it.  If this Court determines, however, that the Bankruptcy Court erred in concluding that the evidence at trial established the parties' shared equitable interests in the Sales Proceeds, the parties' interests in Nortel IP must be defined by the rights granted under the MRDA.  In the circumstances relevant to this contingent cross appeal—where allocation is based on property rights delineated by contract—that allocation cannot, as a matter of law, constitute unjust enrichment.

When Cross-Appellees finally confront Ontario law, they rely on the US Opinion, which leads them to replicate the Bankruptcy Court's errors in misconstruing and misapplying Ontario law.  The Bankruptcy Court improperly relied on recitals and a schedule to the MRDA, neither of which, as a matter of Ontario law, can supersede the words of its substantive provisions.  The

---

[6] Importantly, the Ontario Court observed that an unjust enrichment claim cannot be maintained under Ontario or Delaware law when a controlling contract exists.  Ont. Op. ¶¶ 198-99.

Bankruptcy Court also considered, and Cross-Appellees rely upon, evidence that is not part of the factual matrix that Ontario law permits a court to use in interpreting the contract.  As the Ontario Court made clear, as a matter of substantive Ontario contract law, only certain facts existing at the time the MRDA was executed constitute the factual matrix.

If property interests as defined by contract are the proper basis for allocation, the Court should interpret the MRDA under correct Ontario law principles, grant the Canadian Debtors' contingent cross-appeal and allocate the Sales Proceeds as set forth in Mr. Green's expert report.

## ARGUMENT

## I.  THE US DEBTORS AND THE UKPC MISCONSTRUE THE PURPOSE OF CONTINGENT CROSS-APPEAL

The US Debtors and the UKPC fundamentally misconstrue the issue at the heart of this contingent cross-appeal and when that issue would be relevant.  The Canadian Debtors only seek consideration of their contingent cross-appeal if this Court first determines that the Bankruptcy Court erred in concluding that it had to look to equitable principles to define the parties' interests in the Sales Proceeds because the rights granted by the MRDA did not control allocation.  Only in that case do the Canadian Debtors ask this Court to order an allocation of the Sales Proceeds that gives effect to the Ontario-law property interests granted in the MRDA, as properly construed by the Ontario Court, because the MRDA is the sole source of Participants' rights in Nortel IP.[7]  The UKPC's re-argument[8] of their support of the US Allocation Decision is beside the point because if the Court is considering the Canadian Debtors' contingent cross-appeal it necessarily has already rejected the UKPC's position.

---

[7] *See* Opening Br. at 43-46; TR21003 (MRDA) Art. 14(d).  Multiple witnesses for the US and EMEA Debtors who were Nortel tax employees testified that the only source of NNI's IP rights is in the MRDA and there is no other legal document that was the source of any form of ownership related to Nortel's IP.  Trial Tr. 1327:25-1328:19 (Orlando), 1511:8-1512:9 (Albert-Lebrun), 1779:11-1780:3 (Stephens), 1890:19-1891:13 (Weisz).

[8] *See* UKPC Opp. at 5-7.

The Ontario Court endorsed *in full* the interpretation of the MRDA put forward by the Canadian Debtors and concluded that, *if the MRDA governs allocation*, their valuation expert, Mr. Green, had presented the correct valuation, giving effect to the property interests provided in the MRDA.[9]  Cross-Appellees' suggestion that reliance on the Ontario Opinion is somehow inconsistent because the Ontario Court found the MRDA not to apply is misplaced because the Canadian Debtors only ask this Court to consider the Ontario Court's MRDA analysis if it determines that *the MRDA defines the property rights that must govern allocation*.[10]  In that circumstance, this Court has the benefit of the Ontario Court's authoritative analysis in applying Ontario law to interpret the MRDA on the same record as the Bankruptcy Court.

Also, if the Court has determined that the rights granted under the MRDA control allocation, Cross-Appellees' reliance on the Ontario Court's statement regarding unjust enrichment is misplaced because that statement followed from the Ontario Court's conclusion that the MRDA does not govern allocation.  If the rights created by the MRDA are controlling for purposes of allocation, allocation based on a controlling contract could not be unjust enrichment under Ontario or Delaware law.[11]

## II.    OWNERSHIP IS A QUESTION OF ONTARIO LAW SUBJECT TO *DE NOVO* REVIEW

The US Debtors consistently mischaracterize the US Opinion as containing "factual findings" with respect to ownership of Nortel IP that they contend are subject to a deferential

---

[9] Ont. Op. ¶ 169-70, App'x A ¶ 47, App'x B ¶ 99.

[10] US Debtors Opp. at 69-70; UKPC Opp. at 2, 7, 9-11.  The US Debtors can hardly maintain such a position when they themselves rely on the Bankruptcy Court's analysis of the MRDA notwithstanding that court's conclusion that the MRDA did not control allocation.

[11] *See* Opening Br. at 44 n.186 (citing *Kerr v. Baranow*, 2011 SCC 10 ¶¶ 32, 40-41 (Can.) (holding unjust enrichment claim fails where a contract governs the relationship between the parties); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. Ch. 2009) (same).

standard of review.[12]   They are wrong because, as the Bondholders concede, ownership is a

question of law, not of fact, and therefore subject to *de novo* review.[13]   The Federal Circuit has

rejected the US Debtors' argument that US patent law governs ownership of US patents,[14]

holding that "the question of who owns patent rights, and on what terms, typically is . . . not one

arising under United States patent laws."[15]   Thus, if the Court determines that the MRDA defines

the property rights at issue, it must apply Ontario law.[16]

## III.   THE BANKRUPTCY COURT'S ERRONEOUS INTERPRETATION OF THE MRDA UNDER ONTARIO LAW MUST BE REJECTED

### A.   The Bankruptcy Court Erred in Giving Effect to MRDA Recitals and Schedule A

The US Debtors rely on the Bankruptcy Court's interpretation of the MRDA, including

its resort to recitals to reach its conclusion,[17] but, under Ontario law, the recitals should not have

---

[12] *See*, *e.g.*, US Debtors Opp. at 2, 7, 9 & n.4, 18, 25.

[13] Bondholders Opp. at 5; *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."); *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997) ("[N]onbankruptcy law defines the nature, scope, and extent of the property rights that come into the hands of the bankruptcy estate.") (quoting *In re Transcon Lines*, 58 F.3d 1432, 1438 (9th Cir. 1995)).

[14] *See* US Debtors Opp. at 10 n.5.  This contention contradicts their claim that ownership is a question of fact.

[15] *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001); *see also Clouding IP, LLC v. Google Inc.*, 61 F. Supp. 3d 421, 430-31 (D. Del. 2014) (Stark. J.) (cited in US Debtors Opp. at 10, n.5).  In *International Nutrition*, the Federal Circuit deferred on the basis of comity to the judgment of a French court as to the owner of a patent under an assignment agreement governed by French law.  257 F.3d at 1329.

[16] Although the US Debtors did not advocate at trial for allocation on the basis of the value of specific tangible or intangible assets, there now appears to be no disagreement that, if allocation is to be based on legal ownership, Mr. Green has properly identified the owners of the tangible and non-IP intangible assets sold in the Business Line Sales.  *See* US Debtors Opp. at 13 n.9.

[17] US Debtors Opp. at 60 n.62.  The Bankruptcy Court's opinion is rife with references to and reliance upon recital clauses in the MRDA, CSAs and addenda to the MRDA.  *See*, *e.g.*, US Op. at 20 n.64 (citing to the final recital in the MRDA), 71 (stating "NNL's claim of legal title to the IP is reflected in the MRDA's first recital"), 76 (relying upon the third recital of the CSAs from 1992, 1995, and 2000) and 83-84 (stating that the "recitals to the MRDA describe the Licensed

been considered.  As the Ontario Court explained, a recital may be used to interpret a contract only if there is an ambiguity in the operative parts of the agreement and the recital is clear.[18] Here, no party has ever argued, and no court has ever held, that the MRDA is ambiguous.[19] Given the lack of ambiguity, there is no justification under Ontario law to rely upon a recital.

Even if the recitals are considered, the Ontario Court correctly explained that the recital that states that "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory," is consistent with the conclusion that the Licensed Participants have "license rights, rather than ownership rights," because the recital only says that the Licensed Participants have an "ownership of *certain* exclusive rights," not ownership of NN Technology itself.[20]

The Bankruptcy Court, and the US Debtors, again err in relying on a reference to "ownership" in Schedule A to the MRDA.[21]  As the Ontario Court correctly held, Schedule A is operative only to the extent it sets forth the RPSM calculations.[22]  Schedule A does not grant any substantive rights and cannot vary those "granted in the operative provisions of the MRDA,"

---

Participants' ownership rights" and citing to the second recital to the MRDA and the recitals to the Second Addendum to the MRDA).

[18] Ont. Op. ¶¶ 58, 59.  Delaware contract law is the same on this point.  *Clouding IP*, 61 F. Supp. 3d at 432 (holding that reliance on a recital "neglects the core inquiry" because the "Court must look to the provision of the contract that is legally operative in effectuating the transfer and determine what was actually granted").

[19] Trial Tr. 31:15-32:18 (counsel for EMEA Debtors) ("[W]e take the position that the contract is unambiguous."); B.D.I. 13551 (US Debtors and UCC Pre-Trial Brief) at 85 ("NNI's rights under the MRDA are clear and unambiguous.").  The US Debtors' suggestion that the MRDA may be ambiguous and therefore certain evidence may be considered as parol evidence, US Debtors Opp. at 63, comes too late and has been waived.  *Brenner v. Local 514, United Bhd. of Carpenters & Joiners*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

[20] Ont. Op. ¶¶ 73-74 (emphasis added).

[21] US Op. at 83-84; US Debtors Opp. at 60 n.62.

[22] Ont. Op. ¶ 80.

which grant the Licensed Participants license rights, not ownership.[23]

### B. The Bankruptcy Court and the US Debtors Ignore Contractual Limitations on the MRDA Licenses

The allocation sought by the US Debtors is premised on rights purportedly granted by the MRDA, but, rather than analyzing the language of the contract, they simply parrot the Bankruptcy Court's erroneous conclusion that "NNL Had Nothing of Value to Sell in the Licensed Participants' Exclusive Territories."[24]  Both the US Debtors and the Bankruptcy Court ignore numerous provisions of the MRDA limiting the scope of the license and reserving important rights to NNL as owner of Nortel IP.  As the Ontario Court correctly found, the scope of the license is limited by the definition of Products in the MRDA:

> The license is not a license of NN Technology, but rather a license 'to make… and sell *Products* using or embodying NN Technology'.  Thus the MRDA definition of 'Products' is of central importance . . . .[25]

"Products," as defined in the MRDA, are:

> products, software and services designed, developed, manufactured or marketed . . . by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.[26]

A licensing business, such as that proposed as "IPCo" and that carried on by the Rockstar Consortium, is not a "service" within the definition of Products.[27]  This limitation in scope is

---

[23] *Id*.

[24] US Debtors Opp. at 12 (quoting US Op. at 85).

[25] Ont. Op. ¶¶ 82-84 (quoting MRDA Art. 5(a)) (emphasis added); Opening Br. at 45-46; *see also* Ont. Op. ¶¶ 86-96 (explaining why the US Debtors' reading of Article 5(a)'s license grant relies solely on the first clause and ignores the remainder of the operative language).

[26] MRDA Art. 1(g).

[27] *Id*. Art. 5(a); Ont. Op. ¶¶ 109-10 ("Nortel was not in a business of licensing its services to others for the business of others. It was providing a service to its customers to support the technology being acquired by its customers. The MRDA must be read in that context.").  This field of use limitation is not inconsistent with the testimony that one goal of the MRDA

crucial to determining the proper allocation of value that should flow from applying the rights granted under the MRDA.  Because the Licensed Participants had no right to use Nortel IP for licensing, but only to operate Nortel's business, their licenses had no value in the context of the sale of the Residual Patent Portfolio, whereas in the line of business sales they are entitled to the value they could have realized by continuing to operate the Nortel business.

The MRDA licenses were encumbered with certain obligations, including to continue to perform R&D activity, to provide information to NNL and to participate in the RPSM.[28]  The MRDA, and therefore the licenses granted thereunder, could not be assigned without the consent of the other Participants.[29]  The MRDA licenses could be retained by the Licensed Participants upon the MRDA's expiration, but not if the MRDA was terminated or they were forced to retire from it due to failure to perform R&D, ceasing to be an affiliate of NNL or material breach.[30]  By contrast, the MRDA specifically provides that the grant of legal title to NNL "shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever."[31]

The MRDA makes clear that NNL and the Licensed Participants are not on equal footing: no license is granted to NNL to operate in Canada (confirming its status as owner of Nortel IP),[32] Licensed Participants, but not NNL, are subject to confidentiality restrictions[33] and "NNL [has] the right, in its sole discretion, to terminate participation in this Agreement of any Participant" in

---

Participants was to avoid NNL having a "permanent establishment" in the United States because sublicensing was a "miniscule part of the business of Nortel" and presented no such concerns. Ont. Op. ¶¶ 153-54.

[28] MRDA Arts. 3(b), 4(c), 11(c).

[29] *Id.* Art. 14(a).

[30] *Id.* Art. 11(c); *see also id.*, Second Add., Art. V (amending Art. 11(d)).

[31] *Id.* Arts. 9(b) & (c), 11(e).

[32] Ont. Op. ¶ 81.

[33] MRDA Art. (6)(b).

certain circumstances.[34]  Crucially, NNL alone retained:

> [the] exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights . . . and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.[35]

Thus, only NNL could convey the right to prosecute the thousands of patent applications sold in the Rockstar Sale.[36]

These contractual limitations on the licenses granted under the MRDA confirm that the Licensed Participants did not own Nortel IP, but rather had contractually-defined license rights that did not grant all substantial rights in the Licensed Participants' respective territories.[37]

### C.    The Bankruptcy Court Committed Legal Error in Identifying the Factual Matrix

Rather than looking to the factual matrix to better understand the words of the MRDA (as would be permitted under Ontario law), the Bankruptcy Court ignored those words and relied instead upon what it considered "the Factual Matrix Surrounding Transfer Pricing, Historical Business Practices and Custom of the Industry," much of which is not proper factual matrix evidence under Ontario law, to support its interpretation of the MRDA.[38]  The US Debtors, NNSA, and UKPC seek to capitalize on this error, claiming that all evidence in the record

---

[34] *Id.* 4th Add., Art. II(iii).

[35] *Id.* Art. 4(d).

[36] TR40197 (List of Transferred Patents in Rockstar Transaction).

[37] Opening Br. at 18-19, 45-46.  The Ontario Court also correctly concluded that a "licensee does not enjoy property rights.  Its rights are contractual."  Ont. Op. ¶ 82; *see also* Opening Br. at 45. US IP law does not transform those licenses into a property right.  *See infra* Section IV.

[38] US Op. at 75.  The Bankruptcy Court expressly stated that "the MRDA simply does not capture the economic reality that the non-Canadian participants, and the U.S. Debtors in particular, were generating the majority of the value of the Nortel Enterprise."  *Id* at 74.  Finding that the MRDA does not describe the parties' rights as the Bankruptcy Court wanted to view them, it ignored the contractual terms and looked to other, improper evidence to override those terms.  This was wholly improper under Ontario law.  *See Sattva Capital Corp. v. Creston Moly Corp.,* 2014 SCC 53 ¶ 57 (Can. B.C.) ("While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.") (citation omitted).

constitutes factual matrix.[39]

Under Ontario contract law, only certain evidence comprises the "factual matrix" that properly informs the Court's understanding of the words of the contract itself.[40]  This is a question of substantive law, not only admissibility, just as otherwise admissible parol evidence may not be used to interpret an unambiguous Delaware contract.[41]  The factual matrix is limited to "objective facts known to the parties at or before the date of the agreement."[42]  "Evidence of the parties' post-contracting conduct by definition is not part of the factual matrix,"[43] nor is

---

[39] NNSA's contention that "[t]he Monitor does not suggest that the Bankruptcy Court improperly considered evidence of the MRDA's 'factual matrix' that was outside the scope of the inquiry required under Ontario law," NNSA Opp. at 23, is wrong.  *See* Opening Br. at 44-45 (The Bankruptcy Court "erred as a matter of law in considering" certain evidence "to be factual matrix evidence.").

[40] Ont. Op. ¶ 52 ("In interpreting the contract, the court must have regard to the objective evidence of the 'factual matrix' or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties.") (quoting *Salah v. Timothy's Coffees of the World Inc.* [2010] O.J. No. 4336 ¶ 16 (Can.)).

[41] *See Baker Acceptance Corp. Ltd. v. Tryburski* [1967] O.J. No. 1123 ¶¶ 7-8 (Can. C.A.) ("[I]t is the duty of a Court of appeal to reject inadmissible evidence and decide the case on admissible evidence only, even though no objection was made at the trial.");  *Hole v. Hole*, 2016 ABCA 34 ¶ 37 (Can. Alta. C.A.) (finding trial judge "erred in law by applying incorrect principles" in considering events that occurred after execution of an agreement); *In re Penn-Dixie Indus., Inc.*, 22 B.R. 794, 797 (Bankr. S.D.N.Y. 1982) ("Even if there is no objection to parol evidence by the litigants, the court should nevertheless exclude parol evidence from its consideration since this rule is not a rule of evidence, but rather a rule of substantive law.").  In *Olde Discount*, cited by the US Debtors, the facts whose admission was belatedly challenged on appeal were "not critical to [the Third Circuit's] disposition."  *Olde Discount Corp. v Tupman*, 1 F.3d 202, 205 n.1 (3d Cir. 1993). Whether a particular alleged fact is properly considered to be part of the "factual matrix" is a question of Ontario law to be reviewed *de novo*.

[42] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 ¶ 71 (Can.) ("*Primo Poloniato*").  Mr. Bereskin's report does not provide evidence of custom and practice as part of the factual matrix, US Debtors Opp. at 61 n.64, because that report is in fact a thinly disguised, and inadequate, legal opinion interpreting of the MRDA, *see, e.g.*, Bereskin Report ¶¶ 37, 45, 47 (opining on interpretation of specific Articles).  Mr. Bereskin identifies no technical terminology or jargon that requires "specific, technical, or other specialized knowledge" to interpret. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 n.10 (3d Cir. 2008).

[43] US Op. at 68 (*citing* Geoff R. Hall, Canadian Contractual Interpretation Law (2d ed., LexisNexis Canada Inc. 2012)) ¶ 3.2.2; *York Bremner Dev. Ltd. v. FHR Prop. Inc.*, [2007] O.J. No. 3484 ¶¶ 31-32 (Can. Ont. S.C.J.)).

evidence of what a party intended to agree to or understood the words of the contract to mean.[44] Applying Ontario law, the Ontario Court found that the factual matrix was limited to objective circumstances in December 2004 when the MRDA was executed.[45]

The Bankruptcy Court, however, ignored these temporal and subject matter restrictions in identifying evidence to be part of the factual matrix.  Cross-Appellees rely on the evidence relating to communications with tax authorities, Nortel's business operations after the MRDA was executed and supposed custom and practice in the industry that the Bankruptcy Court incorrectly held to be part of the factual matrix evidence.[46]  In particular, the Bankruptcy Court erroneously concluded it could consider evidence from long after the MRDA was executed because it was amended in December 2008, and the US Debtors rely heavily on that evidence in their Opposition.[47]  Because, as the Ontario Court correctly found, those amendments did not substantively alter the operative provisions regarding ownership and license rights, they do not justify expanding the factual matrix beyond the objective circumstances in December 2004.[48]

Similarly, the Bankruptcy Court erred as a matter of Ontario law in considering communications to tax authorities in 2002, 2003, 2004, and 2008.[49]  Only the November 30,

---

[44] *Zaccardelli v. Kraus*, [2003] A.J. No. 442 ¶¶ 29-30 (Master) (Can. Alta.) ("What [a party] thinks the documents mean is irrelevant and so not admissible. . . .  What [a party] understood or intended is not relevant and so not admissible.").

[45] Ont. Op. ¶ 118.

[46] US Debtors Opp. at 60-63; NNSA Opp. at 23 n.38; US Op. at 75; *see* Opening Br. at 44-45.

[47] US Op. at 75 n.191; US Debtors Opp. at 26-27.

[48] Ont. Op. ¶ 118.

[49] US Op. at 77-78.  The US Debtors purport to quote the Bankruptcy Court's opinion as saying the MRDA was drafted to "memorialize . . . representations to tax authorities," and they rely on that supposed quote to claim (wrongly) that all communications with tax authorities are part of the factual matrix.  US Debtors Opp. at 62.  In fact, the Bankruptcy Court found that the MRDA memorialized "the group's transfer pricing policy in place from 2001 forward," US Op. at 19, not its representations to tax authorities.  The Bankruptcy Court also did not find that all such communications were "highly probative of the parties' intended construction of their agreement," as the US Debtors claim, US Debtors Opp. at 62.

2004 submission approximates the execution of the MRDA, and the Bankruptcy Court cites to only a single sentence of that document, describing sharing operating profits, that does nothing to further clarify the MRDA itself.[50]  It is the tax authority communications well outside the factual matrix period that refer to the Licensed Participants as economic owners of the IP.[51]  Under Ontario law, such statements have no role to play in interpreting the MRDA.  The Bankruptcy Court (and the US Debtors) erroneously cite to *Primo Poloniato* to support consideration of Nortel's correspondence with tax authorities.[52]  In that case, the Ontario Court of Appeal held that a June 1997 submission to the Canada Revenue Authority that resulted in an advance tax ruling that in turn formed the basis for a December 1997 variation to a trust deed was "helpful in understanding the full factual context of the 1997 variation" but did not "contradict[] or change[] the factual matrix as described by" the lower court.[53]  The facts here are entirely different—the tax authorities never provided Nortel an authoritative ruling on the MRDA and RPSM, so no such ruling was the basis for the MRDA or any addendum,[54] and the communications on which

---

[50] US Op. at 78 ("Nortel explained that the [Licensed Participants] 'have agreed to continue participating in the future benefits of new IP' under the RPSM because they were 'responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP. . . .'") (quoting TR11084 (2004 response to IRS Information and Document Request for Functional Analysis) cover letter at 2.

[51] US Op. at 77-78.

[52] *Id.* at 77; US Debtors Br. at 62.  At trial, the Ontario Court characterized the US Debtors' reliance on *Primo Poloniato* for considering subjective intent evidence from after the execution of the MRDA to be part of the factual matrix as a novel view of factual matrix evidence.  Trial Tr. 1850:19-1852:15 (Ontario Court) (In response to the US Debtors' attempt to introduce evidence what the witness understood "beneficial ownership" to mean as related to the MRDA, the Ontario Court stated, "It is a new one, so far as I'm concerned, to call it part of the factual matrix.").

[53] *Primo Poloniato*, 2012 ONCA 862 ¶¶ 2, 21, 23, 85.

[54] Nortel's request for an Advance Pricing Agreement covering 2000 to 2005 was not resolved until 2009, after the insolvency, in connection with which NNL was required to allow a $2 billion claim in favor of NNI.  B.D.I 14434 (Canadian Debtors' Supplemental Consolidated Proposed Findings of Fact) ¶ 255.  The request for an Advance Pricing Agreement covering 2006 onward was withdrawn in 2010.  *Id.* ¶ 261.

the Bankruptcy Court relied occurred years, not months, prior to and after the execution of the MRDA. *Primo Poloniato* thus does nothing to undercut the Ontario Court's conclusion of law that communications with tax authorities were not part of the factual matrix.[55]

Even if tax authority communications were part of the factual matrix, references to economic or beneficial ownership must be understood in the context of the transfer pricing principles Nortel was trying to satisfy. As the US Debtors' own witness conceded, an exclusive license subject to a field of use limitation (such as the MRDA's limitation to use of Nortel IP in "Products") is sufficient to make the licensee a beneficial owner for transfer pricing purposes.[56] Thus, to the extent the Licensed Participants were ever referred to as beneficial or economic "owners" of Nortel IP, such references are consistent with them owning license rights and, even if considered as part of the factual matrix (which they are not), cannot and do not expand the scope of the license rights granted in the MRDA.[57]

Lastly, the Bankruptcy Court considered Nortel's enforcement and sub-licensing practices without regard for when such activities occurred and failed to explain how that evidence, even if it were part of the factual matrix, assists in understanding the words used in the operative provisions of the MRDA. The Ontario Court found, based on the actual language of

---

[55] Ont. Op. ¶¶ 118-19 (holding the "great deal of evidence led by the U.S. and EMEA interests as to the subjective views of . . . mostly tax personnel" was inadmissible and not factual matrix evidence).

[56] Michael Orlando (a former NNI tax employee) testified that economic ownership of intangible property, as described in OECD Transfer Pricing Guidelines and referenced in the economic analysis and other communications submitted to tax authorities, includes ownership of IP license rights as defined in the MRDA. Trial Tr. 1334:19-1342:17 (Orlando) (discussing TR11055 (2002 Horst Frisch Report submitted to tax authorities); TR22078 (2008 tax authority communication) (referencing IRS transfer pricing regulations); TR50295 (CRA transfer pricing circular); TR11391 (2010 OECD Transfer Pricing Guidelines)).

[57] TR00051 (Kinrich Report) at 31 n.83 ("Exclusivity in licensing is the legal basis for beneficial ownership of a right by the licensee since it transfers to the licensee some of the patentee's monopoly rights . . . .  In the case of an exclusive license, the licensee becomes the only person entitled to make use of the patent in the *fields* specified in the license.") (emphasis added).

14

the MRDA in Article 4(e), that the Licensed Participants did not have an exclusive right to bring suit in their territories,[58] and this interpretation is consistent with "the limited practice in the U.S. before the MRDA was signed[, which] was that both NNL and NNI were named as plaintiffs in infringement actions."[59]  Thus, even if "those actions can be considered to be part of the factual matrix," they confirm that "the right to sue granted to NNI was not an exclusive right."[60]

## IV.    THE MRDA LICENSES DID NOT CONVEY "OWNERSHIP" UNDER US LAW

In their analyses of the MRDA licenses, both the US Debtors and the Bankruptcy Court conflate two distinct concepts: standing to sue for infringement, on the one hand, and ownership or license interests in property, on the other.[61]  US patent law governs the former, but contract law controls the latter.[62]  US patent law is relevant only as a bridge between the rights granted by the MRDA and their value.

The US Debtors rely upon *Clouding IP*, but it contradicts their position.  That decision holds that a transfer of "*all rights* under [a] patent in a specified geographic region of the United States" or "'***all substantial rights***' [in a] patent" transfers legal title.[63]  Nothing in *Clouding IP* supports the existence of "bare legal title" to a US patent.  The US Debtors' concession that the

---

[58] Ont. Op. ¶ 169.

[59] *Id.* ¶ 113.

[60] *Id.*

[61] US Debtors Opp. at 10-11; US Op. at 85.

[62] *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008) ("[S]tate law, not federal law, typically governs patent ownership" and foreign ownership of the patent "would require looking to foreign law, as opposed to state law, to determine ownership . . . .").  The US Debtors cite to *TV Guide Online, Inc. v. Tribune Media Services*, Civ. No. 05-725-SLR/LPS, 2008 WL 979538, at *3 (D. Del. Mar. 26, 2008) (Stark, M.J.), for the proposition that the scope of a patent license is determined by reference to US law, US Debtors Opp. at 10 n.5, but it says no such thing.  To the contrary, the *TV Guide Online* decision only holds that US patent law governs whether a license conveys standing to sue for infringement.  2008 WL 979538, at *3.

[63] *Clouding IP*, 61 F. Supp. 3d at 431-32 (quoting *Rite-Hite Corp. v. Kelley Corp.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (*en banc*)) (emphasis added) and 429 (quoting *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007)) (emphasis in *Clouding IP* decision).

MRDA grants NNL legal title to Nortel IP and that NNL in fact continued to hold such legal title until it was transferred in the asset sales,[64] forecloses any argument that the MRDA license granted NNI all rights or all substantial rights to Nortel IP.  If the license were as broad as the US Debtors claim, NNL would not have held legal title, as all parties agree it did and as the MRDA specifically provides in Article 4(a).

In *Clouding IP*, this Court found that reference in a recital to the passing of title was ineffective to convey title where the operative provisions of the agreement did not convey the rights necessary for title to pass.[65]  The US Debtors' position turns *Clouding IP* on its head because they contend that an operative provision granting title—Article 4(a)—should be overridden by the MRDA's recitals, Schedule A of the MRDA, and (improper) "factual matrix" evidence.  This is contrary to Ontario contract law, as shown above, and it is also contrary to US patent law, as set out in the *Clouding IP* decision.

Under the MRDA license, NNI had "***exclusionary rights and interests created by the patent statutes, but not all substantial rights*** to the patent."[66]  The license rights were sufficient to grant NNI constitutional standing to bring infringement claims, but, as the *Clouding IP* decision observes is the typical practice,[67] NNL as patentee was joined as co-plaintiff.[68]  The Federal Circuit has held that, when determining if all substantial patent rights or something less has been granted, courts should look to such rights as "the nature of license provisions regarding

---

[64] US Debtors Br. at 9-10; US Debtors Opp. at 19-20, 27.

[65] *Clouding IP*, 61 F. Supp. 3d at 431-32.

[66] *Id.* at 429 (quoting *Morrow*, 499 F.3d at 1339) (emphasis in *Clouding IP* decision).

[67] *Id.* (citing *Morrow*, 499 F.3d at 1340).

[68] *See*, *e.g.*, TR22084 (March 14, 2001 Complaint for Patent Infringement) ¶ 8; TR40777 (March 14, 2001 Complaint for Patent Infringement) ¶ 14; TR40788 (March 15, 2002 Amended Complaint for Patent Infringement) ¶ 10; *see also* Ont. Op. ¶ 113.  The MRDA grants Licensed Participants a non-exclusive right to bring infringement actions.  MRDA Art. 4(e), Third Add., Art. IV (amending Art. 4(e)).

the reversion of rights to the licensor following breaches of the license agreement[,] . . . the ability of the licensor to supervise and control the licensee's activities . . . and the nature of any limits on the licensee's right to assign its interests in the patent."[69]  Here, the MRDA unambiguously provides that NNL retains legal title to Nortel IP,[70] and the Licensed Participants' exclusive right to make, use, and sell Products containing Nortel IP was subject to pre-existing third party licenses.[71]  NNL retained the exclusive right to prosecute patent and copyright applications and all other forms of IP registrations, and also had the right to request documentation relating to Nortel IP.[72]  Moreover, the MRDA provides NNL the right, in its sole discretion, to terminate the licenses in the event that a Licensed Participant became insolvent, failed to conduct research and development in accordance with the agreement or committed some other breach.[73]  Finally, Licensed Participants were restricted from assigning their rights under the MRDA without consent of other Participants.[74]  Thus, the US Debtors' reliance on US patent law to support their expansive claims to ownership of Nortel IP in the United States is unavailing; the Bankruptcy Court's statement that NNL had no valuable rights in the United States to sell is legal error that must be reversed on *de novo* review.

## V.  THE MRDA HAS NOT BEEN TERMINATED

The US Debtors argue in their Opposition both that the RPSM aspect of the MRDA "ceased to apply in bankruptcy," and that the MRDA "terminated due to an insolvency."[75]  These arguments are incorrect and do not help the Court establish the value of the parties' rights under

---

[69] *Clouding IP*, 61 F. Supp. 3d at 433 (quoting *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010)).

[70] MRDA Art. 4(a).

[71] *Id.* Art. 5(a).

[72] *Id.* Art. 4(c)-(d).

[73] *Id.* Fourth Add., Art. II(iii).

[74] *Id.* Art. 14(a).

[75] US Debtors Op. at 26-27, 72-73.

the MRDA.  First, the RPSM provisions of the MRDA continued to apply to Nortel's operations even after the insolvency filings, as shown by NNI's payment in the IFSA of amounts owed under the RPSM for post-petition operations.[76]  While the RPSM did not apply to proceeds from the sale of businesses, it would have remained a term of the MRDA license had the US Debtors chosen to continue operating rather than participate in the coordinated global asset sales.[77] Second, as the US Debtors stated in their opening brief, "[t]he MRDA explicitly remained in effect after the parties' insolvency and, indeed, continues to be in effect today."[78]  They got it right the first time—the MRDA has never been terminated because the Fourth Addendum to the MRDA, entered into on the eve of the insolvency filings, contains a "standstill" provision prohibiting a party from electing to withdraw from the MRDA or being automatically terminated due to insolvency or breach.[79]  Finally, to the extent the US Debtors argue that the MRDA entitles the Licensed Participants to the fair market value of the licenses upon their termination, that does not assist the Court in establishing the scope of the license, which is the basis for determining its fair market value.

## VI.   THE US DEBTORS' CLAIMS OF WAIVER REGARDING THE INTERPRETATION OF THE MRDA ARE BASELESS

The US Debtors make baseless claims of waiver seeking to preclude the Monitor and the Canadian Debtors from making the foregoing points.[80]  There can be no waiver where those

---

[76] TR12032 (IFSA) at 2, 4.

[77] MRDA Fourth Add., Art. II.  Thus, Mr. Green's valuation of the Licensed Participants' rights concerned their "value in use," *i.e.* the value they could have received from continuing to run the Nortel business subject to the RPSM obligation.  TR00042 (Green Report) at 14-16.

[78] US Debtors Br. at 33; *see also* US Debtors Opp. at 20-21.

[79] MRDA Fourth Add., Art. II(iii).  Consequently, the Debtors are not, and never were, entitled to a "fully paid up" license.  MRDA Art. 9(b).  Crucially, if the MRDA were to expire or terminate, the Article vesting legal title to NN Technology in NNL "shall survive notwithstanding [expiration or termination] for any cause whatsoever."  *Id.* Art. 9(c).

[80] US Debtors Opp. at 57.

points have been continuously asserted since the initial allocation pleadings were filed in May 2013, and where the Canadian Debtors expressly stated in the Opening Brief on this appeal that the "Bankruptcy Court *erred* in its construction of the MRDA under Ontario law" and incorporated the Ontario Court's interpretation by reference.[81]   The Canadian Debtors are entitled to expand upon that interpretation in response to the US Debtors' Opposition, which itself incorporates by reference the Bankruptcy Court's MRDA analysis.[82]

The US Debtors also argue that failing to object to admission of evidence at the Allocation Trial waived the right to dispute the Bankruptcy Court's consideration of that evidence when interpreting the MRDA.[83]   The US Debtors are wrong because admissibility is irrelevant to the legal question whether that evidence constitutes part of the factual matrix that may be considered in interpreting the MRDA under Ontario law.[84]   Indeed, the US Debtors concede that the Canadian Debtors maintained their objection to consideration of such evidence as factual matrix evidence in the extensive post-trial briefing.[85]   And, even where evidence is not objected to at trial, the trial court's evaluation of that evidence is subject to review for clear error.[86]   Thus, this Court can and should consider the Canadian Debtors' legal arguments about

---

[81] Opening Br. at 43-46 (emphasis added); B.D.I. 13553 (Canadian Debtors Pre-Trial Br.) at 31-45; B.D.I. 14432 (Canadian Debtors Post-Trial Br.) at 87-114.

[82] In the sole waiver case cited by the US Debtors, a cross-appellant waived its right to argue an issue on reply where its opening brief addressed it only by referring to another party's brief that in fact contained no such argument. *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 397, n.25 (3d Cir. 1994).   By contrast, the Opening Brief amply preserved its interpretation of the MRDA.  Opening Br. at 3, 5 (Issue 1 on contingent cross-appeal), 43-44, 47.

[83] US Debtors Br. at 63 (citing *Olde Discount*, 1 F.3d at 205 n.1).

[84] *See supra* note 41.

[85] US Debtors Br. at 61.

[86] *See In re Montgomery Ward Holding Corp.*, 269 B.R. 1, 10-12 (D. Del. 2001) (holding that bankruptcy court erred in giving dispositive weight to speculation in unobjected-to affidavit).

proper factual matrix evidence and contentions of clear error.[87]

## VII.   DEFERENCE ON THE BASIS OF COMITY WAS SOUGHT BY THE CANADIAN DEBTORS BEFORE TRIAL AND IS CONSISTENT WITH INDEPENDENT ADJUDICATION OF THE ALLOCATION DISPUTE

The US Debtors' claim of waiver with respect to the question of comity is also incorrect.

They contend that the Canadian Debtors raised the question of comity for the first time after

obtaining a favorable interpretation of the MRDA from the Ontario Court.[88]   This is simply

untrue.   On the eve of the Allocation Trial, the Canadian Debtors specifically asked the

Bankruptcy Court to defer to the Ontario Court on matters of Ontario law, relying on the Cross-

Border Protocol, which expressly promotes comity and cooperation between the Courts,

including with respect to determinations of law.[89]   In moving to strike expert reports on Ontario

law, the Canadian Debtors asserted that "Ontario law does not need to be proved" in the

Bankruptcy Court because "the [Ontario] Court is the preferable source for Ontario law," and "it

is preferable, and permissible, to instead strike the [reports] in favor of determining Ontario law

from the Canadian Court, and allowing the Courts to coordinate their decisions on the law."[90]

On the specific issue of comity, the Canadian Debtors observed:

Here, concerns about the reliability of bias in expert reports, adherence to the parties' expectations, and *comity* all establish the [Ontario] Court as the preferable source for determinations on the interpretations of the MRDA . . . .   The Cross-Border Protocol also explicitly allows the Courts to coordinate their decisions on the law of their respective jurisdictions.[91]

Thus, there has been no waiver of the argument that the Bankruptcy Court should defer to the

---

[87] *See* Opening Br. at 44-45.   The UKPC is mistaken in contending that the Canadian Debtors have not challenged the Bankruptcy Court's factual findings.   UKPC Opp. at 3.

[88] US Debtors Opp. at 64.

[89] B.D.I. 13317 (Canadian Debtors' Motion to Strike Canadian Law Expert Reports) ("Motion to Strike") ¶¶ 3-4; B.D.I. 990, Ex. 1 (Cross-Border Protocol) ¶¶ 6, 14.

[90] Motion to Strike at 3; B.D.I. 13489 (Reply in Support of Motion to Strike) ¶ 25.

[91] Motion to Strike at 22-23 (emphasis added) (citing Cross-Border Protocol ¶ 14).

Ontario Court's interpretation of the MRDA on the basis of comity.  Then, as now, the Canadian Debtors submitted that the Ontario Court is the better forum for adjudicating issues of Ontario law, and the most reasonable approach was for the Courts to confer on issues arising under the laws of their respective jurisdictions.

This is the dynamic contemplated by the Cross-Border Protocol, which respects the independent authority of each Court to adjudicate matters within its jurisdiction and establishes a framework for the Courts to confer with each other on a wide variety of issues raised in the Canadian and US Proceedings, including where one of the Courts is required to consider or apply the law of the other jurisdiction.  The Cross-Border Protocol provides each Court with the discretion to either hear expert evidence on the law of the other jurisdiction or seek the advice and direction of the other Court, and each Court may "consider whether it is appropriate to defer to the judgment of the other Court."[92]

Under the Cross-Border Protocol, the US Debtors' argument that the Bankruptcy Court could not have deferred to the Ontario Court's interpretation of the MRDA because the Courts were required to render independent and simultaneous decisions on allocation is misguided.[93] The supposed sequencing problem is a red herring because the Courts had the right to confer with one another, as the US Debtors themselves point out,[94] and there is no infringement of independence where the Courts had the discretion to defer to one another's views on such laws,

---

[92]  Cross-Border Protocol ¶¶ 12, 14. Courts have long respected the importance of giving deference to foreign courts pursuant to cross border protocols due to "the potential for chaos" "[l]urking in all transnational bankruptcies" if comity is ignored.  *In re Brierley*, 145 B.R. 151, 164 (Bankr. S.D.N.Y. 1992); *see also In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036, 1053 (2d Cir. 1996) ("[C]omity argues decidedly against the risk of derailing [international] cooperation by the selfish application of our law to circumstances touching more directly upon the interests of another forum.").

[93] US Debtors Opp. at 64-65.

[94] *Id.* at 64.

before and while developing their ultimate conclusions on allocation.  Deference on the basis of comity is not inconsistent with notions of judicial independence because the comity doctrine is a matter of judicial discretion.[95]  Thus, the Canadian Debtors could, and did, maintain that the Bankruptcy Court, in independently adjudicating the Allocation Dispute, should exercise its judicial discretion to grant comity to the Ontario Court's interpretation of an Ontario law-governed contract, and ask this Court to do the same.  Even if this Court concludes that the Bankruptcy Court did not abuse its discretion in performing its own analysis of the MRDA under Ontario law, this Court may consider the Ontario Opinion as part of its *de novo* review of the Bankruptcy Court's application of foreign law and reverse for legal error.[96]

## VIII.   THE EMEA DEBTORS' CONTINGENT CROSS-APPEAL SHOULD BE DENIED

The EMEA Debtors' contingent cross-appeal seeks application of their contribution theory of allocation if the US Allocation Decision is reversed.  As shown in the opening brief of the Canadian Debtors and as set forth below, the Bankruptcy Court properly rejected the contribution theory and the EMEA Debtors' contingent cross-appeal should be dismissed.[97]

### A.    The EMEA Debtors' Theory Is Inconsistent with the MRDA

The MRDA unequivocally vests title to NN Technology in NNL.[98]  The EMEA Debtors, like Cross-Appellees, contend the title conveyed was only "legal," and that they enjoyed beneficial ownership by resulting trust.[99]  Article 13 of the MRDA expressly disclaims any

---

[95] *Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987).

[96] *See* Opening Br. at 44, n.187 (citing *Grupo Protexa, S.A., v. All Am. Marine Slip*, 20 F.3d 1224, 1239 (3d Cir. 1994)).

[97] Opening Br. at 42-43.

[98] MRDA Art. 4(a).

[99] EMEA Debtors Br. at 16-17, 35.  The US Debtors agree that no trust was formed and instead argue that the scope of the MRDA licenses amounted to beneficial ownership.  US Debtors Opp. at 10-11, 23.  As shown above, the licenses, properly construed under Ontario law, do not grant

fiduciary relationship between the parties—the hallmark of a trust—and therefore no trust exists here.[100]  Moreover, a resulting trust is an equitable, restitutionary remedy available only where (i) an express trust has failed or (ii) there is a gratuitous transfer.[101]  Neither applies here.  No express trust was ever contemplated, and vesting of legal title in NNL was irrefutably not gratuitous.  The MRDA expressly recites that the EMEA Debtors were granted royalty-free exclusive licenses to use NN Technology developed by the other Participants in consideration for vesting legal title in NNL.[102]  Thus, the EMEA Debtors are not beneficial owners of Nortel IP.[103]

### B.   The EMEA Debtors' Argument About Supposed "Creditor Expectations" Has No Basis

The EMEA Debtors' opening brief argues for the first time, without any evidence, that "legitimate creditor expectations" will be satisfied by application of the contribution theory.[104]  Even if creditors could have expected that R&D expenditure calculated under the RPSM would be the basis for allocation, the EMEA Debtors' proposed allocation is inconsistent with Nortel's past practice because they seek to vastly extend the period over which R&D expenditure was

---

the rights necessary to transform the licensees into owners of NN Technology in their respective territories.  *See supra* Section IV; Opening Br. at 11, 46.

[100] *See* Donovan W.M. Waters, Mark R. Gillen and Lionel D. Smith, eds., Waters' Law of Trusts in Canada (4th ed., Thomson Reuters Canada 2012) at 42; *Lac Minerals Ltd. v. Int'l Corona Res. Ltd.*, [1989] 2 S.C.R. 574 ¶ 125 (Can. Ont.); *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 ¶ 33 (Can. Alta. Q.B.).  There is also no evidence of the requisite intention to create a trust and no evidence that the "settlor" employed the necessary language clearly showing the intention to create a trust.  *See* Waters' Law of Trusts in Canada at 140.

[101] Mitchell McInnes, The Canadian Law of Unjust Enrichment and Restitution (LexisNexis Canada Inc. 2014) at 1354-55.

[102] MRDA Art. 4(a).  Like NNI's license, the EMEA Debtors' licenses were limited in scope. *See supra* Section III.B.

[103] Accordingly, the proposed allocations set out in the reports of the EMEA Debtors' experts, James Malackowski and Paul Huffard, that rely on joint ownership of the IP should be rejected. There is no basis—either in law or in valuation theory—for the so-called "contribution approach" to allocating the Sales Proceeds.  As conceded by Mr. Malackowski, the contribution theory arose from the litigation position taken by the EMEA Debtors.  *See* TR00033 (Malackowski Report) at 39; Trial Tr. 2356:23-2359:12 (Malackowski).

[104] EMEA Debtors Br. at 48.

calculated.[105]   Supposed "creditor expectations" therefore provide no support to the EMEA Debtors' contingent cross-appeal, and it should be denied.  The attempt to mislead this Court by relying on a draft of "Potential Questions and Sample Answers" for a 2002 meeting with tax authorities that Nortel personnel neither prepared, adopted, used, or otherwise provided to the tax authorities should be ignored.[106]

## IX.   "LIMITED REMAND" WOULD BE INAPPROPRIATE

Certain cross-appellees request that, if the Allocation Decision is reversed, the Court grant a "limited remand" to the Bankruptcy Court to consider further valuation evidence.[107]  This request should be denied because the vast record in this case covers the entire waterfront of issues and "limited remand" would only serve to further delay distributions and would further deplete the assets available to the creditors who have thus far survived this proceeding.  The long

---

[105] Malackowski Report at 41-44, 48 (proposing a look-back period at least three times as long as the RPS method in effect at the time of the relevant sales and twice as long as the longest RPS capital stock period Nortel ever used); *see also* Trial Tr. 2438:22-2439:16 (Malackowski) (conceding Nortel used with look-back period prescribed by RPSM).

[106] EMEA Debtors Br. at 39-40 (relying on TR22020, a draft prepared by consultant KPMG of potential responses to anticipated questions tax authorities might raise in a meeting). When objections were raised as to reliance on this document, counsel for EMEA conceded at trial: "I think counsel is absolutely correct that there is nothing in the record that shows that that document was provided to the authorities or, indeed, that that specific answer was given or that that question was asked at the tripartite meeting. I don't believe there is anything in the record that shows that that actually happened." Trial Tr. 2155:14-21. The document itself was a draft intended for further discussion.   TR22016 (KPMG cover memo) (noting "some of these questions may need to be further researched and analyzed to ensure that the brief answers make sense and are the most defensible/best answers from Nortel's perspective in the long run."). Post-meeting communications reveal that the tax authorities never asked how proceeds from the sale of IP would be shared. *See, e.g.* TR43679 (Summary of APA Meeting); TR44935 (Executive Summary, Tax Authorities' Questions). The unrefuted evidence at trial was that Nortel never said anything one way or another to tax authorities about how proceeds of a sale of IP would be allocated. Trial Tr. 1347:25-1348:8 (Orlando).

[107] Bondholder Opp. at 4; UCC Opp. at 25; US Debtors Opp. at 27.

history of this allocation litigation,[108] including the appearance of new parties at the motion for reconsideration and appeal stages and the objection by the US Debtors, UCC and Bondholders to having this appeal heard by the Third Circuit in the first instance,[109] makes amply clear that disappointed parties will use any remand to hold creditors' distributions hostage until they get the result they want.

As shown in the Opening Brief, this Court already has sufficient evidence in the record to order allocation consistent with the Green expert report, and remand would unfairly reward those parties that chose not to submit expert evidence on valuation under the proper reading of the MRDA.[110]   If this Court grants the Canadian Debtors' contingent cross-appeal, it should order allocation in line with Mr. Green's report and not permit disappointed cross-appellees to erode the recovery of vulnerable creditors through continued litigation.

## CONCLUSION

For the foregoing reasons, the Monitor and Canadian Debtors respectfully request that, if this Court finds that the Bankruptcy Court erred in ordering an equitable allocation, this Court order allocation of the Sales Proceeds in accordance with the report of Philip Green.

---

[108] The debtors filed for bankruptcy over seven years ago—in January 2009. Five years ago, the Third Circuit noted its impatience with a lengthy process in this case as the largest claimants are pension funds "representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions.  They are the Pawns in the moves being made by the Knights and the Rooks" and added, "[n]o party will benefit if the parties continue to clash over every statement and over every step in the process. This will result in wasteful depletion of the available assets from which each seeks a portion." *In re Nortel Networks, Inc.*, 669 F.3d 128, 143 (3d Cir. 2011).  At this juncture, remand is unnecessary and the history of this case demonstrates that any purported "limited" remand is next to impossible in this case.

[109] *See* Opening Br. at 19; B.D.I. 15963 (Bondholders Opp. to Certification to Third Circuit); B.D.I. 15964 (US Debtors Opp. to Certification to Third Circuit); B.D.I. 15965 (UCC Opp. to Certification to Third Circuit).

[110] Opening Br. at 47-48.  The CCC was the only other party to submit expert valuation on the ownership theory, and they do not seek application of that valuation on this appeal.  *See* TR00045 (Britven Report) at 20, 22; CCC Br. at 5-6, 30.

Dated:  March 11, 2016
Wilmington, Delaware

ALLEN & OVERY LLP
Ken Coleman (admitted *pro hac vice*)
Jacob S. Pultman (admitted *pro hac vice*)
Laura R. Hall (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399

– and –

BUCHANAN INGERSOLL & ROONEY PC
*/s/ Mary F. Caloway*
Mary F. Caloway (No. 3059)
Kathleen Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

*Counsel for the Canadian Debtors and Ernst &*
*Young Inc., as Monitor*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Bankr. P. 8015(a)(7)(C), I hereby certify that this brief contains 25 or fewer pages, exclusive of the portions exempted under Fed. R. Bankr. P. 8015(a)(7)(B)(iii), and therefore complies with the length requirements established by this Court's November 2, 2015, Order.


*/s/ Mary F. Caloway*
Mary F. Caloway