## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| Nortel Networks Inc., et al., | : | Chapter 11 |
| | : | Bankruptcy Case No. 09-10138 (KG) |
| Debtors. | : | Jointly Administered |
| | : | |

| | | |
|---|---|---|
| Nortel Networks Inc., et al., | : | Appeals from the Bankruptcy Court |
| | : | Civil Action No. 15-624 (LPS) |
| Appellants and | : | Civil Action No. 15-586 (LPS) |
| Cross-Appellees, | : | Civil Action No. 15-622 (LPS) |
| | : | Civil Action No. 15-623 (LPS) |
| v. | : | Civil Action No. 15-627 (LPS) |
| | : | Civil Action No. 15-628 (LPS) |
| Ernst & Young Inc., as Monitor and Foreign | : | Civil Action No. 15-635 (LPS) |
| Representative of the Canadian Debtors, et al., | : | Civil Action No. 15-636 (LPS) |
| | : | Civil Action No. 15-699 (LPS) |
| Appellees and | : | Misc. Action No.15-196 (LPS) |
| Cross-Appellants. | : | Misc. Action No. 15-197 (LPS) |
| | : | |
| | : | CONSOLIDATED APPEALS |

## MEMORANDUM OPINION

These 18 consolidated bankruptcy appeals and contingent cross-appeals relate to the

allocation method to be used in connection with disbursement of $7.3 billion being held in

escrow ("Escrow Funds")[1] for payment to the estates of Nortel Networks Inc. (the "U.S.

Debtors") and those of other Nortel entities, including Nortel Networks Corporation and Nortel

Networks Limited ("Canadian Debtors"), NNSA ("French Debtors"), and a group of subsidiaries

located in Europe, the Middle East, and Africa ("EMEA Debtors"). (See D.I. 1-1 ("Allocation

---

[1]The Escrow Funds contain the proceeds of court-supervised sales of assets, principally an extensive portfolio of patents. (See All. Dec. at 6) The parties agreed to work cooperatively in the asset sales in order to maximize their collective recovery, deferring disputes as to the appropriate allocation of the proceeds until later. (See id.)

1

Decision" or "All. Dec.") at 6)[2]  In January 2009, the Nortel entities around the world filed for bankruptcy.  (*Id.* at 3)  The ensuing litigation has now lasted more than seven years and is ongoing in courts around the globe, including in the United States and Canada.

Between May and September, 2014, coordinated, cross-border trials were held in the U.S. Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court") and the Superior Court of Justice in Canada ("Canadian Superior Court").  (*Id.* at 2)  Judges on both courts – Bankruptcy Judge Kevin Gross and Justice Frank Newbold, respectively – presided.  On May 12, 2015, the Delaware Bankruptcy Court and the Canadian Superior Court issued opinions holding that a "modified pro rata" allocation formula would govern distribution of the Escrow Funds.  (*See id.* at 2)  After briefing and further argument on post-trial motions, including motions for reconsideration, the Delaware Bankruptcy Court issued an order denying all requests that it materially change its Allocation Decision.  (*See* D.I. 1-3)

Appeals (including contingent cross-appeals) from the Delaware Bankruptcy Court were filed in this Court between July 21 (*see* D.I. 1) and August 11, 2015 (*see* C.A. No. 15-699 D.I. 1). On September 25, 2015, Chief Magistrate Judge Mary Pat Thynge issued a recommendation with respect to briefing and mandatory mediation.  (D.I. 17)  The Court adopted her recommendation. (*See* D.I. 22; *see also* D.I. 26)  During preparation of their appellate briefs, the parties continued their ongoing efforts to resolve their disputes with the assistance of retired Judge Joseph J. Farnan, Jr.[3]

––––––––––––––––––––

[2]Except where otherwise noted, all references to the Docket Index ("D.I.") are to C.A. No. 15-624.

[3]The Court understands these efforts are continuing.  (*See, e.g.*, D.I. 117 at 9)  Perhaps unsurprisingly, the parties offer contrasting predictions as to what, if any, impact certification of

Briefing on the appeals was completed on March 23, 2016. (*See* D.I. 85-1; *see also* D.I.

123 (order granting motion for leave to file sur-reply brief)) On April 5, 2016, the Court heard

extensive oral argument on all of the pending appeals and contingent cross-appeals. (*See* D.I.

109 ("Tr."))[4]

On May 3, 2016, the Court of Appeal for Ontario ("Ontario Court") denied motions to

appeal the Canadian Superior Court's decision.[5] (D.I. 110) ("Canadian Appellate Decision")

---

a direct appeal may have on the possibility of a settlement. (*Compare, e.g.*, D.I. 112 at 2
("[E]xpediting the appeal process will also benefit the parties in their continuing efforts to
negotiate a resolution . . . .") *with* D.I. 117 at 9 ("Certifying the appeal to the Third Circuit,
however, would delay for many months (at least) the valuable effect a judicial decision could
have on the parties' settlement discussions.")) The Court strongly encourages the parties to
continue attempting to work toward a settlement and deeply hopes that today's decision does not
hinder those efforts.

[4]A brief summary of the issues presented in these appeals is as follows. Appellants argue
that the Allocation Decision should be reversed on the grounds that it is incompatible with
Section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a); it violates due process; it amounts to
an impermissible substantive consolidation; and it fails to take into account the assets that were
owned and attributable to several of Nortel's subsidiaries. Generally, Appellants seek reversal of
the Allocation Decision's modified pro rata methodology in favor of a methodology by which the
Escrow Funds are allocated in proportion to each debtors' ownership interest in the assets whose
sales generated those funds. Some Appellants prefer an allocation scheme based on a
contribution theory, whereby the Escrow Funds would be allocated to subsidiaries in proportion
to the subsidiaries' role in creating the assets that were sold.

By contrast, Appellees argue that the Allocation Decision is reasonable and consistent
with the law and, therefore, that the modified pro rata methodology should be upheld. In a
contingent cross-appeal, the Canadian Debtors argue that if the decision is reversed, the Court
should adopt an allocation scheme based on ownership of the sold assets, as ascertained by legal
title. Other contingent cross-appeals argue that if the Allocation Decision is reversed, the Court
should adopt the contribution theory favored by at least one Appellant or the pure pro rata
allocation scheme that was presented at the bankruptcy trial.

[5]The Ontario Court is the applicable appellate court directly below the Supreme Court of
Canada and, therefore, is effectively in the same position as the Third Circuit is in the U.S.
federal court system. (*See* D.I. 112 at 1)

The Ontario Court concluded that none of the issues the Canadian appellants sought to press

merited the exercise of that court's discretion to hear the appeal.  The Ontario Court further

stated:

> Consistent allocation decisions have been issued by the Canadian
> and U.S. courts.  A further appeal in Canada would achieve
> nothing but more delay, greater expense, and an erosion of creditor
> recoveries.  There are assymetric appeal routes in Canada and the
> U.S.  However, we do not accept that the separate appeal
> proceedings in the U.S. somehow diminish the need to bring these
> proceedings in Canada to a conclusion.  *In our view, any
> additional step is a barrier to progress*.  Furthermore, the fact that
> this case is a liquidation and not a restructuring does not render
> delay immaterial, where *so many individuals and businesses
> continue to await a resolution of this proceeding*.

(Canadian Appellate Decision at 40) (emphasis added).

In making these statements, the Ontario Court quoted and amplified similar sentiments

expressed by the U.S. Court of Appeals for the Third Circuit when it decided an appeal that arose

from a previous portion of the bankruptcy proceedings.  (*See id.* at 39)  At that point, the Third

Circuit said:

> *We are concerned that the attorneys representing the
> respective sparring parties may be focusing on some of the
> technical differences governing bankruptcy in the various
> jurisdictions without considering that there are real live
> individuals who will ultimately be affected by the decisions being
> made in the courtrooms.*  It appears that the largest claimants are
> pension funds in the U.K. and the United States, representing
> pensioners who are undoubtedly dependent, or who will become
> dependent, on their pensions.  They are the Pawns in the moves
> being made by the Knights and the Rooks.
>
> Mediation, or continuation of whatever mediation is
> ongoing, by the parties in good faith is needed to resolve the
> differences.  *No party will benefit if the parties continue to clash
> over every statement and over every step in the process.  This will*

> *result in wasteful depletion of the available assets from which*
> *each seeks a portion.*

*In re Nortel Networks Inc.*, 669 F.3d 128, 143-44 (3d Cir. 2011) (emphasis added; internal

footnote omitted).

In light of the Ontario Court's denial of leave to appeal, this Court directed the parties to

submit letter briefs providing "their position and reasoning on whether this Court can and should

now certify a direct appeal to the Court of Appeals for the Third Circuit." (D.I. 111)[6] The parties

had previously addressed the issue of certification while the case was pending before Judge

Gross. On July 30, 2015, Judge Gross had denied certain of the parties' motions to certify these

appeals directly from the Delaware Bankruptcy Court to the Third Circuit. (*See* D.I. 119 Ex. A)

("Denial Decision") The nine letters the Court received on May 9 make clear that the parties'

positions on certification of these appeals has not changed in the time since Judge Gross issued

his Denial Decision.[7]

At this point, certification of a direct appeal is supported by the Canadian Debtors (D.I.

115 at 1); Ernst & Young Inc., which has been appointed as Monitor of the Canadian Debtors in

the Canadian proceedings ("Monitor") (*id.*); the Canadian Creditors Committee ("CCC") (D.I.

112); the Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection

Fund ("UK Pension Claimants") (D.I. 120); and the court-appointed administrators and

---

[6]The Court had also inquired of the parties' positions on certification at the April oral argument, obtaining a response from some but not all parties. (*See* Tr. at 30-31, 118)

[7]Although 28 U.S.C. § 158(d)(2)(E) requires a party requesting certification to do so within 60 days after entry of the order which it seeks to appeal, in their letters no party contends there is a time restriction on the Court's authority to certify on its own motion. Nor does any party argue that the Court's authority to certify turns on whether the Allocation Decision is determined to be a final or interlocutory order. (*See, e.g.*, D.I. 115 at 3 n.2; D.I. 117 at 8 n.7)

authorized foreign representatives ("Joint Administrators") for the EMEA Debtors (D.I. 113). These parties argue that certification is permitted by 28 U.S.C. § 158(d) because, among other things, an appeal now would materially advance the insolvency proceedings. (*See, e.g.*, D.I. 113, 120) Several of these parties further argue that certification is especially appropriate in light of the Canadian Appellate Decision. (*See* D.I. 115 at 1) Certification is also supported by Wilmington Trust, in its capacity as indenture trustee for certain Notes, which contends that "certification is unquestionably in the best interest of all parties." (D.I. 118 at 1) (joining D.I. 115)[8]

Certification is opposed by numerous other parties: the U.S. Debtors, joined by the Nortel Trade Claims Constortium (D.I. 114 at 1); the Official Committee of Unsecured Creditors ("UCC") (D.I. 119 at 1); and the Ad Hoc Group of Bondholders ("Bondholder Group"), which is the largest creditor constituency in these appeals (D.I. 117). These parties argue that certification is impermissible because the statutory prerequisites for it are not satisfied. To these parties, certification is also inappropriate because the Third Circuit could benefit from this Court's insights and because certification would not expedite (and could even delay) resolution of the case. They further urge that the Court not consider the status of the Canadian appeal (which they contend is not completed) when deciding whether to certify. (*See, e.g.*, D.I. 114 at 2; D.I. 119 at 4; D.I. 117 at 9)

Having reviewed the parties' recent letters, and considered the entirety of the record before it, the Court has determined that it must and should certify these appeals directly to the

---

[8]The French Debtors do not object to certification. (*See* D.I. 116)

Court of Appeals for the Third Circuit.[9]  The Court's reasoning is provided below.

Pursuant to 28 U.S.C. § 158(d)(2)(A)(i) & (iii) and 28 U.S.C. 158(d)(2)(B), this Court

"shall" certify a direct appeal if, *inter alia*, the Court, on its own motion, determines that "the

judgment, order, or decree [being appealed] . . . involves a matter of public importance . . . [or if]

an immediate appeal from the judgment, order, or decree may materially advance the progress of

the case or proceeding in which the appeal is taken." *See also* Fed. R. Bankr. P. 8006(e)(1),

(f)(2)(A)-(D) (stating that opinion certifying appeal must set forth relief sought, question

presented, necessary facts, and applicable circumstances specified in 28 U.S.C. § 158(d)(2)(A)).

The Court finds that both of these circumstances are present here.[10]

The Allocation Decision "involves a matter of public importance." 28 U.S.C.

§ 158(d)(2)(A)(i).  This is evident, first, from the enormous size of the Escrow Funds: $7.3

billion.  Obviously, this is a tremendous amount of money.  Even standing alone, this sole fact

could be sufficient to render the overarching issue presented in these appeals – whether the

modified pro rata allocation methodology is consistent with U.S. law and otherwise appropriate –

---

[9]Given the relative lack of authority (and especially Court of Appeals authority) construing § 158(d)(2), and given that the unusual circumstances here include that the Court is moving *sua sponte* to certify a direct appeal, it is unclear whether – given the Court's findings – certification is mandatory or discretionary.  What should not be unclear, however, is that this Court's decision is the same either way.  This Court has decided that certification is the proper course of action regardless of whether that outcome is now mandated or is instead the result of the Court's exercise of its discretion.

[10]The Court "shall" also certify where "the judgment, order, or decree involves a question of law as to which there is no controlling decision of the courts of appeals for the circuit or of the Supreme Court of the United States." 28 U.S.C. § 158(d)(2)(A)(i).  Some parties argue that this basis for certification is also present here.  (*See* D.I. 120) (UK Pension Claimants)  Others disagree.  (*See* D.I. 117 at 5-6 (Bondholder Group); D.I. 119 at 2 (UCC))  The Court does not reach this issue, as it has concluded there are at least two other bases for certification.

a matter of vital public importance.

But the public importance of the matters involved in these appeals is demonstrated in other ways as well. As the Third Circuit suggested in its earlier opinion, the ongoing global litigation directed to allocation of the Escrow Funds has caused a massive, ongoing dissipation of the Escrow Funds – all while tens of thousands of creditors have suffered, lacking access to any portion of the funds. *See In re Nortel Networks Inc.*, 669 F.3d at 143-44. According to the UK Pension Claimants (without contradiction from any other party), over the past seven years "nearly $2 billion in professional fees have been exhausted and nearly 6,000 pensioners in Canada and the UK alone have died without receiving a single cent" from the Escrow Funds. (D.I. 120 at 5; *see also* D.I. 112 at 1 n.1 (CCC contending it represents "tens of thousands of disabled and retired workers in need of prompt distribution of funds"))

Additional factors making the Allocation Decision a matter of public importance are the cross-border nature of the allocation methodology disputes as well as the parties' decision to preclude final distribution of the Escrow Funds unless and until both the United States and Canadian courts agree on the proper allocation methodology. As the Monitor correctly emphasizes:

> [T]he multi-jurisdictional nature of the Nortel bankruptcy
> proceedings and the terms of the escrow agreements governing the
> [Escrow Funds] create the unique circumstance that the allocation
> of the [Escrow Funds] to the Debtor Estates cannot occur unless
> and until the parties agree on allocation or there are consistent
> decisions in the United States and Canada that are not subject to
> further appeal.

(D.I. 115 at 2-3) The trials from which the pending appeals arise were held simultaneously in courtrooms in Delaware and Canada, using video technology to enable the judges, lawyers, and

8

witnesses to "appear" in two proceedings at once. Whether the decisions resulting from this unusual (if not unprecedented) approach were correct, how these cases turn out, and how soon the Escrow Funds will be distributed are all matters that have received – and will continue to receive – substantial public scrutiny in many countries around the world. In sum, these appeals involve matters of public importance.

A separate and independent basis for certification is that "immediate appeal" from the Allocation Decision "may materially advance the progress of the case." 28 U.S.C. § 158(d)(2)(A)(iii). Specifically, obtaining a decision from the Third Circuit as soon as possible would likely materially advance the U.S. Debtors' Chapter 11 case in the Delaware Bankruptcy Court as well as the other Nortel Debtors' insolvency proceedings in Canada and Europe. *See generally In re Specialty Products Holding Corp.*, 2014 WL 545780, at *1 (D. Del. Feb. 7, 2014) (reasoning that certification would materially advance the case).

This is true, first, because it is nearly-certain that these appeals are going to require review by the Third Circuit eventually. Unlike in Canada, where appellate review of the allocation methodology was discretionary, the parties here are entitled to Third Circuit review as of right. Moreover, it is essentially certain that one or more parties would be dissatisfied with whatever decision this Court would render and would, therefore, press a further appeal. (*See* D.I. 115 at 5) ("As the history of this case, the scale of the creditors' interests at stake, and number of debtor estates, creditors, and other interested parties demonstrate, eventual appeal to the Third Circuit on the Allocation Decision is unavoidable . . . .") The numerous pending appeals, as well as the numerous contingent cross-appeals, leave little doubt that appellate review by the Third Circuit is inevitable. Given this reality, having such review sooner rather than later may well

result in materially advancing the progress of these cases.

Second, should these appeals remain in this Court for resolution on the merits, it would take this Court some significant additional time to make and articulate its decisions. Judge Gross' Allocation Decision runs to 130 pages (including appendices). The parties' appellate briefs in this Court combine to total 615 pages. Depending on how one counts, there are at least twenty issues pressed in the main appeals now before this Court, and at least six additional issues in the contingent cross-appeals that may (or may not) also become ripe for decision. The Court heard three hours of oral argument on the appeals (generating a transcript of 160 pages). Given the size of the task before the Court, plus the other demands on the time and attention of the undersigned judge, the Court estimates it will likely take an additional three to four months (at best) to prepare the careful, reasoned opinion the parties expect of it. Should any party seek reconsideration of any portion of the Court's decision (a seemingly likely prospect), it is easy to envision these appeals remaining in this Court until sometime in 2017. By contrast, certification (if accepted by the Court of Appeals) could result in the cases being fully briefed (and, if expedited, maybe also argued and possibly even decided) by the Third Circuit in the early part of next year.

Yet another reason that certification may materially advance the progress of these cases is that if the Third Circuit were to affirm the Allocation Decision, it may become possible for interim distributions to be released from the Escrow Funds, materially advancing payment to pensioners, employees, trade creditors, and others who have waited so long without obtaining any recovery. (*See, e.g.*, D.I. 120 at 3) The Court agrees with the Monitor that "[t]he decision of the Third Circuit will resolve the key dispute in these bankruptcy cases and, if its decision is

consistent with that of the Ontario Court, will remove the impediment to the release of the

[Escrow Funds] that has plagued this case for far too long." (D.I. 115 at 3)  Even if the Third

Circuit's decision differs from the Canadian Appellate Decision, the other involved courts – and

the parties – will benefit from learning this result as soon as possible, so they can resolve any

remaining disputes in a timely fashion.  All of this, again, may materially advance progress of

these cases.[11]

In determining that these appeals should be certified, both as "a matter of public

importance" and because it "may materially advance the progress of the case," the Court has

thoroughly considered the arguments against certification.  They are substantial.  Principal

among them are that these appeals have now been pending in this Court for nearly a year, the

issues have been fully briefed and argued, and they are ripe for decision.  The opponents of

certification insist that this Court's analysis would help crystallize the issues that may need

further examination from the Third Circuit, which will assist that Court, or alternatively may help

the parties amicably resolve the litigation.  They also emphasize that Judge Gross has already

denied a request for direct certification and that there is no need for this result to change.

These considerations, while weighty, do not alter the Court's conclusion.  The time these

cases have spent in this Court has not been wasted.  In addition to facilitating ongoing mediation,

---

[11]The Court agrees with the UCC that "the possibility of inconsistent United States and Canadian decisions" "is nothing new" and further that this "possibility cannot provide a basis to ignore the rights of U.S. parties under U.S. law." (D.I. 119 at 3-4) (citing *In re Kaplan*, 104 F.3d 589, 597-98 (3d Cir. 1997) ("[T]he fact that a bankruptcy proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his or her personal views of justice and fairness, however enlightened those views may be.") (internal quotation marks omitted))  Still, the Court believes that certification may materially advance the progress of these cases (and the insolvency proceedings) even if Appellants are correct about some or all of the errors they identify in the Delaware Bankruptcy Court's decision.

in their time here these cases have progressed in that the parties have now identified and briefed the issues on appeal, formulated and argued their positions with respect to the modified pro rata allocation methodology (which had not been proposed by any party during the bankruptcy trial), and answered the Court's questions relating to potential weaknesses in their arguments. Whatever the size and timing of the briefing ordered by the Third Circuit (should it accept the direct appeal), the preparation of briefs for that Court should be markedly assisted by the effort the parties have devoted to briefing in this Court.[12]  Furthermore, the time the Court invested in learning the case has helped it to carefully balance all of the important, competing considerations and to react quickly to the Canadian Appellate Decision.

The parties opposing certification also focus on the fact that even if the modified pro rata methodology is approved by the Third Circuit, creditor claims will still need to be resolved in order to calculate each estate's allocation under that methodology.  In the view of these parties, there is no particular urgency to finalizing the allocation methodology, because so much litigation still lies ahead with respect to resolution of each individual claim.  As the Bondholder Group puts it, "the claims reconciliation processes for the U.S., Canadian, and EMEA Debtors have progressed since the issuance" of the Delaware Bankruptcy Court's order denying certification, but "they still remain pending and could take significant additional time to resolve" – meaning that this Court's proceedings are not actually delaying distributions to creditors. (D.I. 117 at 2)

The Court disagrees with this analysis.  That the claims processes are moving forward

---

[12]Some or all of the parties could choose to move to expedite the appeals and/or for leave to refile their briefing from this Court as their briefs in the Third Circuit. (*See* D.I. 120 at 5) (UK Pension Claimants suggesting these procedures)

(*see, e.g.*, D.I. 113 at 2), and can continue to do so as the appeal of the allocation methodology is pending, are factors that now *favor* certification of these appeals.  Certification will likely promote completion of the reconciliation processes and reduce or eliminate the risk that litigation over the allocation methodology will slow down the parallel reconciliation tracks.  As the Joint Administrators write, "[c]ertification should ensure that the U.S. appellate process is concluded by the time the [Delaware] Bankruptcy Court and the Canadian [Superior] Court are ready to apply the modified pro rata methodology [if affirmed] and enter final orders determining how the escrowed sale proceeds are to be distributed." (D.I. 113 at 2)  Or, as the UK Pension Claimants state: "[t]he issue on appeal – namely, how the $7.3 billion proceeds from the sale of the Nortel Group's assets is allocated among the Nortel debtors – is the proverbial elephant in the room.  A prompt final resolution of these Appeals may materially advance the Global Insolvency cases . . . ." (D.I. 120 at 3)  The Court agrees.

The Court appreciates that Judge Gross reached a different decision on certification. Changed circumstances, however, have persuaded this Court that certification is now appropriate.[13]

In July 2015, Judge Gross found that the request for direct appeal was premature, as the Appellants had not yet even filed their statement of issues on appeal. (*See* D.I. 119 Ex. A at 2)

---

[13]From one perspective, this Court's decision today is consistent with Judge Gross' decision.  He may have been partly motivated to deny certification because he preferred this Court to decide that question. (*See, e.g.*, Aug. 3, 2015 transcript (Bkrcy. Case 09-10138-KG Doc. 15993) at 100 (Judge's comments); *see also id.* at 36-37, 54, 79-81, 97-100 (parties arguing over which Court should decide certification question)) That is, he may have wanted the reviewing court to decide for itself whether it was the proper court to undertake the initial review of the Allocation Decision.  Likewise, this Court has now similarly concluded that the Third Circuit should decide for itself whether it should undertake the initial review of the Allocation Decision.

Obviously, with the passage of time this is no longer a concern.  Judge Gross anticipated that the issues presented by these appeals would include mixed questions of fact and law (e.g., whether the "modified pro rata" methodology is "fair and equitable"), which are not appropriate for direct appeal under the "controlling decision" prong of § 158(d)(2)(A)(i).  As noted above, the Court has not certified on the basis of the "controlling decision" prong, but rather on the alternative grounds of "matter of public importance" and "may materially advance the progress of the case." Judge Gross also felt that direct appeal to the Third Circuit, while "sav[ing] time and money," would not "materially advance" the case, given the necessity of claims reconciliation, which "will take time and can proceed as the parties appeal." (*See id.* at 2-3)  The Court has already addressed this concern above and reiterates that certification now "may" materially advance the progress of these cases (e.g., by improving the likelihood that litigation over the allocation methodology will not prolong the reconciliation process).

Judge Gross further believed these appeals would benefit from allowing issues to "percolate" in this Court and by having this Court "cast its light on these appeals." (*See id.* at 2; *see also, e.g.,* D.I. 117 at 2 (arguing that "[a] reasoned opinion from this Court would not only assist the parties in their continued efforts to resolve matters consensually but also clarify and distill the issues for the Third Circuit")) Again, as noted above, the appeals have now "percolated" here for some time, and the Court believes some benefit has been derived as a result.  More importantly, at this point – particularly now that the Ontario Court has declined to review the Canadian Superior Court decision – this Court would welcome the Third Circuit's guidance on whether, in the highly unusual circumstances presented here, that Court prefers further percolation in this Court. *See generally Weber v. United States*, 484 F.3d 154, 160 (2d

14

Cir. 2007) (explaining that there may be "salutary effects of allowing some cases to percolate through the normal [appellate] channels").

The Court recognizes that while the Canadian appellate proceedings may be effectively concluded, it is also possible that those appeals will continue, as several parties indicate they will be seeking review of the Canadian Appellate Decision. (D.I. 114 at 2 (stating intent to challenge Ontario Court's "rubber stamping of the Canadian-favored decision"); D.I. 117 at 2 (Bondholder Group intends to appeal denial of leave to appeal); D.I. 119 at 4 (other Appellants intend to file petition for review in Supreme Court of Canada))[14] The Court is not in a position to assess the likelihood of this relief being granted by the Canadian courts. The Court does conclude, however, that whatever the chance of that occurrence, the U.S. case should not remain in this Court in the meantime. Instead, the nearly-certain inevitable appeal to the Third Circuit should move forward.

The Court further recognizes that today's decision does not effectuate a direct appeal. The Third Circuit must still authorize a direct appeal, which it may choose not to do. *See In re Millenium Lab Holdings*, No. 16-8017 (3d Cir. Feb. 24, 2016) (denying certification). The parties opposing certification may continue to oppose in the Third Circuit, which could delay that Court's decision on whether to authorize a direct appeal.[15] (*See* D.I. 119 at 3) Should the result be denial of certification, the time lost to deciding the certification issue in the Third Circuit and

---

[14]The parties favoring certification acknowledge that "Appellants could theoretically seek leave of the Supreme Court of Canada to appeal from the [Ontario] Court of Appeals' refusal to grant leave." (D.I. 120 at 4)

[15]Alternatively, even the parties that currently oppose certification could choose to direct their resources to prevailing on the merits issues as expeditiously as possible, to help bring about the prompt conclusion of these proceedings.

returning these cases here will, admittedly, delay this Court's resolution of the appeals.

While the Court cannot predict the likelihood of this outcome, the possibility of it occurring does not alter the overall balance, which favors certification for all the reasons already explained. Nor does this possibility change the fact that these cases present matters of public importance and that direct appeal may materially advance their progress. Should the direct appeal be denied, this Court will endeavor to decide the appeals on the merits in a timely fashion.

Finally, the Court disagrees with those parties (the UCC, the Bondholder Group) who contend that the Canadian Appellate Decision should not factor into this Court's certification decision. (*See* D.I. 119 at 4) (arguing that because Ontario Court has "virtually unlimited power" to "'make any order that it considers appropriate in the circumstances,'" including power to decline to hear an appeal – something the Third Circuit will not be permitted to do ultimately – the Canadian decision "should not factor into how and whether this Court" certifies direct appeal); D.I. 117 at 9 (Ontario Court's "decision to deny leave to appeal the Allocation Decision does not in any way impact this analysis")) The Court considered certifying these appeals prior to and again after reviewing the parties' briefs, and engaged the parties in discussion of this option at the hearing last month. (*See* Tr. at 30-31, 118) Learning two weeks ago that the Canadian appellate proceedings have advanced far ahead of the U.S. proceedings – and may well have effectively concluded – pushes the balance in favor of sending these appeals to the Court where (this Court is convinced) they will ultimately need to be resolved.

In short, under the circumstances as they now exist, the Court cannot escape the conclusion that these matters of public importance may be materially advanced by certification of direct appeal. Any reader of the briefs filed in the pending appeals, or anyone who heard the oral

argument last month,[16] should reasonably conclude that Appellants (and the contingent Cross-Appellants) raise substantial, challenging issues. The issues merit careful consideration – a process this Court is not in a position to complete for at least several more months. Moreover, this Court is not empowered to provide a final, non-appealable resolution of the issues. Only a higher court can do so. In the end, then, this Court believes that the Third Circuit should decide whether it wishes to take up the parties' disputes about allocation now, or whether it would prefer these issues to remain before this Court for the additional time it would take this Court to make and articulate its decision.

Accordingly, this Court will certify all of these appeals, including the contingent cross-appeals, directly to the Third Circuit. By separate order, the Court will direct the parties to meet and confer and submit a proposed order to effectuate the decision announced in this Memorandum Opinion.

May 17, 2016                                 HON. LEONARD P. STARK
Wilmington, Delaware                         UNITED STATES DISTRICT COURT

---

[16]Reflecting the public importance of these appeals, the Court granted requests to allow parties and interested observers to listen to the oral argument by telephone, and more than 60 individuals did so. (*See, e.g.*, D.I. 84, 88-95, 98-99, 108)